# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### Appeal Nos. 15-2009 and 15-2055

AQUA SHIELD,

Plaintiff-Cross Appellant

v.

INTERPOOL POOL COVER TEAM, ALUKOV HZ SPOL SRO,
ALUKOV SPOL SRO, POOL & SPA ENCLOSURES,

Defendants-Appellants

On Appeal from the United States District Court
for the District of Utah in Case No. 2:09-cv-00013, Judge Ted Stewart

## CORRECTED JOINT APPENDIX
## VOLUME I (AA1-AA15; A1-A267)

Gregory J. Coffey
COFFEY & ASSOCIATES
310 South Street
Morristown, New Jersey 07960
Phone: (973) 539-4500
Fax: (973) 539-4501

*Attorneys for Defendants-Appellants, Interpool Pool Cover Team, Alukov*
*HZ Spol, SRO, Alukov Spol, SRO, and Pool & Spa Enclosures*

# TABLE OF CONTENTS

**DESCRIPTION**                                        **PAGE NO.**

**JOINT APPENDIX VOLUME I (AA1-AA15; A1-A267)**

**JUDGMENT FILED AUGUST 17, 2015** ...............................................AA1

**MEMORANDUM DECISION AND ORDER ON REMAND FILED AUGUST 10, 2015**.....................................................................AA2

**TRANSCRIPT OF HEARING ON PRELIMINARY INJUNCTION APPLICATION DATED OCTOBER 25, 2005** ........................................A1

**COMPLAINT IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK FILED OCTOBER 18, 2005** .........................................................................................A30

**MEMORANDUM DECISION AND ORDER OF TRANSFER FILED JANUARY 5, 2008**......................................................................A43

**FIRST AMENDED COMPLAINT IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH FILED AUGUST 31, 2009**....................................................................A49

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FILED AUGUST 14, 2013**......................................................................A60

**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S RULE 59 MOTION TO ALTER JUDGMENT FILED DECEMBER 9, 2013** ...........................A99

**TRANSCRIPT PAGES 1-4 OF BENCH TRIAL BEFORE THE HONORABLE TED STEWART DATED MARCH 19 AND MARCH 20, 2013** ...............................................................................A113

**MEMORANDUM DECISION AND ORDER ON MOTIONS FILED NOVEMBER 28, 2011**..................................................................A117

**DESCRIPTION**                                                       **PAGE NO**.

**NOTICE OF SUPPLEMENTAL AUTHORITY FILED MAY 5, 2015** ...................................................................................**A128**

**MEMORANDUM DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO PRECLUDE RELIANCE UPON EVIDENCE FILED JANUARY 15, 2013**..........**A130**

**MEMORANDUM DECISION AND ORDER ON REMAND FILED AUGUST 10, 2015** ...................................................................**A143**

**JUDGMENT FILED AUGUST 17, 2015** ...........................................**A157**

**TRANSCRIPT PAGES 193-250 OF BENCH TRIAL BEFORE THE HONORABLE TED STEWART DATED MARCH 19 AND MARCH 20, 2013** ....................................................................................**A158**

**TRANSCRIPT PAGES 145-156 OF BENCH TRIAL BEFORE THE HONORABLE TED STEWART DATED MARCH 19 AND MARCH 20, 2013** ....................................................................................**A216**

**TRANSCRIPT PAGES 184-189 OF BENCH TRIAL BEFORE THE HONORABLE TED STEWART DATED MARCH 19 AND MARCH 20, 2013** ....................................................................................**A229**

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION IN LIMINE FILED MARCH 18, 2013**.....**A244**

**LETTER FROM IGOR KROL, ESQ. OF KROL & O'CONNOR DATED AUGUST 2, 2005**....................................................................**A247**

**LETTER FROM IGOR KROL, ESQ. OF KROL & O'CONNOR DATED AUGUST 16, 2005**..................................................................**A251**

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR INJUNCTION RELIEF DATED OCTOBER 24, 2005**......................**A254**

**DESCRIPTION**                                                            **PAGE NO.**

**JOINT APPENDIX VOLUME II (A268-A610)**

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OF PATENT INFRINGEMENT FILED APRIL 19, 2011** ....................................................................................A268

**DECLARATION OF BOB BROOKS FILED APRIL 19, 2011** ........A294

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT OF UNITED STATES PATENT 6,637,160 FILED JUNE 5, 2011** ............................A311

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT FILED NOVEMBER 21, 2012** ..............................................................................A339

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED DECEMBER 7, 2012** ..............................................................A352

**INVOICES FROM ALUKOV HZ SPOL. S.R.O. TO POOL & SPA ENCLOSURES, LLC** ............................................................................A370

**AMENDED JUDGMENT FILED DECEMBER 9, 2013** ...................A431

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES RELATING TO REASONABLE ROYALTY, NON-WILLFUL INFRINGEMENT AND NON-EXCEPTIONALITY FILED APRIL 23, 2015** ....................................................................................................A432

**INVOICES FROM ALUKOV HZ SPOL. S.R.O. TO POOL & SPA ENCLOSURES, LLC FROM OCTOBER OF 2008 THROUGH NOVEMBER OF 2011** ...........................................................................A442

**INVOICES FROM ALUKOV HZ SPOL. S.R.O. TO POOL & SPA ENCLOSURES, LLC FROM DECEMBER OF 2011 THROUGH JANUARY OF 2013** ...............................................................................A487

**DESCRIPTION**                                        **PAGE NO.**

**INVOICE FROM ALUKOV HZ SPOL. S.R.O. TO POOL & SPA ENCLOSURES, LLC DATED FEBRUARY 26, 2013** ......................A504

**PROPOSED LICENSING FEE FROM JULY 10, 2001 TO JULY 10, 2021** ...................................................................................A506

**TRANSCRIPT PAGES OF BENCH TRIAL BEFORE THE HONORABLE TED STEWART DATED MARCH 19 AND MARCH 20, 2013** ...............................................................................A507

**CIVIL DOCKET SHEET FOR CASE NO. 2:09-CV-00013-TS**........A555

**UNITED STATES PATENT NO. 6,637,160 DATED OCTOBER 29, 2003** ......................................................................................A583

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

Central Division for the District of Utah

FILED
U.S. DISTRICT COURT
2015 AUG 17 P 3: 07
DISTRICT OF UTAH

BY:
DEPUTY CLERK

AQUA SHIELD,

        Plaintiff

v.

INTERPOOL POOL COVER TEAM,
ALUKOV HZ SPOL SRO, ALUKOV SPOL
SRO, and POOL &AMP; SPA
ENCLOSURES,

        Defendants

**JUDGMENT IN A CIVIL CASE**

Case Number:2:09-CV-13-TS

IT IS ORDERED AND ADJUDGED

That judgment be entered in favor of the plaintiff and against the defendant on plaintiff's claim that the defendants' models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient infringe claims 1-14 and 16 of the '160 Patent. Defendants, their officers, agents, servants, employees and attorneys and those in active concert or participation with such person(s) who receive actual notice of this order, by personal service or otherwise, shall be permanently enjoined from infringing, either directly, by inducement, or by contribution the '160 Patent making, using, selling or offering to sell the products adjudged to infringe in the United States or importing into the United States the products adjudged to infringe or are not more than colorably different from the adjudicated devises. The products adjudged to infringe the '160 Patent include the following pool cover models manufactured or offered for sale by defendants: Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient with generally flat and removable end-panels. Plaintiff is further awarded costs in the amount of $1,971.17 and reasonable royalties in the amount of $216,000.00.

August 17, 2015
_____
*Date*

D. Mark Jones
_____
*Clerk of Court*

_____
*(By) Deputy Clerk*

**AA1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AQUA SHIELD, INC., a New York corporation,<br><br>    Plaintiff,<br><br>v.<br><br>INTER POOL COVER TEAM, ALUKOV HZ SPOL. S.RO., ALUKOV, SPOL. S.R.O., POOL & SPA ENCLOSURES, LLC,<br><br>    Defendants. | MEMORANDUM DECISION AND ORDER ON REMAND<br><br><br>Case No. 2:09-CV-13 TS<br><br>District Judge Ted Stewart |

   This matter is before the Court following remand from the United States Court of

Appeals for the Federal Circuit. The Federal Circuit vacated the Court's decision concerning the

amount of the reasonable royalty and the finding of no willfulness, which led to the denial of

enhanced damages. The Federal Circuit remanded for further proceedings on these issues. For

the reasons discussed below, the Court finds that Plaintiff is entitled to damages in the amount of

$216,000 and that Defendants' conduct was willful, but the Court declines to award enhanced

damages or attorney's fees.

## I. BACKGROUND

   Plaintiff brought this action in the Eastern District of New York on October 18, 2005,

alleging that Defendants infringed U.S. Patent No. 6,637,160 (the "'160 Patent"). Plaintiff

sought, but was ultimately denied, a preliminary injunction. "The district court in New York

denied the requested preliminary injunction because Aqua Shield lacked information needed to

show a likelihood of success on the merits and because of questions about personal jurisdiction over the defendants."[1]  The case was eventually transferred to this Court.

> Aqua Shield moved for summary judgment of infringement based on IPC's sales of various enclosure models. . . . IPC responded with noninfringement arguments only as to claims 10 and 15, not the other fourteen asserted claims. The district court held that there was no genuine issue of fact about IPC's infringement of all claims except claim 15, and therefore entered summary judgment of infringement of claims 1–14 and 16. Aqua Shield later dropped its allegation of infringement of claim 15, and it presented no infringement issues at the later trial.
>
> With respect to invalidity, the parties filed cross-motions for summary judgment.  As to anticipation, the district court ruled that IPC failed to compare[ ] the construed claims of the '160 patent to the prior art and did not introduce[ ] evidence showing that the [prior art] discloses each limitation of the '160 patent. As to obviousness, the court ruled that IPC did not argue[ ] obviousness on a claim-by-claim basis, try to show that all of the elements of even a single claim in the '160 patent were made obvious by prior art, or articulate[ ] why a person of ordinary skill in the art would have been motivated to combine the prior art to produce the claimed invention.  For those reasons the district court granted summary judgment in favor of Aqua Shield regarding validity.[2]

The Court held a two-day bench trial in March 2013 concerning issues of relief.  In the Court's Findings of Facts and Conclusions of Law, the Court found that Plaintiff had failed to prove damages, that Defendants' conduct was not willful, and that Plaintiff was not entitled to attorney's fees.  The Court did, however, enter a permanent injunction.

Plaintiff moved the Court to alter its judgment to include a finding of willfulness, reasonable compensation, and costs.  The Court agreed to amend the judgment in part, awarding Plaintiff $10,800 in damages as a reasonable royalty.  The Court declined to otherwise amend the judgment.

---

[1] *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 768 (Fed. Cir. 2014).

[2] *Id.* at 768–69 (alterations in original) (citations and quotation marks omitted).

**AA3**

Plaintiff appealed the judgment of the Court and the Federal Circuit vacated the Court's royalty award, non-willfulness finding, and denial of enhanced damages and attorney's fees.

On appeal, Plaintiff challenged the Court's application of the hypothetical-negotiation approach. The Federal Circuit agreed, in part, finding that the Court erred in the use it made of Defendants' profit figures. The Federal Circuit found that the Court erred "in treating the profits IPC actually earned during the period of infringement as a royalty cap. That treatment incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened."[3] This Court's analysis "incorrectly replace[d] the inquiry into the parties' anticipation of what profits would be earned *if a royalty (of amounts being negotiated) were to be paid* with an inquiry into what profits were earned *when IPC was charging prices without accounting for any royalty*."[4]

The Federal Circuit noted that it had "not been shown proof that this case is different from the typical one in which pricing might be adjusted to account for a royalty based on sales price. Indeed, IPC has not pointed to any evidence supporting the district court's conclusion that a royalty should be a percentage of profits rather than sales revenues."[5] The court vacated the royalty calculation and remanded for redetermination. The Federal Circuit directed this Court to "consider all relevant record evidence, including the advantages of the patented product, the ease

---

[3] *Id.* at 772.

[4] *Id.*

[5] *Id.*

and cost of designing around the claimed invention, and the relevance of IPC's actual profits to

what IPC's expectations would have been in a hypothetical negotiation."[6]

On the issue of willfulness, this Court reasoned that prior to its infringement decision,

Defendants did not act willfully based on the decision of the New York court to deny Plaintiff's

motion for a preliminary injunction. On appeal, the Federal Circuit found that "the Eastern

District of New York's decision to deny Aqua Shield's motion for a preliminary injunction

cannot reasonably be read to support a conclusion that any substantial basis existed for doubting

infringement or validity."[7] The court went on to state:

> The New York court denied Aqua Shield's motion because of personal-
> jurisdiction questions and because Aqua Shield lacked sufficient knowledge of
> IPC's product to make the required showing of a likelihood of success on the
> merits. Personal jurisdiction does not speak to infringement or validity at all.
> And Aqua Shield's ignorance of IPC's products appears irrelevant to a validity
> analysis and does not indicate what an infringement analysis of those products
> would show once the details of those products were fully known—as they were
> all along to IPC. The denial of Aqua Shield's motion for a preliminary injunction
> is thus a legally insufficient reason for determining that IPC did not willfully
> infringe.[8]

On the issue of willfulness after the Court had issued its decision finding infringement,

this Court had relied on testimony that Defendants had attempted to design around the '160

patent by permanently fixing the end panels in place. The Federal Circuit found that this

evidence "stops short of demonstrating that IPC did in fact design around the '160 patent and, if

so, when."[9] "Questions remain about whether that change was actually implemented or whether

---

[6] *Id.* at 773.

[7] *Id.* at 774.

[8] *Id.*

[9] *Id.*

the resulting products avoided infringement.  Both inquiries are relevant to the issue of willfulness."[10]

The Federal Circuit thus vacated the Court's determination concerning willfulness.  The court stated that "[o]n remand, the district court should focus on IPC's defenses as articulated during the infringement and invalidity proceedings—during which IPC presented no infringement defenses for claims 2–9, 11–14, or 16, and presented no element-by-element argument for invalidity."[11]

> If the court finds that the defenses were objectively unreasonable, in the sense that no "reasonable litigant could realistically expect" them to succeed, it should proceed to consider *Seagate*'s second requirement.  On that issue, we note that the objective baselessness of an infringer's defenses, assessed on the litigation record, may have a strong bearing on whether the "objectively-defined risk" of infringement "was either known or so obvious that it should have been known to the accused infringer."[12]

The Federal Circuit further directed that "[i]f the court determines on remand that IPC willfully infringed Aqua Shield's patent, it should reconsider its decision to deny enhanced damages and attorney's fees."[13]  With this background in mind, the Court considers the issues currently before it.

---

[10] *Id.*

[11] *Id.* (citations omitted).

[12] *Id.* (quoting *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1008 (Fed. Cir. 2012); *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007)).

[13] *Id.* at 775.

## II. DISCUSSION

### A.   REASONABLE ROYALTY

Upon a finding of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[14]

"The [reasonable] royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant."[15] "The hypothetical negotiation seeks to determine the terms of the license agreement the parties would have reached had they negotiated at arms length when infringement began."[16]

The following factors are considered in determining a reasonable royalty:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
7. The duration of the patent and the term of the license.

---

[14] 35 U.S.C. § 284.

[15] *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).

[16] *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012).

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.[17]

The Court previously considered these factors and found that an 8% royalty rate would be appropriate. The parties do not appear to have appealed this determination and both parties apply the 8% royalty rate in their supplemental briefing. Therefore, the Court will continue to apply the 8% royalty rate.[18] The question then becomes what is the appropriate royalty base to which the royalty rate should be applied.[19]

---

[17] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[18] The Federal Circuit directed that the Court, in redetermining its royalty calculation, "should consider all relevant record evidence, including the advantages of the patented product, the ease and cost of designing around the claimed invention, and the relevance of IPC's actual profits to what IPC's expectations would have been in a hypothetical negotiation." *Aqua Shield,*

Plaintiff argues that the royalty rate should be applied to the selling price of the infringing devices. The evidence presented at trial supports this position. The parties' licensing negotiations focused on Defendants' selling price.[20] The testimony of Alex Stonkus and Jan Zitko, while admittedly less than clear, also supports the notions that royalty payments would be based on sales.[21]

Defendants argue that any reasonable royalty should be based on profits rather than sales. However, there is no evidence to support this argument. While the Court heard testimony about the parties' profits, there is no evidence suggesting that the hypothetical negotiation would have resulted in a royalty based upon profits. As on appeal, Defendants have "not pointed to any evidence . . . that a royalty should be a percentage of profits rather than sales."[22]

The evidence at trial showed that Defendants had sold $2.7 million worth of infringing products. Applying the 8% royalty rate to this amount, the Court finds that Plaintiff is entitled to a reasonable royalty of $216,000.

B.   WILLFULNESS

The Federal Circuit has held that "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood

---

774 F.3d at 773. Having considered these factors, the Court continues to find that an 8% royalty rate is reasonable.

[19] *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("A reasonable royalty may be a lump-sum payment not calculated on a per unit basis, but it may also be, and often is, a running payment that varies with the number of infringing units. In that event, it generally has two prongs: a royalty base and a royalty rate.").

[20] Trial Ex. CC.

[21] Trial Tr. 237–44, 302–04.

[22] *Aqua Shield*, 774 F.3d at 772.

that its actions constituted infringement of a valid patent."[23]  "If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."[24]

As to the first requirement, the Federal Circuit held on appeal that this Court "should focus on IPC's defenses as articulated during the infringement and invalidity proceedings."[25] The court directed that "[i]f the court finds that the defenses were objectively unreasonable, in the sense that no 'reasonable litigant could reasonably expect' them to succeed, it should proceed to consider *Seagate*'s second requirement."[26]  On that issue, the Federal Circuit noted "that the objective baselessness of an infringer's defenses, assessed on the litigation record, may have a strong bearing on whether the 'objectively-defined risk' of infringement 'was either known or so obvious that it should have been known to the accused infringer.'"[27]

"Objective recklessness will not be found where the accused infringer has raised a 'substantial question' as to the validity or noninfringement of the patent."[28]  Thus, the Court must consider whether Defendants' non-infringement and invalidity defenses were objectively

---

[23] *In re Seagate*, 497 F.3d at 1371.

[24] *Id.*

[25] *Aqua Shield*, 774 F.3d at 774.

[26] *Id.* (quoting *Bard*, 682 F.3d at 1008).

[27] *Id.* (quoting *In re Seagate*, 497 F.3d at 1371).

[28] *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 776 F.3d 837, 844 (Fed. Cir. 2015).

reasonable. Based on the record before it, the Court finds they were not as no "reasonable litigant could realistically expect"[29] those defenses to succeed "as articulated."[30]

During the proceedings related to infringement, Defendants only presented claims of non-infringement as to two of the sixteen claims asserted against them. And on only one claim—claim 15, which was later withdrawn by Plaintiff—did the Court find that issues of fact precluded summary judgment. Defendants' response to Plaintiff's motion regarding infringement showed a complete disregard of the respective burdens on summary judgment and Defendants took virtually no efforts to rebut the claims of infringement made by Plaintiff. No reasonable litigant could realistically expect such a strategy to succeed.

The same is true for Defendants' invalidity arguments. Defendants made only general arguments concerning anticipation and obviousness, but did not engage in any sort of rigorous analysis that would enable them to meet their burden on summary judgment. No reasonable litigant could realistically expect that strategy to succeed.

The Court must then proceed to *Seagate*'s second requirement: whether this objectively-defined risk was either known or so obvious that it should have been known to Defendants. The Federal Circuit noted that the objective baselessness of an infringer's defenses may have a strong bearing on this issue. As set forth above, Defendants' defenses, assessed on the litigation record, were objectively baseless. Thus, this supports the conclusion that Defendants either knew or should have known of this objectively-defined risk.

---

[29] *Bard*, 682 F.3d at 1008.

[30] *Aqua Shield*, 774 F.3d at 774.

Defendants continue to rely on the denial of Plaintiff's motion for preliminary injunction by the New York court in support of their argument that they did not willfully infringe. However, the Federal Circuit held that "[t]he denial of Aqua Shield's motion for a preliminary injunction is . . . a legally insufficient reason for determining that IPC did not willfully infringe."[31]

Defendants further contend that they had no expectation that their enclosures infringed until the Court issued its ruling on infringement. However, Plaintiff correctly points out that it sent Defendants a cease-and-desist letter in 2005, putting Defendants on notice of their possible infringement. Defendants also argue that once the Court issued its ruling on infringement, they instructed their factory to modify its products by fixing the end panels. In response to this argument, the Federal Circuit noted that "[q]uestions remain about whether that change was actually implemented or whether the resulting products avoided infringement."[32] Defendants provided no further evidence on these points. There is no evidence that this change was ever made, nor is there evidence suggesting that this change resulted in a non-infringing product. Rather, the evidence suggests that Defendants continued to engage in infringing activities after the Court issued its rulings on infringement and validity. The evidence shows that Defendants offered to sell, sold, and imported products that had detachable end panels.[33] Based upon this, the Court finds that Defendants willfully infringed Plaintiff's patent at the very least after the Court issued its rulings on infringement and invalidity.

---

[31] *Id.*

[32] *Id.*

[33] Tr. Ex. HH; Trial Tr. 266–73.

C.    ENHANCED DAMAGES

35 U.S.C. § 284 states in pertinent part that "the court may increase the damages up to

three times the amount found or assessed."[34]  The Federal Circuit has held that "an award of

enhanced damages requires a showing of willful infringement."[35]  "But, a finding of willfulness

does not require an award of enhanced damages; it merely permits it."[36]  "[T]he decision to grant

or deny enhanced damages remains firmly within the scope of the district court's reasoned

discretion, informed by the totality of the circumstances."[37]

In exercising this discretion, the Court considers a number of factors, including:

> (1) whether the infringer deliberately copied the ideas or design of another; (2)
> whether the infringer, when he knew of the other's patent protection, investigated
> the scope of the patent and formed a good-faith belief that it was invalid or that it
> was not infringed; (3) the infringer's behavior as a party to the litigation; (4)
> defendant's size and financial condition; (5) closeness of the case; (6) duration of
> defendant's misconduct; (7) remedial action by the defendant; (8) defendant's
> motivation for harm; and (9) whether defendant attempted to conceal its
> misconduct.[38]

Considering these factors, the Court finds that an award of enhanced damages is not

appropriate here.  First, there is no evidence that Defendants deliberately copied Plaintiff's

patented technology.  Defendants presented testimony that they and others were making similar

products prior to the issuance of the patent.  Second, there is evidence that Defendants sought the

---

[34] 35 U.S.C. § 284.

[35] *In re Seagate*, 497 F.3d at 1368.

[36] *Id.*

[37] *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999).

[38] *Liquid Dynamics Corp. v. Vaughn Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006)
(citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992)).

advice of counsel and were informed that they could continue to sell their products.[39]  Third, while Defendants' behavior during litigation was certainly less than ideal, it was not so egregious as to warrant enhanced damages.  Fourth, there is little evidence concerning the size and financial condition of Defendants, other than the fact that they sold $2.7 million worth of infringing products.  Fifth, for substantially the same reasons set forth above, this was not a close case.  Sixth, Defendants' misconduct occurred over a significant duration, even after Plaintiff sent a cease-and-desist letter and the Court ruled on infringement and invalidity.  Seventh, Defendants allege that they attempted remedial action.  However, there is no evidence that Defendants actually took that action and, even if they did, it is questionable whether this resulted in a non-infringing product.  Eighth, there is no evidence that Defendants' actions were taken out of a desire to harm Plaintiff.  Finally, there is no evidence that Defendants attempted to conceal its misconduct.

Considering these factors and the totality of the circumstances, the Court declines to award enhanced damages.

D.     ATTORNEY'S FEES

35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."[40]  The Supreme Court has recently held "that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the

---

[39] Trial Tr. 53–54, 87–88, 248–52.

[40] 35 U.S.C. § 285.

case) or the unreasonable manner in which the case was litigated."[41] This Court is to "determine whether a case is 'exceptional' in the case-by-case exercise of [its] discretion, considering the totality of the circumstances."[42]

For substantially the same reasons set forth above, the Court finds that this is not an exceptional case and, therefore, declines to award attorney's fees.

### III. CONCLUSION

Based upon the above, the Court awards Plaintiff a reasonable royalty in the amount of $216,000. Plaintiff's request for enhanced damages and attorney's fees is DENIED. The remaining portions of the Court's Judgment (Docket No. 179), including the permanent injunction, remain in effect.

The Clerk of the Court is directed to close this case forthwith.

DATED this 10th day of August, 2015.

BY THE COURT:

Ted Stewart
United States District Judge

---

[41] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1756 (2014).
[42] *Id.*

**AA15**

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -   X

AQUA SHIELD,                    :

            Plaintiff,    :    CV-05-4880 (CBA)

            v.            :    U.S. Courthouse
                           Brooklyn, N.Y.
INTERPOOL COVER TEAM,           :

            Defendant.    :    TRANSCRIPT OF HEARING
                           October 25, 2005
- - - - - - - - - - - - - -   X    Four o'clock p.m.

BEFORE:

      HONORABLE CAROL B. ANON, U.S.D.J.


APPEARANCES:

For the Plaintiff:     IGOR KROL, ESQ.


For the Defendant:     MICHAEL SURNEY, ESQ.


Court Reporter:     Holly Driscoll, CSR
                   225 Cadman Plaza East
                   Brooklyn, New York   11201
                   (718) 260-2469


25   Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

1       THE CLERK:  Aqua Shield v. Interpool.

2       THE COURT:  All right, I have Mr. Krol for the

3   plaintiff and Mr. Surney --

4       MR. SURNEY:  Yes, Your Honor.

5       THE COURT:  -- for the defendant.

6       Mr. Krol, have you read defendant's papers?

7       MR. KROL:  Yes, Your Honor.

8       THE COURT:  He raises a substantial number of issues

9   about this case.  Maybe we want to take them one at a time.

10  Let's just take the first issue of standing and that deals

11  with Aqua Shield's relationship to the individual who owns the

12  patent.

13      MR. KROL:  Your Honor, at the time I drafted the

14  papers I didn't have a copy of the assignment of the patent.

15  I knew I drafted it in 2001 but I didn't know at the time

16  whether or not the assignment was executed.  Mr. Brooks is

17  in the courtroom, Your Honor, and I have a copy of the

18  assignment, the patent belongs now to Aqua Shield.

19      THE COURT:  Did it belong to Aqua Shield when you

20  brought the lawsuit?

21      MR. KROL:  Pardon?

22      THE COURT:  Did it belong to Aqua Shield when you

23  brought the lawsuit?

24      MR. KROL:  Yes, in 2002, Your Honor, I just didn't

25  know when it was assigned.  I have an assignment someplace

1  here if you'll permit me one second.

2         THE COURT:  Do you want to just mark that as -- do

3  we have any exhibit tags?

4         MR. KROL:  The copy of the assignment is attached to

5  the employment confidential information and arbitration

6  agreement, I'll hand the original up.

7         THE COURT:  Just mark that as Plaintiff's 1.

8         Now, this establishes that the patent was assigned

9  to Aqua Shield?

10         MR. KROL:  Aqua Shield, Your Honor.  There's a

11  notary stamp at the bottom.

12         THE COURT:  Where does it say that?

13         MR. KROL:  Last page, Your Honor, Exhibit C.

14         THE COURT:  Okay.

15         The next issue deals with personal jurisdiction.

16         MR. KROL:  Personal jurisdiction, Your Honor, is

17  based essentially on the Worldwide Volkswagon test, the idea

18  being that a national distributor may not select a district

19  where it can be sued.  Your Honor will recall that in

20  Worldwide Volkswagon the national importer of Volkswagon cars,

21  while it entered a special appearance, did not contest the

22  issues of jurisdiction, it was the regional distributor who

23  sold in a tri-state area and a local dealer who could not be

24  beholden to the court in Oklahoma but the national distributor

25  could be sued anyplace in the country including in Oklahoma

1  and, in fact, was sued there.

2          Furthermore, the --

3          THE COURT:  What evidence do you have that the

4  defendant is a national distributor of these items?

5          MR. KROL:  I was about to respond to that, if I may,

6  I need a piece of paper; we are prepared to demonstrate, if we

7  can go online, that IPC, Interpool Cover Team, according to

8  the web site, consists of members who are manufacturers and

9  traders.  The word "traders" I assume applies to distributors

10 too.

11         If you enter the web site of IPC, Your Honor, you

12 will find a list, a link to a list of members.  That one in

13 turn would lead you to two members in the United States, one

14 of them is called DuoGard and the other one is called Galina,

15 G A L I N A, both located in Wisconsin.

16         Now, the next link, if you access the web site of

17 IPC's members, will show you the web site of either DuoGard or

18 Galina who tell you in so many words that they market the

19 products to North America.

20         Now, if you screen further on those interactive web

21 sites, you would find that you cannot only purchase something;

22 what you can do, you can submit your drafts, rough or

23 otherwise, and they will give you a quote, click to receive a

24 quick quote.

25         I have with me something we managed to download

```
 1   which, of course, is not as effective as looking at it on the
 2   screen but still, if I may, Your Honor (handing).
 3              I don't have a copy.
 4              THE COURT:  Do you want to put Exhibit 2 on that.
 5              MR. KROL:  As an aside, Your Honor, we were served
 6   at 6 p.m. yesterday night and I'm not complaining, for obvious
 7   reasons it is a quick hearing but that's the reason we didn't
 8   prepare sufficient number of copies, I offer apology to my
 9   colleague.
10              THE COURT:  Do you want to show that to counsel?
11              (Pause.)
12              THE COURT:  So, your point is because they market
13   their products in North America and because if I'm sitting in
14   New York I can go on the web site and they'll ship me
15   something to New York, that gives jurisdiction here, that's
16   the sum and substance of it?
17              MR. KROL:  Yes.  You have both legs, Your Honor; you
18   have a general jurisdiction because in New York under 302
19   allows you to assert jurisdiction in the situation where
20   somebody contracts anywhere, including in Wisconsin, to supply
21   goods and services in New York and you can have a specific
22   jurisdiction because in a patent case specific jurisdiction
23   exists whenever somebody without authority makes, uses, offers
24   to sell or sells the patented invention.
25              So, in terms of your jurisdiction, Your Honor, they
```

1 don't have to make offers exclusively in New York in order to
2 get sued.

3         THE COURT: To get personal jurisdiction over them
4 they have to be doing business in New York.

5         MR. KROL: Your Honor, even if they are
6 manufacturing the stuff elsewhere but making offers to sell
7 it to New York residents, that's doing business in New York
8 under 302 and under patent law since they're making offers to
9 sell those products anyplace in the United States and under
10 the Holeyann (ph) case, 199 F.3d 1304, they're subject to
11 jurisdiction everywhere. It is a Federal Circuit case, Judge,
12 1999.

13         So, it looks like, if I were to sum up on the issue
14 of personal jurisdiction, they don't have to come to New York
15 in order to make a sale here, for as long as they maintain an
16 interactive web site that allows you to make -- to order a
17 product, whether it is from Wisconsin or from the Czech
18 Republic, that I cannot tell, but the members of the IPC team
19 are found in the United States and they are openly,
20 intentionally marketing the product to the whole of the
21 country, to the whole of North America and that should be
22 sufficient reason to hold them in the court in New York.

23         There's a number of cases lately dealing with how
24 such advertising and solicitation of offers on a web site
25 could lead to personal jurisdiction and some suggestions have

1   been made, including in the Second Circuit, as to the whole
2   spectrum of cases starting with a completely pure passive web
3   site where you can look at the picture and there's nothing
4   else you can do, going to the absolutely on the other end
5   where you can do everything on the web site, let's say go to
6   L.L. Bean and the Ninth Circuit case.

7           THE COURT:  Do you have any evidence that they
8   actually have shipped products into New York?

9           MR. KROL:  I don't have anything, Your Honor, that
10  cannot be found on the web site.  There was no discovery in
11  this case.  I repeat, if I may, that on a patent case offer to
12  sell an infringed product is tantamount to the sale itself and
13  there's no question that the offer to sell has been made.

14          THE COURT:  The question of venue; venue, as I
15  understand it, is if the defendant resides in the state or the
16  defendant has committed infringement in the state, it has a
17  regular and established business in the state; how do you
18  satisfy that?

19          MR. KROL:  Your Honor, that is a permissive venue.
20  I take it Your Honor refers to 1400 where it says may lay
21  venue but there is a more general venue provision that says
22  that the foreign defendant can be sued in any district in the
23  United States and, in fact, in selecting a district Your Honor
24  may note that my office is in Manhattan, I was thinking about
25  finding a pallet for --

1        THE COURT:  Finding what?

2        MR. KROL:  Some sort of a pallet, a convenient forum

3  for everybody on the assumption that let's say the Czech

4  defendants will arrive some place in Kennedy, so, and the

5  plaintiff being located in Eastern District, Nassau County,

6  that it would be most convenient for the parties to place

7  venue since it could be placed anywhere in the Eastern

8  District.

9        THE COURT:  Turning to the issue of your requirement

10  that you show the likelihood of success on the merits, the

11  complaint and the information in support of the complaint

12  alleging infringement seems to me to be wholly deficient.

13  What do you have to offer, if anything, on the claim of

14  infringement?

15        MR. KROL:  At this juncture, Your Honor, all we have

16  is a picture.

17        THE COURT:  Well, a picture can't infringe, I mean

18  you haven't made out anything like a claim of infringement.

19        MR. KROL:  Well, I brought a witness to testify,

20  Your Honor.

21        THE COURT:  Who is going to say what?

22        MR. KROL:  Who is going to read on the claims of the

23  patent on what he can see on that picture and he will testify

24  that to the extent we are in the preliminary injunction stage

25  here, Your Honor, without discovery and without any

1　information that we have on the infringing product except one,
2　when you look at the web screen which gives you an animated
3　picture of how this thing moves and looking at the description
4　of what is provided on the web site, that you see exactly the
5　same product or at least a product that accomplishes the same
6　purpose with the same means. Now, to be sure in the future we
7　intend to find out exactly how the accused apparatus is made
8　and we would be able at that point to read the claims of the
9　patent on to what we find.

10　　　　　THE COURT: Well, you're going to have to do that, I
11　mean today if you wanted to prevail on a claim for a
12　preliminary injunction you're going to have to make a strong
13　showing of both validity and infringement and am I correct
14　that you can't, are not in a position to make a strong showing
15　of infringement today because I don't want to waste my time
16　here hearing a witness if you're conceding that now? ·

17　　　　　MR. KROL: I believe -- I don't concede anything,
18　Your Honor, except one thing, that I said that in the future I
19　may know more and I certainly will know more about the accused
20　apparatus but today I have a witness who can read on the
21　claims of the patent onto what's available in the web site
22　because in essence what Your Honor is telling me is that if
23　somebody is about to allegedly infringe by bringing the
24　allegedly infringing product into the United States to exhibit
25　it at a trade show, there's nothing the patent holder can do

**A9**

1  in the event the patent holder doesn't have a clue because
2  there's no technical description.

3         Now, to the extent that the technical description
4  exists and the only place we can find it is on the web site,
5  to that extent I have a witness who will read on the patent
6  onto the technical description as it exists but that's all I
7  can do today. If that's not enough, Your Honor will throw me
8  out.

9         THE COURT: I guess I'm not clear on what your
10 witness is going to say or do but --

11        MR. KROL: He is, if I may, the proffer consists of
12 switching on the computer onto the internet and showing Your
13 Honor how the animated picture of the accused apparatus works
14 and then my witness will read to you the patent claim to show
15 how this animated picture and the description below shows that
16 it infringes upon the claims in the patent. This is at the
17 moment all I have, the web site. If that's not enough, show
18 me the door.

19        THE COURT: You want to call your witness.

20        MR. KROL: Thank you, Your Honor.

21        MR. SURNEY: Your Honor, I'd like to object to that.
22 I think it should have been submitted in the moving papers.
23 That's exactly the analysis that they should have undertaken.
24 If they had done that, we would have had a chance to prepare
25 for that. For me to listen to this witness now, I may be able

1   to cross-examine but I don't have the benefit of -- my client
2   has the technical knowledge, I don't have the benefit of
3   preparing for such cross-examination and with all due respect,
4   the burden was on them to do that when they filed their
5   papers.
6           And, furthermore, Your Honor, I'm sorry to
7   interrupt, but I think all that's moot, I don't think they
8   made a prima facie showing of jurisdiction, let alone a
9   reasonably likelihood that they're going to prevail on
10  jurisdiction.
11          THE COURT:  Well, you want to be heard on that
12  issue?
13          MR. SURNEY:  Well, yes, Your Honor, I mean I haven't
14  read the Worldwide Volkswagon case in quite a while but
15  counsel is relying on the web site of a U.S. company to show
16  infringement by a foreign corporation.  None of his
17  allegations pertain to the foreign corporation.  He's relying
18  on the web site of the distributor and from what he's shown
19  us, Exhibit 2 doesn't identify any products of the foreign
20  manufacturer.  I think that's insufficient right off the bat.
21          And, you know, the mere fact that it's offered or
22  shown on a web site is not sufficient to show that there's
23  jurisdiction in New York.  Maybe there's jurisdiction in
24  Wisconsin, maybe in Florida where they want to appear for the
25  trade show but not New York.

1    MR. KROL:  May I respond, Your Honor?  The

2 appearance of somebody at a trade show doesn't confer

3 jurisdiction, there are plenty of cases that say that.

4    THE COURT:  I mean you've just come in here to

5 support jurisdiction and thrown a couple of pieces of paper to

6 me from a web site that doesn't really mean anything to me.  I

7 mean there's no analysis, no support, no case support other

8 than throwing out a case here and a couple of sheets that you

9 got from the web site.  That kind of showing today doesn't

10 satisfy me that there's jurisdiction.

11    MR. KROL:  Your Honor, that's why we're prepared to

12 show you on the web site exactly what would happen if you were

13 to access that web site.  May I have that?

14    THE COURT:  But the web site isn't the -- isn't this

15 company.

16    MR. KROL:  Your Honor, if I may, I heard the word

17 corporation and corporation has nothing to do with that.

18 According to the web site, IPC, and that's attached as an

19 exhibit to my order to show cause, IPC is an association of

20 its members and the web site tells you that two of those

21 members are in the United States.  So, I'm not going to the

22 web site of some American distributor, I'm going to the web

23 site of IPC, I'm going on the web site of a member, it is an

24 association and under 17(b)(1) an association can be sued in

25 its own name.

1       This is what I'm doing here, I'm suing IPC and I'm
2  simply supporting the in personam jurisdiction by pointing out
3  that if you open the web site of IPC, called parent here but
4  not a corporation, an association, you will find two American
5  members and as you continue to enter the interactive web site,
6  you can buy the allegedly offending product.  Now, if that is
7  not enough support for jurisdiction nationwide in the United
8  States, I don't know what is.  They are obviously offering the
9  offending product for sale in North America, everywhere in
10 North America and anywhere they're offering --
11      THE COURT:  What are they even offering for sale?
12      MR. KROL:  Well, I have pictures for you, Your
13 Honor.
14      THE COURT:  I mean how were you showing me this on
15 the web site?
16      MR. KROL:  Here it is.
17      (Handing to the Court.)
18      MR. KROL:  In the bottom corner, Your Honor, you'll
19 see exactly the same enclosure as those in question.
20      THE COURT:  Which of these is the infringing
21 product?
22      MR. KROL:  The bottom left corner, Your Honor.  See
23 the cover for the swimming pool?
24      THE COURT:  The policarb?
25      MR. KROL:  Yes, Your Honor.

1        THE COURT:  So, you're saying if you go on this IPC

2  web site, that you get Galina as one of their members and

3  Galina has for sale the policarb and that you can get -- the

4  policarb can be sent to you in New York, is that essentially

5  it?

6        MR. KROL:  Yes, Your Honor.  Here is the exact seven

7  steps that is required to get from one web site to the other

8  to the next and so forth to place an order --

9        THE COURT:  So, Galina is a distributor of --

10       MR. KROL:  If Your Honor will look at Exhibit D of

11  my order to show cause, Galina is not just a distributor,

12  Galina is a member of IPC, whatever that means, because IPC

13  advertises itself, Your Honor, as a "Pan European association"

14  of I suppose its members and among those two members the

15  exhibit to the order to show cause shows DuoGard and Galina.

16  I confess that we haven't attempted to order a pool enclosure,

17  Your Honor, it runs in substantial dollar numbers.

18       THE COURT:  So, what's your theory, that because

19  they offer this for sale on their web site to anyone in the

20  United States, that's sufficient because a member of the

21  defendant Interpool Cover Team, one of its members offers for

22  sale an item that you believe infringes the patent?

23       MR. KROL:  To anybody anywhere in the United States.

24       THE COURT:  That that's sufficient?

25       MR. KROL:  I believe that's sufficient for in

**A14**

1  personam jurisdiction, Your Honor.

2          THE COURT: Counsel, do you take issue with the

3  facts of that or just the law?

4          MR. SURNEY: Well, primarily the law but as to the

5  facts, I would raise a question who is making this sale.

6  There is no showing who's making this sale, is it the foreign

7  association or is it this U.S. company located in Wisconsin.

8  So, factually I address that.

9          Second of all, I mean I haven't seen any of this

10 fact before so I can't address it more than that but the law

11 as well, Your Honor, I mean there's no authority to support

12 the position that has been cited anyway that simply

13 advertising a product on a web site is sufficient for

14 jurisdiction.

15         MR. KROL: If it were simply advertising, Your

16 Honor, I would concur but this is advertising that allows you

17 to purchase.

18         THE COURT: Well, all advertising allows you to

19 purchase.

20         MR. KROL: No, you can purchase it on the web site,

21 Your Honor. Not all advertising allows you to purchase it on

22 an interactive web site but this web site allows you to submit

23 your drawings and gives you a quote for what you want to buy

24 and it doesn't matter whether the sale took place or not

25 because just making offers for sale and entering the

1    marketplace for the purpose of infringing upon a patent is
2    sufficient to confer jurisdiction.
3            If I may, Your Honor, Plaintiff's 2 shows you that
4    you can order it and get a quote (handing).
5            THE COURT:  Well, this is another company.
6            MR. KROL:  That's two of them, DuoGard and Galina,
7    they're both members.
8            THE COURT:  What is it that you can get a quote on?
9            MR. KROL:  In the green language highlight.
10           THE COURT:  I know but I don't know what this
11   relates to.  You've just got a piece of paper that says they
12   can get a quote for something.
13           You want to demonstrate this on the web site
14   somehow?
15           MR. KROL:  If I could, Your Honor, I'd appreciate
16   the opportunity.  We'll need a couple of minutes to set it up.
17           (Pause.)
18           MR. KROL:  What computer shall we use, Your Honor?
19   Can we use --
20           THE CLERK:  I can do it here.
21           (Pause in the proceedings.)
22           THE COURT:  State your name for the record.
23           MR. STEIN:  Jonathan Stein.
24           THE COURT:  What is your relationship to the
25   plaintiff?

1          MR. STEIN:  I'm Mr. Krol's associate.

2          THE COURT:  Okay.

3          MR. STEIN:  May I, Your Honor?

4          THE COURT:  Yes, just indicate step by step what

5    you're doing.

6          MR. STEIN:  Okay.  What I'm doing now is I'm going

7    to the master company, IPC Association's web site which is

8    www.poolcover-IPC.com.  What that does is that takes us to the

9    over site.  Now, once here, go down to the site map which is a

10   map of the site.  Once you're at the map of the site it shows

11   you an overview, the hierarchy of all the places you can go

12   and you'll see that there's a column that says members.

13          Now, it says members of IPC Team in Europe, central

14   Asia and USA, not distributors but members.

15          THE COURT:  And that's what you're clicking on now.

16   Can you see this, counsel?

17          MR. SURNEY:  Yes, Your Honor.

18          MR. STEIN:  Correct.  Now, if you go to the bottom

19   of the page it says overseas members, USA.  Two of the

20   companies they have as members are DuoGard Industries and

21   Galina USA.  As Mr. Krol indicated and clicking on Galina, for

22   example, will take you directly to this member's web site.

23          To make a long story short, once you've gone through

24   the web site and you click on their catalog --

25          THE COURT:  So, you're on the Galina web site?

1        MR. STEIN: Right, the member Galina web site. Once

2   you click here and you go to the bottom, you have the option

3   of it says most of the items listed above are currently

4   available in stock and can be shipped within 48 hours to your

5   location. For more information or to place an order please

6   contact us either via e-mail to Betty Reid or they give a

7   phone number. If you click e-mail -- I won't do it on your

8   machine, it might mess it up.

9        MR. SURNEY: Can we wait a minute, I'd like to read

10  that.

11       MR. STEIN: Sure.

12       (Pause.)

13       THE COURT: You want to read it out loud maybe for

14  the record.

15       MR. STEIN: Most of the items listed above are

16  currently available in stock and can be shipped within

17  48 hours to your location. For more information or to place

18  an order please contact us either via e-mail to Betty Reid,

19  which is a link. You may also call us at (888)825-GUSA (4872)

20  from 7:30 a.m. to 5:00 p.m. central time. We look forward to

21  serving you.

22       So, this is a service, an ordering service. So,

23  this demonstrates that you can go to the master web site, find

24  the member closest to you and order the product. It is not a

25  separate distributor, it is a member.

1        THE COURT: What does -- there's an e-mail address?

2        MR. STEIN: I don't know how your Outlook is set up.

3 If you click on here it generates an e-mail to this person

4 Betty who is the person in charge of the purchasing.

5        THE COURT: And then, you've done this before, what

6 does that get you once you do that?

7        MR. STEIN: Well, once you send her an e-mail with

8 your specifications, she sends back predictably a quote and

9 you can decide, each pool is different, every swimming pool is

10 different.

11       THE COURT: How do you know that this Galina offers

12 that pool, how do you know it offers the product you claim is

13 infringing?

14       MR. STEIN: It is right there under policarb, it

15 shows you the model of this particular one that seems to

16 infringe directly on Aqua Shield's patent which is this.

17       THE COURT: Which one is it on the screen?

18       MR. STEIN: Bottom left.

19       THE COURT: What is the name of it?

20       MR. STEIN: Policarb is the heading.

21       MR. KROL: Your Honor, may Mr. Stein show you the

22 animated picture of the actual pool enclosure both from Aqua

23 Shield :-

24       MR. STEIN: You can't on this computer, it doesn't

25 have the right plug in, I checked it already.

1    MR. KROL:  Okay.  Maybe we can do it on --

2    (Pause.)

3    MR. STEIN:  I just wanted to show you some pictures.

4    MR. SURNEY:  Your Honor, with the jurisdiction

5    motion, because now they're showing the features of the

6    product, I don't know because I have some comments if he's

7    finished.

8    THE COURT:  Are you finished with that portion --

9    MR. STEIN:  Yes.

10   THE COURT:  -- of the jurisdiction?

11   MR. KROL:  Yes, Your Honor.

12   THE COURT:  Okay.

13   MR. SURNEY:  Your Honor, I submit that that is not

14   an interactive web site.  All that says is call us or send us

15   an e-mail and we can talk about sending you a product and

16   usually we do it in 48 hours.  It is not where you can

17   actually buy the product, you click on this, you put in your

18   credit card and they ship it to you like on Amazon.com or a

19   similar web site, that is an interactive web site and in

20   certain circumstances that has been found to be sufficient for

21   jurisdiction but this is not that based on this showing and,

22   furthermore, I'll repeat again, that is the web site of the

23   company in Wisconsin.

24   THE COURT:  It alleges it is a member.

25   MR. SURNEY:  Yes, Your Honor, I concede that but I

1  don't know what a member is and I don't know that merely
2  stating on a web site that somebody is a member is sufficient
3  to confer jurisdiction.

4        MR. KROL: If may, Your Honor, we're here basically
5  in order to weigh who is better or heavier hurt by the
6  exhibition in Florida, somebody who holds the U.S. patent and
7  can show that somebody else is attempting to sell an extremely
8  similar product of which we at this juncture have no other
9  knowledge except the web site, or the allegedly infringing
10 manufacturer who has members in the United States who claim to
11 be an association of members and who offers those products for
12 sale throughout the United States that our technical knowledge
13 of the allegedly infringing product is extremely limited I
14 grant you, Your Honor.

15        THE COURT: I mean that's the problem, the problem
16 is that you can't come in and ask this Court to issue an
17 injunction stopping them from coming to a show that I imagine
18 that they've expended money and time and all of that to go to.
19 I mean to get an injunction is a serious matter and, you know,
20 you can't come in and get an injunction and say, granted, you
21 know, I don't have enough information but, you know, what am I
22 supposed to do, I mean that's not the answer to getting an
23 injunction.

24        For you to get an injunction, assuming you get past
25 the issues of jurisdiction, you've got to make quite a strong

1   showing of both validity and infringement and if you can't do
2   that, you're not entitled to an injunction, that's as simple
3   as that.

4           MR. KROL: Perhaps, Your Honor, but, first of all,
5   I'm prepared to continue to show the validity of my patent and
6   the infringement because I have brought a technical expert to
7   do that. I have no other means to do it. I'm a lawyer, I
8   cannot read a patent on the accused apparatus and in addition
9   to that, my request for preliminary injunction is extremely
10  narrow, Your Honor. I'm not suggesting that, as you've seen
11  in my papers, that you enjoin them from whatever they're
12  doing. I'm trying to keep them from coming to this Florida
13  show because that's the place where I'm exhibiting as well
14  under the auspices of, admittedly for today, a valid U.S.
15  patent and I'm going to create havoc and confusion having the
16  same exhibition hall contain what my client claims are two
17  identical products and this is why we're here.

18          I understand our information about their product is
19  extremely limited but I respectfully submit to Your Honor that
20  they had ample opportunity to let me know why they're not
21  infringing. In August I sent them a letter saying you're
22  infringing my product, I never got anything back.

23          THE COURT: Look, they don't have to -- if you send
24  them a letter, presumably they should respond to your letter
25  but if you don't explain to someone anything else other than

1   to say you're infringing my product, their not answering you

2   isn't an admission that they're infringing your product.

3          MR. KROL: I'm not suggesting that this is an

4   admission, Your Honor. I'm suggesting that if they were to

5   answer, we would today have some technical information about

6   their product. Furthermore, since we, according to Your

7   Honor's order, informed them by e-mail in the middle of last

8   week, some technical description of their product could have

9   been attached yesterday when they served us and they could

10  have then come here with an expert and showed you.

11         THE COURT: You didn't seek any discovery or you

12  didn't come in for an order with any expedited discovery.

13         MR. KROL: There was no time for expedited

14  discovery, Judge. All we did is we asked for a hearing and

15  that's where we are.

16         MR. SURNEY: With respect, Your Honor, they're

17  trying to shift the burden. The burden is on them to make

18  that demonstration, not the defendant.

19         MR. KROL: Well, the burden on us isn't to prove

20  beyond a reasonable doubt or by a preponderance of evidence,

21  all we need to do is to show that it is likely that their

22  apparatus that looks, acts, moves like ours is likely to

23  infringe the patent and even if it turns out that the wheels

24  are made out of something different, Your Honor, as my expert

25  will show you, they are substantially equivalent products,

1   they look the same, they act the same, they perform the same
2   process, they're using the same mechanism as all of that wheel
3   arches that wheel on rails and there's absolutely nothing else
4   at this point that I can do except for a professional who can
5   read a patent on whatever is seen on the screen.

6           THE COURT:  Well, that should have been in your
7   papers so that when this was served on the defendant he had
8   some ability to prepare for this hearing.

9           MR. KROL:  That is sort of in the order to show
10  cause, we attached it.

11          THE COURT:  The order to show cause is nothing but a
12  conclusion, the fellow looks at a picture and says, yeah, that
13  infringes that, I mean that sums up what the order to show
14  cause said.  I mean I gave you the opportunity to come here
15  and I signed the order to show cause, I didn't grant the
16  preliminary relief.

17          If you want to call a witness, you can but it isn't
18  fair to the defendant to have him here for the first time in a
19  hearing with your theory of how this infringes -- his product
20  infringes your patent, it is not in the papers that you
21  submitted, there's nothing but the most -- I mean it is just
22  entirely conclusory.

23          MR. KROL:  Your Honor, I'm prepared to look for an
24  adjourn date if Your Honor is inclined to deny injunctive
25  relief.  The show is about to start at the end of this week on

**A24**

1  October 31st. If there is no opportunity to do that, I'm
2  prepared to withdraw this motion and move for injunction at a
3  later date following an expedited discovery if Your Honor is
4  prepared to order that but the court business would be best
5  served not by asking me to prove that something I don't know
6  about except by the screen but rather by requesting that
7  defendants produce some technical information on their
8  product.

9       THE COURT: Hey, look, nobody asked me to order any
10  discovery here, I mean it seems like to me -- if you want to
11  put your expert on, you can, but it seems like to me from what
12  you're saying that you're acknowledging that your expert is
13  not going to be able to make a strong showing because he
14  doesn't have the technical information that he needs; am I
15  correct about that?

16       MR. KROL: Absolutely, Your Honor. My expert can
17  only make a showing on the basis of what's available on the
18  web site and I've never offered anything more than that and I
19  patently acknowledged that in my papers.

20       THE COURT: I mean if he can't, I don't see the
21  point of doing that now if that's all he's going to do,
22  because you're sort of admitting to me that he can't make a
23  strong showing. Now, I mean I wouldn't preclude you from
24  doing it but what is the point of wasting everyone's time at
25  this moment if you admit to me that he's not going to be able

1 to make that showing. You know, perhaps what you want to do
2 is further brief this jurisdictional issue and then make some
3 request for discovery.

4       MR. KROL: Your Honor, we are prepared to do
5 whatever the Court orders us to do. I just want to make sure
6 that what Your Honor is suggesting is that my application for
7 preliminary injunction is denied?

8       THE COURT: Well, if you can't make a showing, by
9 definition it is denied. Then we're on -- and you've admitted
10 in effect that you can't make the showing. I think the next
11 issue that we would need is you may want to further brief this
12 jurisdictional issue because I think today is the first time
13 that the defendant has actually heard the theory of
14 jurisdiction.

15       You can further brief the jurisdiction issue. If
16 you want to do that on sort of an expedited schedule, you can
17 and then if you want to, if the Court concludes that I have
18 jurisdiction, then maybe you want to do some discovery so you
19 can see if you can make out your infringement.

20       MR. KROL: May I have a brief discovery, Your Honor,
21 on the issue of jurisdiction, that is I'd like to receive
22 papers indicating what exactly that association is?

23       THE COURT: You want to make a discovery request on
24 the issue of jurisdiction?

25       MR. KROL: Yes, Your Honor.

1           THE COURT: Well, then make that.

2           MR. KROL: I am making it here. Should I make it in

3  writing?

4           THE COURT: Yes, make a request on jurisdictional

5  discovery and make that request and then maybe you want to

6  brief that issue and then I'll resolve that and then if you

7  want, assuming that I'm satisfied that the Court has

8  jurisdiction over it, if you want to do some discovery of the

9  technical brochures for this, something that would allow you

10  to make that strong showing you think you can make then, you

11  know, we can proceed with the hearing later on, okay.

12           MR. KROL: Yes, Your Honor.

13           THE COURT: All right. So, why don't you make the

14  jurisdictional discovery request first, okay. Does that make

15  sense?

16           MR. KROL: Absolutely. We'll submit certainly, I'm

17  making it on the record now but I'll confirm it in writing,

18  Your Honor, within the next few days.

19           THE COURT: Maybe you want to do it in the form of

20  interrogatories or whatever or documents.

21           MR. KROL: In other words --

22           MR. SURNEY: Your Honor, just before we get there,

23  these papers were served pursuant to the Court's order by

24  e-mail and Federal Express but, again, we're dealing with a

25  foreign association, ordinarily that service would not be

1 sufficient. I don't even know what the laws of the Czech
2 Republic require but I would think before we can get into
3 technical -- providing technical discovery we have to at least
4 address that service issue and maybe the jurisdiction issue as
5 well and that's the point I just wanted to make, Your Honor,
6 because I think we're getting ahead of ourselves here with
7 technical information and taking discovery before we even have
8 a chance to address this case, I mean defendant hasn't even
9 had a chance to answer yet, I mean we might want to move for
10 dismissal on various grounds so.
11     THE COURT: Well, among the grounds you're going to
12 move for dismissal on are jurisdiction, correct?
13     MR. SURNEY: Yes.
14     THE COURT: So, I think before I can resolve that
15 there's some limited jurisdictional discovery. I'm trying to
16 do this in the order of things, I think that's the primary
17 issue that we have now. I've denied the application for
18 preliminary injunction but I'm not going to throw the
19 complaint out at this stage based on, you know --
20     MR. SURNEY: Yes, Your Honor.
21     THE COURT: -- what you're saying but I think we
22 need to do --
23     MR. SURNEY: I guess what I was getting at is there
24 a certain kind of limit on what discovery is going to be, I
25 mean written discovery may be one thing, certainly depositions

1 I would submit would be inappropriate at this point.

2         THE COURT: Well, we're just talking about the

3 jurisdictional issue at that point. I want to resolve it one

4 step at a time. So, counsel has said he wants to issue some

5 limited, like I think interrogatories probably make the most

6 sense on the question of jurisdiction. Then, you know, then

7 once you get the discovery on that, then you file papers

8 indicating why you've got jurisdiction and you respond and

9 then we'll take it from there, okay.

10         MR. SURNEY: Yes, Your Honor, that's fine.

11         MR. KROL: Thank you, Your Honor.

12         THE COURT: All right.

13         (Time noted: 5:05 p.m.)

14         (End of proceedings.)

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**05** · **4880**

----------------------------------X

AQUA SHIELD, INC.,                    :    Case No. _____ -CV-2005

                Plaintiff AMON, J.

                            COMPLAINT

    -against-                        :    JURY TRIAL REQUESTED

INTER POOL COVER TEAM,                :    IN CLERK'S OFFICE
                                  U.S. DISTRICT COURT E.D.N.Y.

                Defendant. :    GOLD, M.J.  ★ OCT 1 0 2005
                                        BROOKLYN OFFICE

----------------------------------X

       Plaintiff Aqua Shield, Inc. ("Aqua Shield"), by its attorneys, Krol & O'Connor, states, upon information and belief, as follows:

**JURISDICTION**

       1.   This court has jurisdiction under 28 U.S.C. §§ 1331, 1332, 1338, and 1367.

       2.   Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(d).

**THE PARTIES**

       3.   Plaintiff Aqua Shield is a New York corporation with a principal place of business located at 111 Alder Street, West Babylon, NY 11704. Aqua Shield manufactures and sells telescopic pool enclosures.

       4.   Bob Brooks, Aqua Shield's CEO, is the holder of U.S. Patent Number 6,637,160 ("'160 Patent"), claiming "an apparatus for providing an enclosure for attachment to a

**A30**

building or for covering an area." Aqua Shield, the real party
in interest, has an implied and exclusive license to use the
'160 Patent in its telescopic swimming pool enclosures.

     5.  Defendant Inter Pool Cover Team ("IPC") is a
European business entity with its headquarters located at Alukov
HZ, Orel 18, 518 21 Slatinany, Czech Republic. IPC manufactures
and sells swimming pool enclosures.

### BACKGROUND FACTS

     6.  On October 28, 2003, the U.S. Patent and Trademark
Office awarded the '160 Patent to Mr. Brooks.

     7. Thereafter, IPC has imported, offered for sale, and
sold telescopic pool enclosures embodying the subject matter
covered by the '160 Patent, in the U.S., in violation of Mr.
Brooks' rights to exclude under 35 U.S.C. §271, et seq., without
the consent or permission of either Mr. Brooks or Aqua Shield.

     8. On August 2, 2005, Mr. Brooks sent IPC a letter, by
registered mail, return receipt requested, to the effect that
IPC was infringing the '160 Patent, and demanded that IPC cease
and desist from further infringement upon the '160 patent (the
"Demand Letter"). A copy of the Demand Letter is attached hereto
as Exhibit A.

     9. IPC received the Demand Letter on August 16, 2005.
A copy of the signed return receipt of the registered mail is
also attached hereto as Exhibit A.

2

**A31**

10. IPC has not responded to the Demand Letter and has continued to infringe on the '160 Patent within the U.S. in violation of U.S. patent law by, among other things, arranging to exhibit its telescopic pool enclosures — infringing upon the '160 Patent — at the Pool & Spa Expo at the Orange County Convention Center in Orlando, Florida in two (2) booths — numbers 141 and 239 — from October 31, 2005, through November 3, 2005 (the "Pool & Spa Expo").

### FIRST CLAIM FOR RELIEF
#### Patent Infringement

11. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-10 hereof.

12. The canopies or enclosures displayed by IPC on its website — http://www.poolcover-ipc.com — and expected to be displayed during the Pool & Spa Expo fall within the subject matter covered by the '160 patent.

13. IPC's willful, intentional and deliberate infringement, and active inducement of infringement, of the '160 patent has deprived Aqua Shield of its lawful sales and profits, caused Aqua Shield to suffer damages that are difficult, if not impossible, to ascertain, and made IPC liable to Aqua Shield, *ad minimum*, for IPC's profits on IPC's sales in the U.S. of the goods infringing upon the '160 patent.

14. IPC's willful, intentional and deliberate infringement, and active inducement of infringement, of the '160 patent entitles Aqua Shield to attorney fees and treble damages.

3

**A32**

### SECOND CLAIM FOR RELIEF
#### Patent Infringement by Equivalent Apparatus

15. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-10 and 12-14 hereof.

16. IPC's telescopic pool enclosures perform the same function in the same way and accomplish substantially the same result as the subject matter claimed in the '160 patent.

17. To the extent that IPC's telescopic pool enclosures are different from the subject matter claimed in the '160 patent, the difference is minor, insignificant and obvious to persons reasonably skilled in the pertinent art.

18. IPC's telescopic pool enclosures are substantially equivalent to the subject matter claimed in the '160 patent and, hence, the importation, offering for sale, and sale of IPC's telescopic pool enclosures in the U.S. infringes on the '160 Patent and violates U.S. patent laws.

19. IPC's willful, intentional and deliberate infringement, and active inducement of infringement, of the '160 patent has deprived Aqua Shield of its lawful sales and profits, caused Aqua Shield to suffer damages that are difficult, if not impossible, to ascertain, and made IPC liable to Aqua Shield, *ad minimum*, for IPC's profits on IPC's sales in the U.S. of the goods infringing upon the '160 patent.

20. IPC's willful, intentional and deliberate infringement, and active inducement of infringement, of the '160 patent entitles Aqua Shield to attorney fees and treble damages.

### THIRD CLAIM FOR RELIEF
#### Unfair Competition

21.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1-10, 12-14 and 16-20 hereof.

22.   The public and the trade are likely to confuse Aqua Shield's products with IPC's products and to ascribe the attributes and characteristics of Aqua Shield's products to IPC's products.

23.   IPC's importation, offers to sell, and sales in the U.S. of IPC's telescopic pool enclosures embodying, or substantially equivalent to, the subject matter covered by the '160 Patent, mislead and confuse the public and the trade alike, injure the public image and reputation of Aqua Shield and constitute unfair competition with Aqua Shield under common law.

24.   IPC has known that its importation, offers to sell, and sales in the U.S. of IPC's telescopic pool enclosures is misleading, and has undertaken such activities with the intent to confuse, mislead, and deceive the public and the trade, and to compete unfairly with Aqua Shield.

25.   By reason of the foregoing, IPC caused Aqua Shield to suffer damages in an amount to be determined at trial.

### FOURTH CLAIM OF RELIEF
#### Equitable relief

26.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1-10, 12-14, 16-20 and 22-25 hereof.

27.   Unless enjoined by this Court, IPC will continue

to infringe upon, and to induce the infringement of, the '160 Patent within the U.S.

28. IPC's willful, intentional and deliberate infringement, and active inducement of infringement, of the '160 patent has deprived Aqua Shield of its lawful sales and profits, caused Aqua Shield to suffer damages that are difficult, if not impossible, to ascertain.

29. IPC's scheduled exhibition of IPC's telescopic pool enclosures at the Pool & Spa Expo, supra, will directly and proximately cause Aqua Shield to lose its market share in the U.S., impair permanently Aqua Shield's ability to command the premium price for its products, and harm Aqua Shield immediately and irreparably in its business and reputation.

30. Aqua Shield does not have adequate remedy at law.

WHEREFORE, plaintiff requests entry of a judgment:

(i) enjoining permanently IPC, and anyone acting on behalf of, or in concert with, IPC, from manufacturing, producing, using, distributing, importing, purchasing, selling, offering for sale, advertising, displaying, or exhibiting in the U.S. of IPC's telescopic pool enclosures or other products embodying the subject matter of the '160 Patent, and barring IPC from unfair competition with Aqua Shield, (ii) awarding Aqua Shield compensatory damages in an amount to be proven at trial, together with appropriate treble damages, and Aqua Shield's

6

A35

costs, fees, and disbursements of this action, and (iii) granting Aqua Shield such other and further relief as the Court may deem just and proper under the circumstances.

Dated:      New York, New York
            October 13, 2005

                              KROL & O'CONNOR
                              Attorneys for Plaintiff
                              320 West 81st Street
                              New York, N.Y. 10024
                              (212) 595-8009

                              By: _____
                                  Igor Krol (1068)

7

**A36**

# EXHIBIT A

**KROL & O'CONNOR**

320 WEST 81ˢᵗ STREET
NEW YORK, NY 10024

PH. (212) 595-8009
FAX (212) 595-8149
KROLlaw@aol.com

August 2, 2005

Dear Sir or Madam:

We represent Bob Brooks, the Chief Executive Officer and co-owner of Aqua Shield, Inc. This letter concerns the infringement of United States Patent Number 6,637,160, owned by Mr. Brooks, an apparatus for providing an enclosure for attachment to a building or for covering an area, and employed in Aqua Shield, Inc.'s telescopic swimming pool enclosures. Said patent was duly filed with the United States Patent and Trademark Office on July 10, 2001 and awarded to Mr. Brooks on October 28, 2003. Thus, Mr. Brooks has been granted, by the United States Government, the exclusive right to make, use, offer to sell, or sell his patented invention, within the United States, or to import said invention into the United States, as per 35 U.S.C. § 271(a). Any unauthorized manufacture, use, offer to sell, sale or importation of the invention covered by U.S. Patent 6,637,160 constitutes an infringement, resulting in severe civil penalties including an injunction, damages, and attorney's fees.

It has recently been brought to our attention that your company, Inter Pool Cover Team, is planning to manufacture and sell infringing pool enclosures within the United States, in violation of 35 U.S.C. § 271, and in abrogation of the rights awarded to Mr. Brooks by the grant of his patent. Without prejudicing or waiving Mr. Brook's right to seek further remedies or relief, this letter constitutes a formal demand upon you to cease and desist – immediately – and thereafter refrain from any further infringement of U.S. Patent 6,637,160.

In order to comply with this demand, you must immediately (i) remove and ensure the removal of any and all advertisements or other offers, in any media, to sell your infringing products, (ii) rescind and terminate any sales or outstanding offers to sell your infringing products, (iii) destroy or, in the alternative, dismantle and remove from the United States, all infringing products you may have already manufactured and imported into the United States, and (iv) abstain from any further manufacturing of your infringing products in the United States or any importation of your infringing products into the United States.

Under the provisions of 35 U.S.C. 271(a), et seq., the owner of a United States Patent may seek various remedies in the U.S. District Court for patent infringement, e.g., injunctive relief, retroactive and constructive royalties, disgorgement of profits, recovery of any damages, costs of the action and reasonable attorneys' fees, and even an award of treble damages for willful infringement. Unless we obtain immediate satisfaction in this matter, our client will resort to legal remedies in order to vindicate his rights to the full extent provided by law.

We expect to receive a communication from you or your counsel within ten (10) business days from the receipt of this letter, containing satisfactory assurances to the effect that the your company will comply with our demands and cease and desist from any further infringement of U.S. Patent 6,637,160.

Very truly yours,

Krol & O'Connor
320 West 81st Street
New York, New York 10024
(212) 595-8009

By: _____
     Igor Krol

**A39**

| Item Description (Nature de l'envoi) | Registered Article (Envoi recommandé) | Letter (Lettre) | Printed Matter (Imprimé) | Other (Autre) | Recorded Delivery (Envoi à livraison attestée) | Express Mail International national |
|---|---|---|---|---|---|---|

| Insured Parcel □ (Colis avec valeur déclarée) | | Insured Value (Valeur déclarée) | | Article Number | |

| Office of Mailing (Bureau de dépôt) | | Date of Posting (Date de dépôt) |

Addressee Name or Firm (Nom ou raison sociale du destinataire)

Street and No. (Rue et No.) Inter Pool Cover Team

Place and Country (Localité et pays) Alukov Hz, Orel 18

518 21 Slatinany, Czech Republic

This receipt must be signed by: (1) the addressee; or, (2) a person authorized to sign under the regulations of the country of destination; or, (3) if those regulations so provide, by the employee of the office of destination. This signed form will be returned to the sender by the first mail.

(Cet avis doit être signé par le destinataire ou par une personne y autorisée en vertu des règlements du pays de destination, ou, si ces règlements le comportent, par l'agent du bureau de destination. Il sera renvoyé par le premier courrier de destinent à expéditeur).

□ The article mentioned above was duly delivered. (L'envoi mentionné ci-dessus a été dûment livré.)

Date 16.8.2005

Signature of Addressee (Signature du destinataire) Orel 18, 636 21 Slintiiany +420 469 681 428 - fax 502 141 002, 721 41

Office of Destination Employee Signature (Signature de l'agent du bureau du destination) 16.8.05

PS Form 2865, February 1997 (Reverse)

 **UNITED STATES POSTAL SERVICE** ®

**Return Receipt for International Mail**
*(Registered, Insured, Recorded Delivery, Express Mail)*

Administration
des Postes des
Etats-Unis
d'Amérique

*Par Avion*

Postmark of
the office
returning the
receipt
Timbre du
bureau
renvoyant
l'avis

Return by the
quickest route
(air or surface
mail), a découvert
and postage free,

The sender completes and indicates the address for the return of this receipt.
*(A remplir par l'expéditeur, qui indiquera son adresse pour le renvoi du présent avis.)*
Name or Firm *(Nom ou raison sociale)*

Krist O'Connor

A renvoyer par
la voie la plus
rapide (aérienne
ou de surface),
à découvert et
en franchise de
port.

320 W. 81ᵗʰ St.
Street and Number *(Rue et no.)*

New York NY 10024
City, State, and Zip + 4 *(Localité et code postal)*

USA

UNITED STATES OF AMERICA        Etats-Unis d'Amérique

PS Form **2865**, February 1997        *Avis de réception*        **CN07** *(Old C5)*

**A41**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JAN 0 5 2008 ★
BROOKLYN OFFICE

-------------------------------------------------------

AQUA SHIELD, INC.

                Plaintiff,

  - against -

INTER POOL COVER TEAM

                Defendant.

-------------------------------------------------------X

NOT FOR PUBLICATION
MEMORANDUM & ORDER
05 CV 4880 (CBA)

Case: 2:09cv00013
Assigned To : Stewart, Ted
Assign. Date : 1/7/2009
Description: Aqua Shield v. Interpool
Pool Cover Team

AMON, United States District Judge:

I.    Introduction

     The parties to this patent infringement action dispute the propriety of jurisdiction in this

Court under the nationwide federal long-arm statute, Federal Rule of Civil Procedure 4(k)(2).

Plaintiff Aqua Shield, Inc. alleges that Inter Pool Cover Team ("IPC"), a European business

entity, has sold and advertised in the United States a product infringing on U.S. Patent No.

6,637,160, of which plaintiff is the assignee.

     In this Court's earlier Order of December 7, 2007 (the "Order"), the Court determined

that nationwide federal jurisdiction makes jurisdiction proper in this Court if plaintiff can certify

that jurisdiction is not proper in the court of general jurisdiction of any state, and if defendant

cannot propose an alternate state in which this case could have been brought, pursuant to the

burden-shifting framework established in United States v. Swiss Am. Bank Ltd., 191 F.3d 30,

41-42 (1st Cir. 1999).

> The plaintiff . . . must certify that, based on the information that is readily
> available to the plaintiff and his counsel, the defendant is not subject to suit in the
> courts of general jurisdiction of any state. If the plaintiff makes out his prima
> facie case, the burden shifts to the defendant to produce evidence which, if

1

A43

credited, would show either that one or more specific states exist in which it would be subject to suit or that its contacts with the United States are constitutionally insufficient. Should the *defendant default on its burden of* production, the trier may infer that personal jurisdiction over the defendant is not available in any state court of general jurisdiction. If, however, the defendant satisfies its second-stage burden of production, then the aforementioned inference drops from the case. . . . If the defendant produces evidence indicating that it is subject to jurisdiction in a particular state, the plaintiff . . . may contest the defendant's proffer. . . . [T]he plaintiff, to fulfill the negation requirement, must prove that the defendant is not subject to suit in the identified forum(s).

Id. (internal citations omitted).

In response to the Order, plaintiff filed a certification on January 4, 2008, stating that defendant would not be subject to jurisdiction in the courts of any state. Defendant responded on January 31, 2008, that "[j]urisdiction over IPC can clearly be found in Utah." (Def.'s Reply 1.) Plaintiff then filed an additional response in the form of a declaration on February 4, 2008, arguing that the Utah long-arm statute would not be available to it, as it "not only does not do business in Utah; Aqua Shield has no contact with Utah whatsoever!" (Krol Supplemental Decl. 4.)

II. Discussion

In a patent case, courts apply Federal Circuit law to determine whether jurisdiction exists. "In interpreting a long-arm statute, the Federal Circuit Court of Appeals, which is the controlling court in a patent case, defers to the forum state's highest court." Envirotech Pumpsystems, Inc. v. Sterling Fluid Sys. (Schweiz) AG, No. 2:99CV814K, 2000 WL 35459756, at *3 (D. Utah Nov. 16, 2000) (finding no jurisdiction over foreign defendant in patent infringement action where *resident plaintiff corporation alleged jurisdiction on theories of the situs of economic injury and stream of commerce*) (internal citation omitted). In this case, the relevant statute is

2

Utah's "long-arm" statute, the Nonresident Jurisdiction Act, Utah Code Ann. § 78B-3-201 et seq. The preamble provision to the Utah long-arm statute provides that "the provisions of this part, to ensure maximum protection to citizens of this state, should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." Utah, Code Ann. § 78B-3-201 (formerly § 78-27-22). Courts have interpreted this provision to indicate that the long-arm statute extends to the bounds of due process. See Envirotech Pumpsystems, Inc., WL 35459756 at *3; Mountain States Sports, Inc., v. Sharman, 353 F. Supp. 613, 615 (D. Utah 1972) (quoting Utah Code Ann. § 78-27-22 (Supp. 1971)).

The Tenth Circuit has determined that the preamble, as "prefatory language," is "neither essential nor controlling in the construction of the [Utah Nonresident Jurisdiction] Act where the operative sections are clear and unambiguous." Hughes Tool Co. v. Meier, 486 F.2d 593, 596 (10th Cir. 1973). Statements in a preamble "regarding scope or purpose of the act . . . may aid the construction of doubtful clauses, but they cannot control the substantive provisions of the statute." 1A Sutherland Statutory Construction § 20:3. Utah courts view preambles as purpose-establishing sections that "may be used to clarify ambiguities, but they do not create rights that are not found within the statute, nor do they limit those actually given by the legislation." Price Dev. Co. v. Orem City, 995 P.2d 1237, 1246 (Utah 2000).

The operative section of the Nonresident Jurisdiction Act, § 78B-3-205, provides that any person, whether or not a citizen or resident, who engages in "the transaction of any business within this state" or participates in "the causing of any injury within this state whether tortious or by breach of warranty" is subject to jurisdiction in Utah as to "any claim arising out of or related

3

to" either of those acts. Utah Code Ann. § 78B-3-205. This section, granting jurisdiction over "any claim" arising out of an enumerated act, does not impose any restrictions on who may bring the claims for which it grants jurisdiction; under the operative language, there is no indication that jurisdiction is established only over "any claim" brought by a citizen.

To the extent courts have interpreted the preamble to carry some weight, the definition of "citizen" proposed can be met in this case. In <u>Mountain States Sports</u>, the court noted that

> the definition of "citizen" in the present context is satisfied when the party demonstrates sufficient contact with the forum state, in relation to the events in dispute, to ensure the proper "respect for sister states' due spheres." If the disputed events or the defendant is closely tied to the forum state, the plaintiff may need little or no contact with the forum in order to sue there. Of course, in such a circumstance, a plaintiff probably need not invoke the long-arm statute.

353 F. Supp. at 616; <u>see also</u> <u>Am. Land Program, Inc. v. Bonaventura Uitgevers Maatschappij</u>, 710 F.2d 1449 (10th Cir. 1983) (long-arm statute available to nonresident plaintiff doing business in Utah); <u>Hughes Tool</u>, 486 F.2d at 596 (finding long-arm statute available to nonresident plaintiff qualified to do business in Utah). Here, there is no concern with regard to respect for sister states' due spheres. Utah is the only state in which an allegedly infringing product was sold, and each state "has an interest in discouraging injuries that occur within the state," including injuries arising from patent infringement. <u>Beverly Hills Fan Co. v. Royal Sovereign Corp.</u>, 21 F.3d 1558, 1568 (Fed. Cir. 1994).

The defendant in this case was required to "produce evidence which, if credited, would show . . . that one or more specific states exist in which it would be subject to suit . . . ." <u>Swiss Am. Bank</u>, 191 F.3d at 41. The defendant has produced evidence supporting jurisdiction in Utah and indicated its consent to jurisdiction in Utah. (Def.'s Reply to Krol Certification 1-3.)

4

Defendant has further indicated that it would be subject to jurisdiction in Utah not only on the grounds that it committed the enumerated act of causing injury but also on the grounds that it transacted business in that state. (Id. at n.1.) Plaintiff, in its additional "declaration," did not meet its burden of proving that jurisdiction over defendant would not exist in Utah.

III.    Conclusion

By virtue of the Rule 4(k)(2) analysis, this Court has determined that this case could have been brought in Utah.  Accordingly, this Court hereby directs the Clerk of the Court to transfer this case to the United States District Court for the District of Utah.  See 28 U.S.C. § 1406; SongByrd, Inc. v. Estate of Grossman, 206 F.3d 172, 179 n.9 (2d Cir. 2000) (noting that "lack of personal jurisdiction could be cured by transfer to a district in which personal jurisdiction could be exercised, with the transfer authority derived from either section 1406(a) or section 1404(a)").

SO ORDERED.

Dated: Brooklyn, New York
December 31, 2008

Carol Bagley Amon
United States District Judge

A TRUE COPY
ATTEST
DATE January 5 2009
ROBERT C. HEINEMANN
CLERK
BY
DEPUTY CLERK

ROBERT C. HEINEMANN
CLERK

TERRY VAUGHN
CHIEF DEPUTY
COURT OPERATIONS

DOUGLAS PALMER
CHIEF DEPUTY
AUTOMATED SERVICES

**RECEIVED CLERK**

JAN 0 7 2009

**U.S. DISTRICT COURT**

PLEASE REPLY TO:

☐BROOKLYN OFFICE
U.S. COURTHOUSE
225 CADMAN PLAZA EAST
BROOKLYN, NEW YORK 11201

☐ LONG ISLAND OFFICE
UNITED STATES DISTRICT COURT
100 FEDERAL PLAZA
CENTRAL ISLIP, NEW YORK
11722-4438

January 5, 2009

Clerk, U. S. District Court
District of Utah
150 Frank E. Moss
  United States Courthouse
350 South Main Street
Salt Lake City, UT 84101

Re: Aqua Shield, Inc., v. Inter Pool Cover Team
EDNY #: 1:05-CV-4880 (CBA)

Dear Clerk:

Pursuant to the Order of Judge Carol B. Amon transferring the above-referenced action to your court, the following documents are enclosed:

     X    Certified copy of Order of Transfer

     X    Certified copy of docket entries

          Entire File

     X    Other: Entire case filed electronically; Documents may be
               retrieved utilizing the CM/ECF system on this Court's
               website: www.nyed.uscourts.gov

Kindly acknowledge receipt of the above-cited documents on the enclosed copy of this letter.

Very truly yours,
Robert C. Heinemann, Clerk of Court

By:    _Fida Abdallah_

Fida Abdallah
Deputy Clerk

Formerly:    EDNY 1:05-CV-4880 (CBA)

Now:    _____

Initials/Date: _____

Case: 2:09cv00013
Assigned To : Stewart, Ted
Assign. Date : 1/7/2009
Description: Aqua Shield v. Interpool
Pool Cover Team

**A48**

Randall B. Bateman (USB 6482)
Perry S. Clegg (USB 7831)
BATEMAN IP LAW GROUP, PC
8 East Broadway, Suite 550
P.O. Box 1319
Salt Lake City, Utah 84110
Tel: (801) 533-0320/Fax: (801) 533-0323
Emails: mail@batemanip.com, rbb@batemanip.com, psc@batemanip.com, and
fcc@batemanip.com

Igor Krol, *pro hac vice*
KROL & O'CONNOR
320 West 81st Street
New York, New York 10024

*Attorneys for Plaintiff*
Aqua Shield, Inc.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AQUA SHIELD, INC.,<br><br>    Plaintiff,<br><br>vs.<br><br>INTER POOL COVER TEAM, ALUKOV<br>HZ SPOL. S.RO., ALUKOV, SPOL. S R.O.,<br>POOL & SPA ENCLOSURES, LLC<br><br>    Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Civil No.: 2:09-CV-00013-TS-SA<br>Judge: Samuel Alba |

COMES NOW Plaintiff, Aqua Shield, Inc., and complains against Defendants Inter Pool

Cover Team, Alukov HZ spol. S.ro., Alukov, spol. S r.o., and Pool & Spa Enclosures, LLC

(referred to herein collectively as "Defendants") as follows:

–1–

## PARTIES

1.      Plaintiff, Aqua Shield, Inc. ("Aqua Shield") is a corporation organized under the laws of the State of New York having a principal place of business located at 114 Bell Street, West Babylon, NY  11704.

2.      Defendant, Inter Pool Cover Team ("IPC") is a European Economic Interest Grouping formed under the laws of the European Union with its headquarters located at Alukov HZ, Orel 18, 518 21 Slatinany, Czech Republic.

3.      Defendant, Alukov HZ spol. S.r.o., is a European business entity located in the Czech Republic, at Orel 18, 518 21 Slatinany, Czech Republic.

4.      Defendant, Alukov, spol. S.r.o., is a European business entity located in the Slovak Republic, Skultetyho 1597, 95501 Topolcany, Slovakia.

5.      Alukov HZ spol. S.r.o. and Alukov, spol. S.r.o. (hereinafter referred to collectively as "Alukovs") are members of IPC.

6.      Defendant, Pool & Spa Enclosures, LLC ("Pool & Spa"), is a limited liability corporation organized under the laws of the State of New Jersey having a principal place of business located at 237 Prospect Plains Road, Monroe Township, New Jersey, 08831.

7.      On information and belief, Pool & Spa is a member of IPC.

## JURISDICTION AND VENUE

8.      This action arises under the patent laws of the United States, Title 35, United States Code.  This Court has jurisdiction over the patent claims under 28 U.S.C. §§ 1331, 1332, and 1338(a).  Venue is proper in this district by virtue of Title 28 U.S.C. §§ 1391(d) and 1400.

–2–

## GENERAL ALLEGATIONS

9.    Bob Brooks is the original owner of the United States Letters Patent No. 6,637,160 ("the '160 Patent"), filed on July 10, 2001 and issued on, October 28, 2003, for a Telescopic Enclosure.  A copy of the '160 Patent is attached hereto and expressly incorporated as Exhibit A. Bob Brooks assigned the '160 Patent to Aqua Shield.

10.    The subject matter of the '160 Patent relates to covers that are generally used to enclose an outdoor swimming pool.  The enclosure of the '160 Patent opens and closes telescopically and some embodiments of the invention may attach to the side of a building.

11.    The '160 Patent is valid and enforceable.

12.    Aqua Shield has an exclusive right to make, use, offer to sell, and sell enclosures claimed in the '160 Patent.

13.    Aqua Shield earns considerable sums through the sales of telescopic enclosures made in accordance with the invention disclosed in the '160 Patent.

14.    Defendant, IPC, markets and promotes the sale of telescopic enclosures and encourages its members to make, use, sell, offer to sell, and/or import embodiments of enclosures that come within the scope of the '160 Patent.

15.    Defendants, Alukovs, manufacture embodiments of enclosures that come within the scope of the '160 Patent.

16.    On information and belief, Defendants, IPC and Alukovs, supply to the U.S. embodiments of enclosures that come within the scope of the '160 Patent which are sold and offered for sale in the U.S.

–3–

**A51**

17.   On information and belief, Defendant, Pool & Spa, sales and offers for sale in the U.S. embodiments of enclosures that come within the scope of the '160 Patent and are received from the Alukovs. 18. Defendants' enclosures that are offered for sale in the U.S. can be found on IPC's website, http://www.poolcover-ipc.com/. Copies of selected pages from Defendant's website showing embodiments of enclosures being manufactured and offered for sale are attached hereto as Exhibit B.

18.   The enclosure displayed and sold under the name "Universe" infringes at least claim 1 of the '160 Patent.

19.   The enclosure displayed and sold under the name "Laguna" on IPC's website infringes at least claim 1 of the '160 Patent.

20.   The enclosure displayed and sold under the name "Elegant" on IPC's website infringes at least claim 1 of the '160 Patent.

21.   The enclosure displayed and sold under the name "Tropea" on IPC's website infringes at least claim 1 of the '160 Patent.

22.   The enclosure displayed and sold under the name "Combi" on IPC's website infringes at least claim 1 of the '160 Patent.

23.   The enclosure displayed and sold under the name "Style" on IPC's website infringes at least claim 1 of the '160 Patent.

24.   The enclosure displayed and sold under the name "Veranda" on IPC's website infringes at least claim 1 of the '160 Patent.

25.   The enclosure displayed and sold under the name "Spa Veranda" on IPC's infringes at least claim 1 of the '160 Patent.

-4-

26.     The enclosure displayed and sold under the name "Ravena" on IPC's website infringes at least claim 1 of the '160 Patent.

27.     On August 2, 2005, Aqua Shield's counsel sent IPC a cease and desist letter stating that IPC was infringing the '160 Patent and demanded that IPC immediately refrain from such infringing conduct. A copy of the cease and desist letter is attached hereto as Exhibit C.

28.     Defendants, IPC and Alukovs, are aware of the '160 Patent.

29.     On information and belief, Pool & Spa is aware of the '160 Patent.

30.     On information and belief, Defendants have told Aqua Shield customers that Aqua Shield was going out of business in an attempt to divert sales.

31.     Defendants make, use, sale, offer to sell, import, induce others to sell, and/or contribute to others making, using, selling, offering to sell, and/or importing telescopic enclosures that fall within the scope of the invention set forth and claimed in the '160 Patent. This conduct by Defendants has taken place within the State of Utah.

### FIRST CLAIM FOR RELIEF
#### (Direct Infringement, 35 U.S.C. §271(a))

32.     Plaintiff, Aqua Shield, incorporates herein each and every allegation of paragraphs 1 through 31 of this Complaint.

33.     The '160 Patent has at all times subsequent to its issue date been fully enforceable.

34.     Aqua Shield is the only assignee of the '160 Patent and has the right to sue for infringement.

–5–

**A53**

35.     Defendants make, use, sale, offer to sell, import, induce others to sell, and/or contribute to others making, using, selling, offering to sell, and/or importing telescopic enclosures that come within the scope of one or more claims of the '160 Patent.

36.     Defendants have, within the State of Utah, made, used, sold, offered to sell, or imported telescopic enclosures that come within a range of equivalents of the claims of the '160 Patent.

37.     The making, using, selling, or importing of infringing telescopic enclosures by Defendants has been without authority or license from Aqua Shield and in violation of Aqua Shield's rights, thereby infringing the '160 Patent.

38.     The making, using, selling offering to sell, or importing telescopic enclosures that fall within the scope of the '160 Patent by Defendants has been with knowledge of the '160 Patent, and in disregard for the exclusive rights of Aqua Shield.

39.     The amount of money damages which Aqua Shield has suffered due to Defendants' acts of infringement cannot be determined without an accounting, and is thus subject to proof at trial.  Further, harm to Aqua Shield arising from Defendants' acts of infringement is not fully compensable by money damages.  Rather, Aqua Shield has suffered, and continues to suffer, irreparable harm which it has no adequate remedy at law and which will continue until Defendants' conduct is enjoined.

### SECOND CLAIM FOR RELIEF
#### (Inducement, 35 U.S.C. §271(b))

40.     Aqua Shield incorporates herein each and every allegation of paragraphs 1 through 39 of this Complaint.

–6–

**A54**

41.     On information and belief, Defendants, IPC and Alukovs, have actively induced, and are now inducing, infringement of the '160 Patent in the U.S.

42.     Defendants, IPC and Alukovs, have unlawfully derived, and continue to unlawfully derive, income and profits by inducing others to infringe the '160 Patent.  Aqua Shield has suffered, and continues to suffer, damages as a result of Defendants' inducement to infringe the '160 Patent.

43.     Aqua Shield has suffered, and will continue to suffer irreparable damage for which there is no adequate remedy at law because of Defendants' inducement of others to infringe, and will continue to be harmed unless Defendants are enjoined from further acts of inducement.

**THIRD CLAIM FOR RELIEF**
**(Contributory Infringement, 35 U.S.C. §271(c))**

44.     Aqua Shield incorporates herein each and every allegation of paragraphs 1 through 43 of this Complaint.

45.     On information and belief, Defendants, IPC and Alukovs, have contributed, and are now contributing to infringement of the '160 Patent by supplying to the U.S. telescopic enclosures that come within the scope of the '160 Patent.

46.     On information and belief, Defendants, IPC and Alukovs, supply to the U.S. all material components of the telescopic enclosure.

47.     The telescopic enclosures supplied to the U.S. by Defendants IPC and Alukovs have no substantial non-infringing use outside the scope of the '160 Patent.

–7–

48.     On information and belief, the telescopic enclosures supplied to the U.S. by Defendants IPC and Alukovs are sold and offered for sale in the U.S. by Defendant Pool & Spa, an IPC member company.

49.     Defendants, IPC and Alukovs, have unlawfully derived, and continue to unlawfully derive, income and profits by contributing to the infringement of the '160 Patent. Aqua Shield has suffered, and continues to suffer, damages as a result of Defendants' contribution to infringement of the '160 Patent.

50.     Aqua Shield has suffered, and will continue to suffer irreparable damage for which there is no adequate remedy at law because of Defendants' contribution to the infringement of the '160 Patent, and will continue to be harmed unless Defendants are enjoined from further acts of contributory infringement.

### FOURTH CLAIM FOR RELIEF
**(Willful Infringement, 35 U.S.C. §271(b))**

51.     Aqua Shield incorporates herein each and every allegation of paragraphs 1 through 50 of this Complaint.

52.     Defendants, IPC and Alukovs, were made aware, by the service of the cease and desist letter, of the '160 Patent at least as early as August 16, 2005.

53.     On information and belief, Defendant, Pool & Spa, is aware of the '160 Patent.

54.     On information and belief, Defendants continue to make, use, sell, offer to sell, or import telescopic enclosures in the U.S. knowing that their products were clearly within the scope of the claims of the '160 Patent.

55.    Defendants knew or should have known that continuing to make, use, sell, offering to sell, and importing their products in the U.S. infringed the '160 Patent.

56.    Defendants, however, have disregarded Aqua Shield's rights in the '160 Patent and continued to make, use, sell, offer for sale, or import telescopic enclosures that come within the scope of the '160 Patent without authority or license from Aqua Shield.

57.    Defendant's willful infringement of the '160 Patent makes this an exceptional case, entitling Aqua Shield to receive treble damages and its reasonable attorneys' fees.

### FIFTH CLAIM FOR RELIEF
#### (Unfair Competition, 15 U.S.C. §1125; Lanham Act §43)

58.    Aqua Shield incorporates herein each and every allegation of paragraphs 1 through 57 of this Complaint.

59.    On information and belief, Defendants have indicated to customers that Aqua Shield is going out of business in an attempt to divert sales of telescopic enclosures away from Aqua Shield.

60.    Defendants' intent to mislead and confuse customers damages Aqua Shield's public image and reputation and has, on information and belief, unfairly lead to the sales of telescopic enclosures by Defendants that would have otherwise been realized by Aqua Shield.

61.    Aqua Shield has suffered, and will continue to suffer irreparable damage for which there is no adequate remedy at law because of Defendants' attempts to deceive the public and trade, and will continue to be harmed unless Defendants are enjoined from further acts of unfair competition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aqua Shield prays for judgment against Defendants as follows:

A.     The Court adjudge United States Letters Patent No. 6,637,160 valid and infringed by Defendants;

B.     The Court adjudge Defendants' conduct constitutes unfair competition;

C.     For damages in an amount to be determined at trial, said damages being not less than a reasonable royalty;

D.     For a finding that Defendants acted willfully in its infringement of the '160 Patent, and for an award of treble damages pursuant to U.S.C. §284.

E.     That Defendants, their agents, servants, employees, directors, and those persons in active concert or participation with them be enjoined under 35. U.S.C. §283 from further violation of Aqua Shield's patent rights or such terms as the Court deems reasonable;

F.     That Defendants be ordered to file with this Court and serve on Aqua Shield within thirty (30) days after service on Defendants of the injunction granted herein, or such extended period as the Court may direct, a report in writing, under oath, setting forth in detail the manner and form in which Defendants have complied with the injunction and order of the Court;

G.     That Defendants be order to pay Aqua Shield's attorneys' fees and its costs and disbursements for this action under 35 U.S.C. §285;

H.     That Defendants be required to pay pre-judgment and post-judgment interest until such awards are paid;

I.     That Aqua Shield has such other and further relief as shall seem just and proper to the Court.

## DEMAND FOR JURY

Plaintiff, Aqua Shield, hereby requests a trial by jury in the above-captioned action.


Dated: August 31, 2009

BATEMAN IP LAW GROUP



By      /Randall B. Bateman/
           Randall B. Bateman
           Bateman IP Law Group
           Attorneys for Plaintiff
           Aqua Shield, Inc.

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AQUA SHIELD, INC. a New York Corporation,<br><br>    Plaintiff,<br><br><br>vs.<br><br><br>INTER POOL COVER TEAM, ALUKOV HZ SPOL. S.R.O., ALUKOV, SPOL. S.R.O., POOL & SPA ENCLOSURES, LLC,<br><br>    Defendants. | FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br><br><br>Case No. 2:09-CV-13 TS |

This matter came before the Court for trial from March 19, 2013, through March 20,

2013. Having heard the evidence presented at trial, reviewed the materials submitted by the

parties, and being otherwise fully informed, the Court makes the following findings of fact and

conclusions of law.

## I. INTRODUCTION

This case concerns Plaintiff's allegations that Defendants infringed Plaintiff's patent,

U.S. Patent No. 6,637,160 (the "'160 Patent" or the "Patent"). The Court previously determined

that Defendants infringed Claims 1–14 and Claim 16 of the '160 Patent, and that the Patent is

1

**A60**

valid.[1] The issues that remain to be determined are: (1) the amount of damages, if any, to be

awarded to Plaintiff; (2) whether Plaintiff is entitled to attorney fees; (3) whether Defendants

induced infringement of the '160 Patent; (4) whether Defendants' infringement was willful; and

(5) whether Plaintiff is entitled to a permanent injunction.[2]

## II. FINDINGS OF FACT

A.   THE PARTIES

1.   Aqua Shield, Inc. ("Aqua Shield") is the Plaintiff in this case.

2.   The defending parties are Inter Pool Cover Team ("IPC"); Alukov HZ Spol. S.R.O.,

    Alukov, Spol. S.R.O., (jointly referred to as "Alukov"); and Pool & Spa Enclosures, LLC

    ("Pool & Spa").  The defending parties are referred to collectively as "Defendants."

3.   At trial, the Court heard testimony from three individuals: Bob Brooks, the inventor of

    the '160 Patent and the president of Aqua Shield;[3] Alexander Stonkus, the CEO of Pool

    & Spa and a representative of all Defendants in this case;[4] and Jan Zitko, the president of

    IPC and the CEO of Alukov.[5]

---

[1]Docket Nos. 87, 129.

[2]Although Plaintiff's Amended Complaint also alleges a claim for unfair competition, the
Court will deny this claim as Plaintiff did not assert it at trial or in its Proposed Findings of Fact
and Conclusions of Law.

[3]Trial Tr. 99:5–15, March 19–20, 2013.

[4]*Id.* at 12:6–15, 24:5–7, 94:19–2.

[5]*Id.* at 289:13–17, 289:25–290:2.

2

**A61**

B.     THE '160 PATENT

4.     The '160 Patent was filed July 10, 2001, and expires on July 10, 2021.[6]

5.     The '160 Patent contains one independent claim (Claim 1) and fifteen dependent claims

(Claims 2 through 16).  These claims are reproduced below:

1.  An apparatus for providing an enclosure for attachment to a building or for
covering an area, comprising:
          (a) a plurality of arcuate panels, said panels having a first and second end,
          and a first and second side wherein said panels are generally rectangular,
          planar panels;
          (b) a plurality of arcuate frame members, said frame members having a
          first and second end, and a first and second side for receiving said panels,
          and an inner and an outer surface;
          (c) a pair of end panels for attachment to the ends of the enclosure to
          complete the enclosure;
          (d) means-for [sic] a plurality of horizontal frame members whereby the
          ends of the arcuate frame members are secured;
          (e) means for a plurality of rollers disposed on said horizontal frame
          members whereby said horizontal frame members are movable thereon;
          (f) means for a plurality of horizontal rails whereby the rollers are rollable
          thereon and the rails are able to be attached to a foundation; and,
          (g) wherein said plurality of arcuate panels and said plurality of arcuate
          frame members are sized so that arcuate panels and arcuate frame
          members of smaller diameter are disposed toward the interior of said
          panels and frame members of larger diameter so that said panels and frame
          members are able to telescope one within each other, wherein said arcuate
          panels approximate the shape of one of a circumference of half a circle or
          one-fourth an ellipse and said end panels are generally flat and removable.
2.  The apparatus of claim 1, wherein said arcuate panels approximate the shape of
the circumference of half an ellipse.
3.  The apparatus of claim 2, wherein said plurality of arcuate frame members
further comprise a generally rectangular shaped housing having a pair of
horizontally disposed U-shaped receptacles on said outer surface thereof for
receiving said first and second sides of said arcuate panels and an inwardly
extending flap disposed on said inner surface.

_____

[6]Docket No. 163, at 18; Docket No. 164, at 8 n.1.

3

**A62**

4. The apparatus of claim 3, herein [sic] said rectangular shaped housing has a slot therein, said slot disposed on said inner surface thereof for receiving said flap.

5. The apparatus of claim 4, herein [sic] said means for a plurality of horizontal frame members further comprise a downwardly disposed U-shaped frame having a plurality of rollers disposed internal said U-shaped frame, said rollers being used for contacting said means for a plurality of horizontal rails.

6. The apparatus of claim 5, wherein said U-shaped frame further comprises a downwardly disposed anchor plate thereon for contacting the rails.

7. The apparatus of claim 6, wherein said anchor plate further comprises a hook disposed on the lower end of said anchor plate.

8. The apparatus of claim 7, wherein said U-shaped frame further comprising an upwardly disposed U-shaped receptacle thereon for receiving said first end of said arcuate panels.

9. The apparatus of claim 8, said means for a plurality of horizontal rails further comprise a base plate upon which plate said rails are mounted and said rails are attached to a foundation.

10. The apparatus of claim 9, wherein said rail has an enlarged, exposed edge for receiving said hook of said anchor plate so that said anchor plate is secured to said rail.

11. The apparatus of claim 10, further comprising means for adding additional rails to said rail base plate whereby the number of rails varies.

12. The apparatus of claim 11, wherein said means for adding additional rails further comprises a slot disposed in the edge of said base plate for receiving the edge of another base plate.

13. Then [sic] apparatus of claim 12, further comprising a stop rod and an end plug disposed in the end of said rail.

14. The apparatus of claim 13, further comprising a cover for being placed over the tops of said rails and a spacer for being placed between said rails to enable one to walk over said rails.

15. The apparatus of claim 4 [sic], further comprising a plurality of hooks and straps for securing said arcuate panels to said arcuate frame members.

16. The apparatus of claim 15, wherein said arcuate panels are transparent.[7]

---

[7]Trial Ex. 1.

4

6.   The '160 Patent teaches a device that has several advantages over other pool covers.  The

patented pool covers are easier to construct, are more aerodynamic, have a higher snow-

load capacity, and are more leak-proof than other square, or "boxy" pool covers.[8]

C.   PROCEDURAL HISTORY

7.   Plaintiff filed this action on October 18, 2005, in the Federal District Court for the

Eastern District of New York.[9]  That same day, Plaintiff moved for a preliminary

injunction preventing Defendants from "infringing upon the '160 Patent, in general, and

exhibiting IPC's enclosures at the Pool & Spa Expo, in particular . . . ."[10]  The court

denied Plaintiff's motion on October 25, 2005.[11]

8.   On January 7, 2009, this matter was transferred to this Court pursuant to 28 U.S.C. §

1406.[12]

9.   On April 19, 2011, Aqua Shield moved for partial summary judgment, arguing that

Defendants had infringed the '160 Patent by selling an infringing pool cover (the "Utah

Installation") to a Utah resident.[13]  Aqua Shield also argued that several other pool cover

models advertised by Defendants infringed the Patent.  On November 28, 2011, the Court

---

[8]Trial Tr. 101:11–25, 118:14–20, 118:21–25, 212:5–7.

[9]Docket No. 2-2, at 1.

[10]Docket No. 2-4, at 7.

[11]Docket No. 3-9, at 1.

[12]Docket No. 1, at 5.

[13]Docket No. 59.

5

granted the motion in part, finding that Defendants infringed Claims 1–14 and 16 of the

'160 Patent by selling the Utah Installation. The Court further found that the following

pool enclosure models sold by Defendants also infringed Claims 1–14 and 16 of the

Patent: Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient (the

"infringing models" or "infringing pool covers").[14]

10.    Aqua Shield asserts that the Court's August 19, 2011 Order also found that Defendants'

model Elegant pool cover infringes the '160 Patent. In support of this argument, Aqua

Shield states that the Utah Installation was a model Elegant pool cover and because the

Court determined that the Utah Installation infringes the '160 Patent, all model Elegant

pool covers infringe the '160 Patent. Plaintiff, however, has never sought a determination

that the Utah Installation was a model Elegant pool cover. Rather, in its motion for

summary judgment on infringement, Plaintiff sought only a determination that the Utah

Installation infringed the '160 Patent. Therefore, in its corresponding Order on summary

judgment, the Court determined only that the Utah Installation infringes the '160 Patent,

not that the model Elegant is an infringing model.

11.    On November 21, 2012, the parties filed cross-motions for summary judgment regarding

the validity of the '160 Patent.[15] On January 15, 2013, the Court granted summary

---

[14]Docket No. 87, at 8, 11.

[15]Docket Nos. 117, 118.

granted the motion in part, finding that Defendants infringed Claims 1–14 and 16 of the '160 Patent by selling the Utah Installation. The Court further found that the following pool enclosure models sold by Defendants also infringed Claims 1–14 and 16 of the Patent: Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient (the "infringing models" or "infringing pool covers").[14]

10.   Aqua Shield asserts that the Court's August 19, 2011 Order also found that Defendants' model Elegant pool cover infringes the '160 Patent. In support of this argument, Aqua Shield states that the Utah Installation was a model Elegant pool cover and because the Court determined that the Utah Installation infringes the '160 Patent, all model Elegant pool covers infringe the '160 Patent. Plaintiff, however, has never sought a determination that the Utah Installation was a model Elegant pool cover. Rather, in its motion for summary judgment on infringement, Plaintiff sought only a determination that the Utah Installation infringed the '160 Patent. Therefore, in its corresponding Order on summary judgment, the Court determined only that the Utah Installation infringes the '160 Patent, not that the model Elegant is an infringing model.

11.   On November 21, 2012, the parties filed cross-motions for summary judgment regarding the validity of the '160 Patent.[15] On January 15, 2013, the Court granted summary

---

[14]Docket No. 87, at 8, 11.

[15]Docket Nos. 117, 118.

6

**A66**

judgment in favor of Plaintiff and against Defendants, finding that Defendants had not overcome the '160 Patent's presumed validity.[16]

D.   POOL COVERS

12.   Plaintiff and Defendants appear to be the only companies in the United States that sell the arched, telescoping, non "boxy" pool enclosures taught by the '160 Patent. Mr. Brooks testified that it is and always has been Aqua Shield's policy to not license the '160 Patent.[17] He also testified that he sent cease and desist letters to any company that he believed was advertising or offering for sale enclosures that infringed the '160 Patent.[18] Each company that received a cease and desist letter quickly complied with it.[19]

13.   Defendants argue that the pool covers they sell differ in important ways from those sold by Aqua Shield. For example, while Aqua Shield does not install any of its pool enclosures for its customers,[20] Alukov flies its employees from Europe to the United States to provide factory installation of all their pool enclosures.[21] Additionally, while the majority of Aqua Shield's enclosures are not custom-manufactured to the customers'

---

[16]Docket No. 129, at 12.

[17]Trial Tr. 153:8–15.

[18]*Id.* at 102:17–105:18.

[19]*Id.* at 105:8–15, 170:4–12.

[20]*Id.* at 137:22–24.

[21]*Id.* at 209:24–210:4; Docket No. 164, at 13.

7

specifications,[22] the majority of Defendants' are.[23] Finally, Defendants' pool enclosures, on average, are more expensive than those sold by Aqua Shield.[24]

14.   Defendants argue that this evidence shows that the parties' products are not in competition with one another. As a result, Defendants' assert that their infringement has not harmed Plaintiff. The Court disagrees.

15.   Mr. Stonkus testified that he

> deal[s] with . . . competitors even today, whether it's Roll-A-Cover, Libart, DynaDome. In my business I lose business to them. Even though, you know, they might be a box enclosure as has been referred to, I lose business and they buy their enclosures over my enclosures every week. I get calls from customers who say, hey, I'm looking at DynaDome, I'm looking at a Roll-A-Cover, I'm looking at Libart enclosure, you know, what's the difference between yours. We talk about the design and the layout and so on, but at the end of the day all these guys have been in business . . . and I compete with them every single day."[25]

If DynaDome, Roll-A-Cover, and Libart (who all sell "boxy" pool enclosures not offered by Defendants) are Defendants' competitors and Defendants lose business to them, then it follows that Aqua Shield (who sells the same arched, telescoping enclosures Defendants do) is also in direct competition with Defendants.

---

[22]Trial Tr. 162:1–8.

[23]*Id.* at 208:4–14.

[24]*Id.* at 207:7–15.

[25]*Id.* at 196:8–20.

16.    Mr. Brooks' testimony also supports this conclusion.  In addition to his repeated

statements that Defendants are his competitors,[26] Mr. Brooks also testified that Aqua

Shield receives calls from potential customers who state that they "could get similar

product from" Defendants.[27]

E.     DEFENDANTS' SALES

17.    Pool & Spa was formed on March 29, 2007, and began selling pool enclosures in 2008.[28]

The purpose of establishing Pool & Spa in the United States was to "sell the models of

pool enclosures manufactured by [Alukov] and promoted by the IPC Team . . . ."[29]

18.    On July 19, 2005, Alukov and IPC sold an infringing pool cover to Sunshine Pool

Products, located in Clearfield, Utah, for $9,000.[30]  Sunshine Pool Products was the

purchaser and end user of the Utah Installation.[31]  Since the Utah Installation, neither IPC

nor Alukov has made any sales of pool enclosures within the United States other than to

Pool & Spa.[32]

---

[26]*Id.* at 118:4–6, 119:19–22, 120:12–13, 130:20–24, 132:2–5, 147:1–2, 150:19–20, 168:12–18, 181:22–23.

[27]*Id.* at 116:7–13.

[28]Trial Ex. H, at 1; Trial Tr. 32:9–14.

[29]Trial Tr. 32:18–22.

[30]Trial Ex. GG, at 1; Trial Tr. 32:15–17, 228:15–21.

[31]Trial Tr. 57:7–9.

[32]*Id.* at 200:22–201:11.

9

19.   From 2008 to 2013, Pool & Spa sold seventy-four infringing pool covers, generating
      $2,700,000 in gross sales revenue.[33]

F.    WILLFULNESS

20.   Prior to the Court's Order on infringement, Defendants had a reasonable belief that their
      pool enclosures did not infringe the '160 Patent.  Although Defendants' did not rely on an
      opinion letter from counsel that their products did not infringe,[34] Mr. Stonkus testified
      that Defendants believed that their products did not infringe because the Eastern District
      of New York denied Aqua Shield's motion for preliminary injunction.  He said that
      "[b]asically the judge had made a ruling and [Aqua Shield] had [sought a] preliminary
      injunction so that we [would] not sell.  The judge ruled, sorry, he didn't accept it, so we
      continued to sell and market our enclosures."[35]  Based on this evidence, the Court finds
      that prior to the Court's order on infringement, Defendants' reasonably believed that their
      products did not infringe the '160 Patent.

21.   After the Court's infringement Order, Defendants made a good faith effort to design
      around the '160 Patent.  Claim 1 of the '160 Patent teaches a device with "end panels
      [that] are generally flat and removable."[36]  Defendants attempted to design around this
      element by fixing the end panels of their pool enclosures in place so that they would no

---

[33]Trial Ex. DD, at 1–3; Trial Tr. 14:23–15:5, 228:9–12.

[34]Trial Tr. 88:14–17.

[35]*Id.* at 199:17–20.

[36]Trial Ex. 1.

longer be removable. Mr. Stonkus testified that after the Court's ruling on infringement

he contacted Defendants' factory in the Czech Republic, and

> spoke to their design people as well as people in the office. I had a lead
> person there and specifically directed them that we cannot ship into the
> United States any enclosures that have detachable faces. So that was very
> clear to them. We talked about how we would change that. They felt
> certainly we're going to make them fixed, permanent faces.[37]

Defendants thereafter modified their enclosures to permanently fix the end panels in

place.[38] The Court finds that this evidence shows that Defendants made a good faith

effort to design around the '160 Patent.

G.    AQUA SHIELD'S PROFIT MARGIN

22.    Neither party offered expert testimony regarding lost profits.

23.    Plaintiff relies on the testimony of Mr. Brooks to support its claim for lost profits. Mr.

Brooks testified that before Defendants entered the market, Aqua Shield enjoyed a profit

margin of between 35 and 45 percent.[39] After Defendants began competing in the U.S.

market, Aqua Shield's profit margin fell to its current rate of "ten to 15 percent max."[40]

With regard to fixed costs, Mr. Brooks testified that Aqua Shield could have produced an

---

[37]Trial Tr. 200:9–15.

[38]*See id.* at 203:9–20.

[39]*Id.* at 111:13–18.

[40]*Id.* at 113:14.

11

additional 25 to 50 pool covers per year without incurring additional costs for personnel, building, or equipment.[41]

24.   Mr. Brooks conceded that at the same time Aqua Shield was allegedly losing profits due to Defendants' infringement, Aqua Shield was also experiencing increased costs of production.  When asked whether Aqua Shield's expenses increased or decreased after Defendants entered the market, Mr. Brooks testified: "Rent goes up.  Aluminum goes up.  Glazing—polycarbonate glazing goes up.  Payroll goes up."[42]

25.   The Court finds that Mr. Brooks' testimony regarding profit margins and fixed costs is not credible.  Plaintiff introduced no financial records to corroborate Mr. Brooks' testimony, and Mr. Brooks refused to testify regarding the foundation for his various estimates.  In the absence of any evidentiary support, the Court will not rely on Mr. Brooks' naked assertions as to Aqua Shield's financial affairs.

H.   2009 LICENSING DISCUSSIONS

26.   In early 2009, Mr. Brooks met with Mr. Stonkus and Mr. Zitko to discuss licensing the '160 Patent to Defendants.[43]  Mr. Zitko testified that his interest in licensing the Patent arose out of his desire to avoid further litigation with Aqua Shield.  Specifically, he

---

[41]*Id.* at 113:18–114:7.

[42]*Id.* at 115:23–25.

[43]*Id.* at 303:9–12.

12

A72

stated: "I prepare royalty fee for you to stop—to stop—to stop this invoicing from the lawyer."[44]

27.    In addition to granting Defendants the right to manufacture and sell products covered by the '160 Patent, the parties also appeared to believe that the agreement would give Aqua Shield the right to resell a number of Defendants' noninfringing products.[45] Ultimately, however, the negotiations failed and no agreement was reached.[46]

### III.  CONCLUSIONS OF LAW

28.    As stated, before the Court are the following issues of law: (1) the amount of damages, if any, to be awarded to Plaintiff; (2) whether Plaintiff is entitled to attorney fees; (3) whether Defendants induced infringement of the '160 Patent; (4) whether Defendants' infringement was willful; and (5) whether Plaintiff is entitled to a permanent injunction.

### A.    DAMAGES

29.    Plaintiff claims that it is entitled to damages in the form of either lost profits or a reasonable royalty on Defendants' infringing sales.

#### 1.    LOST PROFITS

30.    To receive an award of lost profits, Aqua Shield must show that "but for" the infringement, it would have made the additional profits enjoyed by Defendant.[47] "A

---

[44]*Id.* at 140:16–22.

[45]*See id.* at 153:2–20, 240:8–12.

[46]*Id.* at 145:25–146:2, 308:2–13.

[47]*Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003).

13

**A73**

patentee may resort to any method of showing, with reasonable probability, entitlement to lost profits 'but for' the infringement."[48]  "The *Panduit* and two-supplier market tests are recognized methods of showing 'but for' causation."[49]  In this case, Plaintiff attempts to show entitlement to lost profits through both the *Panduit* test and the two-supplier market test.

31.     The *Panduit* test requires that the patentee establish: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made."[50]

32.     The two-supplier market test requires that the patentee show "1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales."[51]

33.     As both tests require Plaintiff to prove the amount of profit it would have made, and that factor is determinative of the issue of lost profits in this case, the Court will limit its analysis to that factor.

---

[48]*Id.*

[49]*Id.*

[50]*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

[51]*Micro Chem.*, 318 F.3d at 1124.

**A74**

34.    To establish the amount of profit it would have made, Plaintiff must introduce evidence

of its profit margin, as well as evidence of any other factors that affect its profits and

losses, including fixed and variable costs.[52]   Although Plaintiff need not prove the amount

of profit he would have made with mathematical precision, damages may "not be

determined by mere speculation or guess."[53]

35.    Plaintiff argues that it is entitled to lost profits due to lost sales and price erosion.  Its

claim for lost profits based on lost sales is supported only by the testimony of Mr. Brooks.

As stated, however, Mr. Brooks' testimony regarding Aqua Shield's profit margin and

fixed and variable costs is not credible.  Plaintiff offers no other evidence regarding its

profit margin or the factors affecting it.

36.    Plaintiff's evidence regarding lost profits for price erosion is similarly inadequate.  To

establish lost profits due to price erosion, Plaintiff has the "burden . . . to show that 'but

for' infringement, it would have sold its product at higher prices."[54]   Among other things,

---

[52]*See Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996) ("Instead of presenting evidence of actual sales combined with reliable economic analysis of demand, supply, and price over time, [the patent owner] invites the jury to engage in rapt speculation."); *Panduit Corp.*, 575 F.2d at 1156 ("Panduit's Achilles heel on element (4) is a lack of evidence of its fixed costs."); John M. Skenyon et al., *Patent Damages Law & Practice* § 2:28 (2012) ("It is imperative in making a case of lost profits to present proof of all factors that affect profits and losses, including fixed and variable costs.").

[53]*Oiness*, 88 F.3d at 1030 (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931)).

[54]*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001).

"[a] credible but-for analysis must account for the 'effect of [a] higher price on demand for the product.'"[55]

37.  "Instead of presenting evidence of actual sales combined with reliable economic analysis of demand, supply, and price over time,"[56] Aqua Shield simply restates the same inadequate basis it attests is sufficient to establish lost profits due to lost sales.  Plaintiff notes that Mr. Brooks testified that prior to Defendants' entry into the United States market, Aqua Shield enjoyed a 35 to 45 percent profit margin,[57] but that it fell to 10 to 15 percent once Aqua Shield had to compete with Defendants.[58]  As stated, this testimony is not credible.  Even if it were, however, it would not be adequate to show lost profits due to price erosion.  According to Plaintiff, Aqua Shield's reduced profit margin is due to "Defendant's entry into the market *and* [Aqua Shield's] artificial price erosion."[59]  Plaintiff makes no effort to determine which portion of its lost profit is due to lost sales, which is due to Aqua Shield's reduced price, and which is due to other factors, such as Aqua Shield's admitted increasing costs of production.[60]  Additionally, Aqua Shield fails

---

[55]*SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1381 (Fed. Cir. 2013) (quoting *Crystal Semiconductor Corp.*, 246 F.3d at 1357).

[56]*See Oiness*, 88 F.3d at 1030.

[57]Trial Tr. 111:13–18.

[58]*Id.* at 113:14.

[59]Docket No. 163, at 14 (emphasis added).

[60]Trial Tr. 115:20–25.

16

to account for the effect an increased price would have had on the demand for its product.

Finally, Aqua Shield has not adequately addressed whether the general decline in the

housing market in late 2008 was also responsible for a portion of its reduced profits.

Although Mr. Brooks testified that he believed the market downturn would not affect

Aqua Shield's sales because Aqua Shield is the "Kia" of the pool enclosure market,[61] the

Court cannot accept this self-serving testimony in the absence of other evidence to

support it.

38.     Based as it is on insubstantial evidence, the Court will deny Plaintiff's claim for damages

due to lost profits.

2.     REASONABLE ROYALTY

39.     Upon a finding of patent infringement, a court is required by statute to "award the

claimant damages adequate to compensate for the infringement, but in no event less than

a reasonable royalty for the use made of the invention by the infringer, together with

interest and costs as fixed by the court."[62]   However, where a patentee has put on no

satisfactory evidence of a reasonable royalty rate, a court cannot award such damages.[63]

---

[61]*Id.* at 158:22–159:8.

[62]35 U.S.C. § 284.

[63]*See Dow Chem. Co. v. Mee Indus., Inc.,* 341 F.3d 1370, 1382 (Fed. Cir. 2003) ("[T]he
district court's obligation to award some amount of damages does not mean that a patentee who
puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the
ground that the amount awarded by the court is not 'reasonable' and therefore contravenes
section 284.") (citation and internal quotation marks omitted); *Devex Corp. v. Gen. Motors
Corp.,* 667 F.2d 347, 363 (3d Cir. 1981) ("The statute [35 U.S.C. § 284] requires the award of a

40.   A reasonable royalty is the amount that "a person, desiring to manufacture [, use, or] sell

a patented article, as a business proposition, would be willing to pay as a royalty and yet

be able to make [, use or] sell, the patented article, in the market, at a reasonable profit."[64]

41.   To determine a reasonable royalty rate, courts often employ the "hypothetical

negotiation" or the "willing licensor-licensee" approach.[65]  This approach "attempts to

ascertain the royalty upon which the parties would have agreed had they successfully

negotiated an agreement just before infringement began."[66]  "The hypothetical negotiation

tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to

describe the resulting agreement.  In other words, if infringement had not occurred,

willing parties would have executed a license agreement specifying a certain royalty

payment scheme."[67]

---

reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."), *aff'd on other grounds*, 461 U.S. 648 (1983).

[64]*Trans-World Mfg. Corp. v. Al Nyman & Sons*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) (alterations in original) (quoting *The Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co.*, 95 F.2d 978, 984 (6th Cir. 1938)).

[65]*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[66]*Id.* at 1325.

[67]*Id.*

18

**A78**

42.   A determination of the royalty rate derived from a hypothetical negotiation is often made

by assessing the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*[68]  These

include: (1) established royalty rate for the patent; (2) license rates paid for comparable

patents; (3) type of license (exclusive/non-exclusive or restricted/non-restricted); (4)

licensor's established licensing policies; (5) competitive relationship between licensor

and licensee; (6) convoyed sales; (7) duration and terms of the license; (8) commercial

success and established profitability; (9) advantages over old methods; (10) nature of

patented invention and benefits to those that use it; (11) extent of use of the patent by the

infringer; (12) customary industry rate for invention or analogous inventions; (13) portion

of profit that should be credited to the invention as distinguished from nonpatented

elements, manufacturing processes, business risks, or significant features added by the

infringer; (14) opinion testimony of qualified experts; and (15) amount that licensor and

licensee would have agreed upon.[69]  The Federal Circuit "sanction[s] the use of the

*Georgia-Pacific* factors to frame the reasonable royalty inquiry."[70]

---

[68]318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see Minks v. Polaris Indus., Inc.*, 546 F.3d
1364, 1372 (Fed. Cir. 2008).

[69]*Georgia-Pacific*, 318 F. Supp. at 1120.

[70]*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

19

43.     Pursuant to the first factor, the Court considers "[t]he royalties received by the patentee

for the licensing of the patent in suit, proving or tending to prove an established

royalty."[71]

44.     Plaintiff argues that this factor has no bearing on the determination of a reasonable

royalty rate because there "is no evidence of an established royalty."[72] For their part,

Defendants argue that the parties' 2009 licensing discussions provide solid evidence of an

established royalty rate.

45.     The Court finds that the parties' 2009 licensing discussions do not provide evidence of a

reasonable royalty rate. First, the hypothetical negotiation used to determine a reasonable

royalty rate must take place before litigation begins, because the "litigation itself can

skew the results of the hypothetical negotiation."[73] Here, the negotiations took place in

2009, four years after the 2005 filing of this case, and Mr. Zitko testified that his primary

reason for negotiating was to avoid the costs of litigation. In his words, "[o]ur target, we

want to avoid to pay high invoices to our lawyers because I pay every year maybe 50,

---

[71]*Georgia-Pacific*, 318 F. Supp. at 1120.

[72]Docket No. 163, at 17.

[73]*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) ("[T]his court has
acknowledged that the hypothetical reasonable calculation occurs before litigation and that
litigation itself can skew the results of the hypothetical negotiation."); *see Hanson v. Alpine
Valley Ski Area, Inc.*, 718 F.2d 1075, 1078–79 (Fed. Cir. 1983) ("[S]ince the offers were made
after the infringement had begun and litigation was threatened or probable, their terms should not
be considered evidence of an established royalty, since license fees negotiated in the face of a
threat of high litigation costs may be strongly influenced by a desire to avoid full litigation.")
(internal quotation marks and citation omitted).

20

60,000 to my lawyer. [Mr. Brooks] told me he will defend his patent. . . . I said okay, I prepare royalty fee for you to stop—to stop—to stop this invoicing from the lawyer."[74] Influenced, as he clearly was, by the desire to avoid litigation, the Court cannot rely on the rates considered by the parties in their 2009 licensing negotiations.

46.     Second, it appears that the parties were negotiating not just a licensing agreement that would allow Defendants to sell the infringing pool covers, but also an agreement that would allow Aqua Shield to resell Defendants' products.[75] It is impossible to tell how and to what extent the royalty rate may have changed if the parties had negotiated only a license allowing Defendants to sell the infringing pool covers.

47.     Finally, the parties' licensing discussions did not produce a mutually acceptable royalty rate. Thus, the rate provided by Defendants cannot be relied on as an "established" royalty rate, and is therefore not probative in determining a reasonable royalty rate.

48.     The Court will not consider the second, third, sixth, tenth, thirteenth, and fourteenth *Georgia-Pacific* factors as the parties have not argued them and there is no evidence to support such an analysis.

49.     Pursuant to the fourth factor, the Court considers the "licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the

---

[74]Trial Tr. 140:16–22.

[75]*See id.* at 153:2–20, 240:8–12.

21

invention . . . ."[76] As it was Aqua Shield's policy not to license the '160 Patent, this factor cuts in favor of a higher royalty rate.

50. The fifth factor considers the "commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter."[77] Here, the parties compete in selling the same type of pool covers throughout the United States. Thus, this factor supports a higher royalty rate.

51. Under the seventh factor, the Court considers the duration of the '160 Patent. The duration of a patent is measured from the date of the hypothetical negotiation to the date the patent expires.[78] A longer duration generally supports a higher royalty rate.[79] Here, the hypothetical negotiation would have taken place in July 2005, just before infringement began.[80] As the '160 Patent expires in July 2021, the patent would have endured for sixteen years after the date of the hypothetical negotiation. This factor therefore cuts in favor of a higher royalty rate.

52. The Court next considers the eighth *Georgia-Pacific* factor, the "established profitability of the product made under the patent; its commercial success; and its current

---

[76]*Georgia-Pacific*, 318 F. Supp. at 1120.

[77]*Id.*

[78]Skenyon et al., *supra* note 52, § 3:29.

[79]*Id.*

[80]*Lucent Techs., Inc.*, 580 F.3d at 1325.

22

popularity."[81]  Plaintiff argues that Aqua Shield has demonstrated sufficient success

selling its pool covers to show that this factor weighs in favor of a high royalty rate.

However, Plaintiff introduced no evidence regarding Aqua Shield's financial status aside

from Mr. Brooks' unsubstantiated and vague testimony.  Defendants, however, have had

at least some degree of success selling the patented product, as demonstrated by their

sales of infringing pool covers.  Thus, the Court finds that this factor favors a higher

royalty rate.

53.    Pursuant to the ninth factor, the Court considers the "utility and advantages of the patent

property over the old modes or devices, if any, that had been used for working out similar

results."[82]  The patented pool covers are easier to construct, are more aerodynamic, have a

higher snow-load capacity, and are more leak-proof than other "boxy" pool covers.[83]  This

factor therefore favors a higher royalty rate.

54.    The eleventh factor requires assessment of the "extent to which the infringer has made

use of the invention . . . and any evidence probative of the value of that use."[84]

Defendants have made thorough use of the patented invention, as demonstrated by Pool

& Spa's sales of the infringing products.  This factor therefore supports a higher royalty.

---

[81]*Georgia-Pacific*, 318 F. Supp. at 1120.

[82]*Id.*

[83]Trial Tr. 101:11-25, 118:14–20, 118:21-25; 212:5–7.

[84]*Georgia-Pacific*, 318 F. Supp. at 1120.

55.   Pursuant to the twelfth factor, the Court considers the "portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."[85]  This factor deals with the narrow issue "of whether there is a *customary* portion of the profit of selling price normally attributed to the patented invention or analogous ones.  As such, this factor is not usually considered because evidence of a customary percentage of the profit or selling price for the specific invention or analogous inventions is not very common."[86]  There was no such evidence in this case.

56.   Plaintiff argues that this factor favors a higher royalty rate because "Aqua Shield has established that a selling price attaining profits in the range of 10%–45% permit a pool enclosure company to be viable in the United States using the patented invention."[87]  Aqua Shield's only evidence regarding its profit margins came by way of Mr. Brooks' testimony, which the Court found to be not credible.  As such, Aqua Shield's argument on this factor is without evidentiary support.  The Court therefore finds that this factor does not affect the determination of a reasonable royalty rate.

---

[85]*Id.*

[86]Skenyon et al., *supra* note 52, § 3:34.

[87]Docket No. 163, at 20.

24

**A84**

57.   The last *Georgia-Pacific* factor asks what royalty rate a willing licensor and licensee would have agreed to had they negotiated a licensing agreement just prior to infringement.

58.   Mr. Stonkus, the CEO of Pool & Spa and Defendants' representative in this case, testified that a six-percent royalty rate would be customary in the pool-cover industry.[88] However, when he was asked how he came to the six-percent figure, Mr. Stonkus testified that, "[i]t goes in line with when I have other dealers that offer our enclosures for sale, typically they are in that five-percent range is what Pool & Spa is giving those as a royalty or commission for selling our enclosures."[89] Thus, the rate proposed by Mr. Stonkus would not have been a royalty for licensing the '160 Patent, but rather would have been a commission for selling another's unpatented products.  It is not clear that there is any relationship between the commission rate Pool & Spa pays to third parties for selling unpatented Pool & Spa enclosures and what a reasonable royalty would be for licensing the '160 Patent.  The Court therefore finds Mr. Stonkus' opinion regarding a six-percent royalty to be unhelpful.

59.   Plaintiff argues that a royalty rate of "no less than about 25%" is warranted in this case because "Aqua Shield has established that a selling price attaining profits in the range of

---

[88]Trial Tr. 238:8–18.

[89]*Id.* at 240:19–22.

25

**A85**

10%-45% permit a pool enclosure company to be viable in the United States using the patented invention."[90]

60.     There are two problems with this assertion. First, aside from Mr. Brooks' unsubstantiated assertions, Plaintiff has introduced no evidence that a reasonable royalty rate should be at or near Aqua Shield's level of profitability. Indeed, the hypothetical negotiation posits a royalty amount that *Defendants* "would be willing to pay as a royalty and yet be able to make [, use or] sell, the patented article, in the market, at a reasonable profit."[91] Were Defendants to pay a royalty rate equal to the profit margin in the industry, they would make no profit. The Court therefore cannot accept Plaintiff's assertion that a reasonable royalty should be equal to its profit margin.

61.     Second, even if the Court were persuaded that a reasonable royalty in this case would be equal to Plaintiff's profit margin, the Court would be unable to determine that rate because the Court has no reliable evidence of Aqua Shield's profit margin. As stated, Plaintiff's only evidence regarding its profit margin was Mr. Brooks' unsubstantiated testimony, which the Court has found to be not credible.

62.     Having considered each of the *Georgia-Pacific* factors, the Court finds that it is unable to determine a reasonable royalty rate. Although some of the factors weigh in favor of a "higher" royalty rate, the Court is without sufficient evidence to determine what that rate

---

[90]Docket No. 163, at 20–21.

[91]*Trans-World Mfg.*, 750 F.2d at 1568 (alterations in original) (quoting *The Goodyear Tire & Rubber Co.*, 95 F.2d at 984).

26

should be higher than. For the reasons already stated, the Court cannot rely on Plaintiff's

assertion that Aqua Shield's profit margin is a reasonable royalty rate or on Defendants'

argument that the parties' 2009 licensing negotiations provide the rate. The Court also

cannot accept Mr. Stonkus' testimony that a six-percent royalty rate is customary in the

industry.

63.     Although 35 U.S.C. § 284 states that, upon a finding of infringement, the Court "shall

award . . . in no event less than a reasonable royalty," the record in this case does not

contain sufficient evidence to determine a reasonable royalty rate. The requirement that

the court award a reasonable royalty ceases to exist where there is an "absence of any

evidence from which a court may derive a reasonable royalty."[92] Such is the case here.

To determine a reasonable royalty rate based on the evidence before the Court would be

nothing more than "pull[ing] the royalty out of a hat . . . ."[93] The Court is unable and

unwilling to entertain such guesswork. Accordingly, Plaintiff's request for damages

based on a reasonable royalty is denied.

64.     As Plaintiff has not met its burden to establish either the amount of its lost profits or a

reasonable royalty rate, the Court is unable to award Plaintiff any damages. Indeed, in the

---

[92]*Devex Corp.*, 667 F.2d at 363.

[93]*Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 910 (N.D. Ill. 2012) (citing *Dow Chem. Co.*, 341 F.3d at 1382).

absence of evidence necessary to determine a reasonable royalty rate, not even nominal

damages can be awarded.[94]

C.    ATTORNEY FEES

65.    Pursuant to 35 U.S.C. § 285,"[t]he court in exceptional cases may award reasonable

attorney fees to the prevailing party."  Before exercising its discretion to determine

whether attorney fees should be awarded, a court must first determine whether a case is

exceptional.[95]  The party seeking attorney fees must prove that the case is exceptional by

clear and convincing evidence.[96]  "The criteria for declaring a case exceptional include

willful infringement, bad faith, litigation misconduct, and unprofessional behavior."[97]

"[T]he trial court has broad discretion in the criteria by which it determines whether to

award attorney fees."[98]

---

[94]*See Devex Corp.*, 667 F.2d at 363 (affirming award of zero damages for lack of evidence); *Lindemann Maschinenfabrik v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1407 (Fed. Cir. 1990) ("[T]he statute obviates the need to show the fact of damage when infringement is admitted or proven, but that does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable and therefore contravenes section 284.").

[95]*Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1370 (Fed. Cir. 1999).

[96]*Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007).

[97]*Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1378 (Fed. Cir. 2005).

[98]*Id.* (quoting *Brooktree Corp. v. Advanced Micro Devices*, 977 F.2d 1555, 1582 (Fed. Cir. 1992)).

66.     The Court finds that this is not an exceptional case. First, Defendants did not willfully infringe the '160 Patent. "[T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."[99] In other words, Defendants' infringing actions must be objectively reckless to establish willful infringement.[100] Where an infringer's position is susceptible to a reasonable conclusion of no infringement, however, the infringer was not objectively reckless.[101]

67.     The Court has found that although Defendants continued to sell and market infringing pool enclosures after this case was filed, they did so because they had a reasonable belief that their enclosures did not infringe the '160 Patent. This belief was based on the denial of Aqua Shield's motion for a preliminary injunction. Furthermore, after the Court ruled that Defendants' enclosures did infringe, Defendants made a good faith effort to design around the Patent by fixing the end panels of their pool covers in place. Thus, Plaintiff has not shown that Defendants willfully infringed as it has not met its burden to show that Defendants acted despite an objectively high likelihood of infringement.

---

[99]*In re Seagate Tech. LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

[100]*See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310–11 (Fed. Cir. 2011).

[101]*Id.* 1310.

A89

68.   Second, the Court finds that Defendants have not acted in bad faith, engaged in litigation

misconduct, or exhibited bad behavior such that an award of attorney fees would be

justified.[102]

69.   The Court therefore finds that this is not an exceptional case, and will not award attorney

fees.

D.   INDUCED INFRINGEMENT

70.   35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent

shall be liable as an infringer."   As the Court has already determined that Defendants are

liable for infringement, the Court finds it unnecessary to determine whether they also

induced infringement.

E.   WILLFUL INFRINGEMENT

71.   Plaintiff argues that Defendants willfully infringed the '160 Patent such that Aqua Shield

is entitled to increased damages.   When a court determines that a party has willfully

infringed, it may increase the damages up to three times the amount found or assessed.[103]

As the Court has already determined that Defendants did not willfully infringe the '160

---

[102]*J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1052 (Fed. Cir. 1987) (stating that the purpose of § 285 is to provide courts discretion to award attorney fees "where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear").

[103]35 U.S.C. § 284 ("[T]he court may increase the damages up to three times the amount found or assessed.").

Patent and that Plaintiff has failed to meet its burden to prove damages, the Court need not discuss this claim further.

F.    PERMANENT INJUNCTION

72.    In cases of patent infringement, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."[104]  Plaintiff must satisfy a four-factor test in order to be granted a permanent injunction.  Specifically, Aqua Shield must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[105]  "Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement."[106]  Ultimately, however, "[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."[107]

73.    Aqua Shield contends that it has and will continue to suffer irreparable harm due to Defendants' infringement.  Specifically, Plaintiff argues that Defendants' competition has

---

[104]*Id.* § 283.

[105]*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

[106]*Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012).

[107]*eBay Inc.*, 547 U.S. at 391.

31

harmed Aqua Shield by reducing its selling price and by impinging on its exclusive right to sell products covered by the '160 Patent. Defendants respond that Aqua Shield has not been irreparably harmed because Defendants' pool covers are in a more expensive market than Aqua Shield's "cheaper, less customize-able" covers.[108] Defendants therefore contend that their products do not compete with those of Aqua Shield and, as a result, Plaintiff has suffered no harm.

74.    "'[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address."[109] "Direct competition between the patentee and the infringer is evidence the patentee is irreparably harmed by the infringing activities."[110] "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."[111]

75.    Defendants and Plaintiff are direct competitors. Therefore, the Court also finds that Aqua Shield has suffered the irreparable harm of being forced to compete against products that infringe the '160 Patent.

---

[108]Docket No. 164, at 23.

[109]*Celsis In Vitro, Inc. v. CelizDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

[110]*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 2013 WL 3043668, at *2 (D. Nev. June 17, 2013) (citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1152–54 (Fed. Cir. 2011)).

[111]*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).

76.   Plaintiff has also shown that it has suffered a loss of reputation. Mr. Brooks testified that
      it was Aqua Shield's policy to not license the '160 Patent to any other company.
      According to Mr. Brooks, this was because Aqua Shield "intend[ed] to manufacture and
      distribute our product ourselves. [Aqua Shield] buil[t] the market just to do it ourselves
      exclusively."[112]

77.   "Exclusivity is closely related to the fundamental nature of patents as property rights. It
      is an intangible asset that is part of a company's reputation . . . ."[113] Where, as here, Aqua
      Shield's "exclusive right to make, use, and sell the patented inventions is under attack by
      [Defendants'] infringement," the Court concludes that Plaintiff's reputation has been
      irreparably harmed.[114]

78.   To satisfy the second factor for a permanent injunction Plaintiff must show that remedies
      at law, such as monetary damages, would be inadequate to compensate Aqua Shield for
      Defendants' infringement.[115] The Court finds that Plaintiff has satisfied this element.
      Although monetary damages would likely be sufficient to compensate Plaintiff for lost
      sales, they cannot adequately compensate Plaintiff for its loss of reputation.[116]

---

[112]Trial Tr. 108:13–15.

[113]*Douglas Dynamics*, 717 F.3d at 1345.

[114]*Id.*

[115]*Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1247 (Fed. Cir. 1989).

[116]*See Douglas Dynamics*, 717 F.3d at 1345.

33

**A93**

79.   Considering the balance of hardships between the parties, the Court finds that a remedy is

warranted.  Defendants have not presented evidence regarding the hardship that they

would suffer should the court grant a permanent injunction.  On the other hand,

"requiring [Aqua Shield] to compete against its own patented invention, with the resultant

harms described above, places a substantial hardship on [Aqua Shield]."[117]

80.   The final factor also favors entry of a permanent injunction.  Although competition

generally serves the public interest, the Court finds that allowing Defendants to continue

to copy the '160 Patent has "the effect of inhibiting innovation and incentive."[118]  "This

detrimental effect, coupled with the public's general interest in the judicial protection of

property rights in inventive technology," outweighs any interest the public may have in

purchasing Defendants' infringing products.[119]

81.   Having determined that Plaintiff is entitled to a permanent injunction, it is incumbent on

the Court to determine the parameters of that injunction.  Rule 65(d) of the Federal Rules

of Civil Procedure specifies the proper form and scope of an injunction issued by a

district court:

> (1) Contents.  Every order granting an injunction and every restraining order must:
>       (A) state the reasons why it issued;
>       (B) state its terms specifically; and

---

[117]*Robert Bosch LLC*, 659 F.3d at 1156.

[118]*Id.*

[119]*Id.*

34

(C) describe in reasonable detail—and not by referring to the complaint or
other document—the act or acts restrained or required.
(2) Persons Bound.  The order binds only the following who receive actual notice
of it by personal service or otherwise:
(A) the parties;
(B) the parties' officers, agents, servants, employees, and attorneys; and
(C) other persons who are in active concert or participation with any
described in Rule 65(d)(2)(A) or (B).

82.     "In accord with the policy of Rule 65(d), the Supreme Court has denounced broad

injunctions that merely instruct the enjoined party not to violate a statute."[120]  In the

patent infringement context, the Federal Circuit "has rejected as overly broad a permanent

injunction that simply prohibits future infringement of a patent."[121]  "[T]he only acts [an]

injunction may prohibit are infringement of the patent by the adjudicated devices and

infringement by devices no more than colorably different from the adjudicated devices.

In order to comply with Rule 65(d), the injunction should explicitly proscribe only those

specific acts."[122]  Furthermore, "a trial court, upon a finding of infringement, must

narrowly tailor an injunction to fit the specific adjudged violations."[123]

83.     Plaintiff argues that Defendants should be enjoined from

(1) the further and continued manufacture and sale of infringing devices including
the current product configuration of the models Elegant, Universe, Laguna,
Tropea, Combi, Style, Veranda, Spa and Orient pool enclosures with generally flat

---

[120]*Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) (citing *NLRB
v. Express Publ'g Co.*, 312 U.S. 426, 435–36 (1941)).

[121]*Id.*

[122]*Id.*

[123]*Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).

35

and removable end-panels ("Infringing Devices"); (2) the importation, distribution through sale and use of dismantled Infringing Devices; and (3) the manufacture, importation, offer for sale, sale and/or use of any pool enclosure devices within the scope of claims 1-14 and 16 of the '160 Patent.[124]

Defendants have not offered a proposed injunction.

84.    The Court finds that portions of Plaintiff's proposed injunction are overly broad. To

begin with, the Court has not found Defendants' model Elegant to infringe the '160

Patent and therefore cannot enjoin Defendants from manufacturing or selling it. Second,

Plaintiff's requested injunctive relief is not limited to Defendants' activities in the United

States. As Plaintiff has not shown that Defendants' products reach the United States

through any channel other than through Pool & Spa's importation, the Court will not

enjoin the international manufacture or sale of the infringing models.[125] Finally, the Court

is unable to grant Plaintiff's third request, which effectively seeks an injunction of any

future infringement of the '160 Patent by Defendants, as the Court has power to prohibit

only "infringement of the patent *by the adjudicated devices* and infringement by devices

not more than colorably different from the adjudicated devices."[126] As set forth more

fully below, however, the Court will enjoin Defendants' from making, using, selling, or

offering to sell in the United States or importing into the United States the models this

---

[124]Docket No. 163, at 25.

[125]The Patent Act prohibits only one who "makes, uses, offers to sell, or sells any patented invention, within the *United States or imports into the United States* any patented invention during the term of the patent therefore, infringes the patent." 35 U.S.C. § 271 (emphasis added).

[126]*Int'l Rectifier Corp.*, 383 F.3d at 1316 (emphasis added).

Court has previously determined to infringe the '160 Patent, as well as any device that is

not more than colorably different from the adjudicated devices.

85.     In sum, the Court finds that: (1) Plaintiff has failed to meet its burden to establish

entitlement to damages in the form of either lost profits or a reasonable royalty; (2) this

case is not exceptional such that Plaintiff is entitled to attorney fees; and (3) Plaintiff is

entitled to a permanent injunction as set forth below.

## IV.  CONCLUSION

It is therefore

ORDERED that judgment is entered in favor of Plaintiff and against Defendants on

Plaintiff's claim that Defendants' models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa,

and Orient infringe claims 1–14 and 16 of the '160 Patent.  It is further

ORDERED that Plaintiff's claim for damages is DENIED.  It is further

ORDERED that Plaintiff's request for a permanent injunction is GRANTED to the extent

it seeks the injunction described below and is DENIED in all other respects.  It is further

ORDERED that Defendants Inter Pool Cover Team, Alukov HZ Spol. S.R.O., Alukov,

Spol. S.R.O., Pool & Spa Enclosures, their officers, agents, servants, employees, and attorneys,

and those persons in active concert or participation with such person(s) who receive actual notice

of this Order by personal service or otherwise shall be permanently enjoined from infringing,

either directly, by inducement, or by contribution, the '160 Patent, by, during the term of the

Patent, making, using, selling, or offering to sell the products adjudged to infringe in the United

States or importing into the United States the products adjudged to infringe or not more than

colorably different from the adjudicated devices. The products adjudged to infringe the '160

Patent include the following pool cover models manufactured or offered for sale by Defendants:

Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient, with generally flat and

removable end-panels.

    The Clerk of Court is directed to enter judgment in accordance with this Order and close

this case forthwith.

    DATED  August 14, 2013.

               BY THE COURT:

               TED STEWART
               United States District Judge

38

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| AQUA SHIELD, INC., A New York Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>INTERPOOL COVER TEAM, ALUKOV HZ SPOL. S.R.O., ALUKOV, SPOL. S.R.O., POOL & SPA ENCLOSURES, LLC,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S RULE 59 MOTION TO ALTER JUDGMENT<br><br><br>Case No. 2:09-CV-13 TS |

This matter is before the Court on Plaintiff's Rule 59 Motion to Alter Judgment.[1] For the reasons discussed below, the Court will grant Plaintiff's Motion to award a reasonable royalty and to allow Plaintiff to seek costs, but will deny the Motion in all other respects.

---

[1]Docket No. 167.

1

**A99**

## I. BACKGROUND

On March 19–20, 2013, the Court held a two-day bench trial on this case. This Court previously found that Defendants Inter Pool Cover Team, Alukov HZ Spol. S.R.O., Alukov, Spol. S.R.O., and Pool & Spa Enclosures, LLC (collectively "Defendants") infringed Plaintiff Aqua Shield Inc.'s ("Aqua Shield") patent, U.S. Patent No. 6,637,160 ("the '160 Patent"). The Court published Findings of Fact and Conclusions of Law[2] and ordered judgment in favor of Plaintiff on Plaintiff's claim that Defendants' models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient infringe claims 1–14 and 16 of the '160 Patent. Further, the Court awarded zero damages and ordered a permanent injunction. Plaintiff now seeks to amend the judgment to include (1) a finding of willfulness, (2) reasonable compensation, and (3) costs.

On November 18, 2013, the Court heard argument on Plaintiff's Motion. During oral argument, Defendants introduced the case of *Unicom Monitoring, LLC v. Cencom, Inc.*[3] Because the case was not referred to in the briefs, the Court granted Plaintiff ten days to respond to the case. Plaintiff filed its Response.[4] Defendants filed an Objection to the Response,[5] arguing that Plaintiff abused its privilege to respond to new authority by rehashing prior arguments and by making new arguments on how to calculate a reasonable royalty. The Court considered both

---

[2]Docket No. 165.

[3]06-CV-1166 (MLC), 2013 WL 1704300 (D.N.J. April 19, 2013) (unpublished).

[4]Docket No. 175.

[5]Docket No. 177.

2

filings but found neither to be particularly helpful.  Further, *Unicom* is distinguishable because the record in that case did not reflect infringer's profits, as the record in this case does.

## II.  DISCUSSION

The purpose of a motion to alter or amend a judgment under Rule 59(e) of the Federal Rules of Civil Procedure "is to correct manifest errors of law or to present newly discovered evidence."[6]  "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."[7]  Such a motion is an inappropriate vehicle to reargue an issue previously addressed by the court such as "when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."[8]

A.  WILLFULNESS

Plaintiff argues that Defendants' infringement was willful.  Plaintiff cites no new evidence and no intervening change in controlling law, and instead argues that the Court misunderstood important facts and controlling law in determining that Defendants' infringement was not willful.

---

[6]*Webber v. Mefford*, 43 F.3d 1340, 1345 (10th Cir. 1994) (citation and internal quotation marks omitted).

[7]*Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

[8]*Id.*

The word willful "is generally understood to refer to conduct that is not merely negligent."[9] A "[d]etermination of willfulness is made on consideration of the totality of the circumstances."[10] Rigid rules do not control determinations of willfulness because the district court is in the best position to consider the evidence, the testimony, and the demeanor of witnesses.[11] The standard for proving willfulness is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed."[12]

Plaintiff argues that Defendants' conduct was willful because (1) Defendants did not rely on an opinion of patent counsel, (2) after the Court's infringement Order, Defendants continued to ship pool enclosures dismantled in parts, and (3) Defendants did not change their manufacturing and shipping practices until after the Court's infringement Order and validity ruling.

Plaintiff recycles the same arguments that it made at trial. The Court found no willfulness because "[p]rior to the Court's Order on infringement, Defendants had a reasonable belief that their pool enclosures did not infringe the '160 Patent" and "[a]fter the Court's infringement Order, Defendants made a good faith effort to design around the '160 Patent."[13]

---

[9]*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004).

[10]*Id.*

[11]*Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986).

[12]*Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 1428 (Fed. Cir. 1988).

[13]Docket No. 165, at 10.

Plaintiff presented evidence at trial that Defendants continued to import infringing products after the Court's infringement Order on November 28, 2011. This Court considered Plaintiff's evidence at trial and adequately addressed willfulness in its Findings of Fact and Conclusions of Law. Under the circumstances presented here, the Court finds that Defendants prudently conducted themselves with confidence that a court might hold the patent invalid or not infringed. Once there was a finding of infringement, Defendants made a good faith effort to design around the '160 Patent. After the Court's rulings on infringement and validity, Defendants modified their enclosures to permanently fix the end panels in place.[14] Thus, because Plaintiff merely repackages arguments that this Court has already rejected, the Court will deny Plaintiff's Motion to Alter Judgment on this ground.

B.    COMPENSATION

Plaintiff next argues that the Court erred by not awarding lost profits or a reasonable royalty. The Patent Act provides that upon a finding of infringement, a court "shall award . . . damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[15] A reasonable royalty is

> [t]he amount that a licensor (such as a patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain the license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to

---

[14]Docket No. 153, at 79.

[15]35 U.S.C. § 284 (2006).

make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.[16]

In seeking a reasonable royalty, the patentee bears the burden of proving legally sufficient evidence that supports the royalty sought.[17]  The Patent Act "requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."[18]

Plaintiff argues that the Court erred by not relying on the licensing negotiations that the parties conducted in 2009 ("the 2009 negotiations") to determine a reasonable royalty.  Plaintiff further argues that the Court erred by disregarding the damages testimony of Bob Brooks ("Brooks") who is the inventor of the '160 Patent and the president of Aqua Shield.  Finally, Plaintiff argues that the Court had sufficient information to determine a reasonable royalty even if the Court disregarded the 2009 negotiations and Brooks's testimony, because Defendants' profits on infringing sales were known.

*1.   Negotiations*

In 2009, the parties met to discuss licensing the '160 Patent to Defendants.  The 2009 negotiations ended without an agreement being reached.  Plaintiff argues that the Court erred by not considering the parties' 2009 negotiations in calculating a reasonable royalty.  Plaintiff cites to numerous cases out of the Federal Circuit that consider royalty rates offered in negotiations

---

[16]*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[17]*Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990).

[18]*Devex Corp. v. Gen. Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981), *aff'd on other grounds*, 461 U.S. 648 (1983).

during litigation.[19]  However, the United States Supreme Court has long held otherwise.[20]  One court has called the prohibition on using settlement negotiations during litigation to determine a reasonable royalty rate "a century-old rule."[21]

Even if it would be proper for the Court to consider the 2009 negotiations, the Court already found that the negotiations did not provide evidence of a reasonable royalty rate.  The Court found that the negotiations took place four years after this case began, the impetus for the negotiations was to avoid the costs of litigation, and the parties attempted to negotiate not only a licensing agreement, but an agreement that would allow Plaintiff to resell Defendants' products.  As the Court noted in its Conclusions of Law, the 2009 negotiations "do not provide evidence of a reasonable royalty rate."[22]  Therefore, the Court will deny Plaintiff's Motion on this ground.

   2.    *Brooks's Testimony*

Plaintiff next argues that Brooks's testimony regarding damages was proper lay testimony and should not have been disregarded.  As stated in the Court's Conclusions of Law, the Court found Brooks's testimony regarding Aqua Shield's lost profits to be "not credible"[23] and even if

---

[19]*See, e.g., ResQnet.com, Inc. v. Lansa*, 594 F.3d 860, 872 (Fed. Cir. 2010).

[20]*Rude v. Wescott*, 130 U.S. 152, 164 (1889); *Cornely v. Marckwald*, 131 U.S. 159, 161 (1889).

[21]*Wang Labs., Inc. v. Mitsubishi Elecs. Am. Inc.*, 860 F. Supp. 1448, 1452 (C.D. Cal. 1993).

[22]Docket No. 165, at 20.

[23]*Id.* at 16.

it were credible it was not "adequate to show lost profits."[24]  Numerous factors unrelated to the

infringement were at play and these factors could have affected Plaintiff's profits.  Plaintiff failed

to meet its burden to prove lost profits through Brooks's testimony.  The Court will not alter its

judgment to award a reasonable royalty based on Brooks's testimony.

    *3.*    *Infringers' Profits*

    Plaintiff next argues that the Court had a statutory obligation to award a reasonable

royalty and that the Court had sufficient information to calculate a reasonable royalty based on

Defendants' profits.

    "In a normal negotiation, the potential licensee has three basic choices: forego all use of

the invention; pay the agreed royalty; infringe the patent and risk litigation."[25]  To determine a

reasonable royalty, the Court must assume that Defendants would have chosen the second option

had they known in 2005 the patent was valid and their products infringed.  The Federal Circuit

has stated that the Patent Act does not require a patentee to prove actual damages.  Ordinarily,

the Court has an obligation to award a reasonable royalty when lost profits are not proven.[26]

However, "that does not mean that a patentee who puts on *little or no* satisfactory evidence of a

reasonable royalty can successfully appeal on the ground that the amount awarded by the court is

not reasonable and therefore contravenes section 284."[27]  Only when the record is completely

---

[24]*Id.*

[25]*Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1576 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse*, 383 F.3d 1337.

[26]35 U.S.C. § 284.

[27]*Dow Chem. Co.*, 341 F.3d at 1382 (emphasis added).

devoid of evidence from which the Court can determine a reasonable royalty, can the Court order an award of zero dollars.[28]  In its Findings of Fact and Conclusions of Law, the Court awarded zero dollars in damages.  However, the Court did not consider the infringer's profits to arrive at this conclusion.

"A reasonable royalty may . . . be based on the infringer's profits."[29]  Although a hypothetical license requires the royalty to be determined in light of anticipated profits when the infringement began, courts have held that evidence of subsequent actual profits is relevant to forming a judgment as to anticipated profits.[30]  "While a plaintiff in a patent infringement action is no longer entitled to recover profits derived by the sale of the infringing items, the infringer's profits may constitute evidence tending to show the plaintiff's damages or be a relevant factor in the calculation of a reasonable royalty."[31]  The Federal Circuit has held that a number of different methodologies can be employed for calculating a reasonable royalty including basing the royalty on a percentage of the infringer's gross or net profit, as a set amount per infringing product sold, or as a percentage of the gross or net price received for each infringing product.[32]

---

[28]*Compare Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) (emphasis added) (holding district court's award of zero damages to be error), *with Devex*, 667 F.2d at 363 (upholding district court's award of zero damages).

[29]*Linkco, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 190 (S.D.N.Y. 2002).

[30]*See, e.g., Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derlick Co.*, 895 F.2d 1404, 1404–06 (Fed. Cir. 1990).

[31]*Jenn-Air Corp. v. Penn Ventilator Co., Inc.*, 394 F. Supp. 665, 675 (E.D. Pa. 1975).

[32]*Fromson*, 853 F.2d at 1578.

9

The Federal Circuit, in discussing its holding in *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, noted that the case "supports the proposition that an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation."[33]  In *Lindemann*, the district court awarded plaintiff $10,000 as a reasonable royalty.[34]  Because plaintiff failed to produce sufficient evidence of damages, the court used defendant's profit margin as a tool for determining a reasonable royalty.[35]  The court noted that "[i]n view of the sparse and totally inadequate record [plaintiff] created at trial, we cannot say that [plaintiff] proved entitlement to an award greater than $10,000."[36]

Plaintiff argues that it submitted the underlying profit and loss statements for each infringing sale[37] and that the Court need only do simple arithmetic in order to arrive at a reasonable royalty rate based on these net profit figures.  Plaintiff further contends that Defendants' net profit on infringing sales ranged from 12% to 39%.[38]  The Court cannot rely on these figures as representing net profits because—while the financial records reflect transaction costs associated with infringing sales—they do not reflect overhead costs across the company.

---

[33]*Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001).

[34]*Lindemann*, 895 F.2d at 1404.

[35]*Id.*

[36]*Id.* at 1408.

[37]Docket No. 167 Ex. 4; *see also* Trial Ex. DD.

[38]Docket No. 167 Ex. 4.

The figure that Plaintiff labels "gross profit" represents total sales income on each infringing pool cover. The figure that Plaintiff labels "net profit" represents the "gross profit" figure minus "cost of goods sold" and "additional expenses" relating to installing the particular infringing pool cover.[39] This figure does not represent a credible net profit figure because it reflects only transaction expenses related to the sale of each individual infringing cover. It does not reflect company-wide salaries or non-transaction related overhead. Thus, the percentages that Plaintiff cites are not accurate net profit figures. The Court, therefore, cannot rely on these figures to represent Defendants' net profit in determining a reasonable royalty.

The record contains additional information related to Defendants' profits. Alexander Stonkus ("Stonkus"), the CEO of Pool & Spa Enclosures, LLC ("P&S"), testified that gross revenue on infringing sales was $2,700,000, that gross profit on infringing sales was just over $600,000, and ultimately the net profit margin on infringing sales was approximately 5%.[40] Jan Zitko, the president of Inter Pool Cover Team corroborated these figures, noting that the Alukov has a yearly corporate net profit on all sales after taxation that is between 5% and 8%.[41] He also noted that profit may be less than that on sales in the United States.[42] Stonkus similarly testified that Alukov's profit margin on all sales—which is 5%—is no different from its profit margin on

---

[39]*Id.*

[40]Docket No. 152, at 228–29.

[41]*Id.* at 293

[42]*Id.* at 302.

A109

infringing sales.[43]  Alexander Stonkus also testified that P&S has operated at a loss since it

began.[44]  Utilizing the information above, the Court finds that Defendants' profits on infringing

sales is 5%.  This yields a net profit on infringing sales of $135,000.

      The Court found that the '160 Patent has several advantages over pool covers that do not

utilize the '160 Patent.  The patented pool covers are easier to construct, are more aerodynamic,

have a higher snow-load capacity, and are more leak-proof than other square or boxy pool covers.

Considering these benefits, while still allowing Defendants a profit on infringing sales, requires

the Court to use its best ability to estimate what Defendants would have likely paid for the

patented design.

      In a willing negotiation between the parties at the time infringement began, in order to

enjoy the advantages of the patent that the Court noted, the Court finds that Defendants would

have been willing to pay 5% of their net profits on infringing sales as a reasonable royalty to

avoid infringement.  As explained in the Findings of Fact and Conclusions of Law, six of the

*Georgia-Pacific* factors weigh in favor of a higher royalty, therefore, the Court finds this number

should be adjusted upward to 8%.  This results in a royalty of $10,800.

      In a hypothetical negotiation, the Court finds Defendants would not have paid more for

the license because they would have likely gone without the benefits of the '160 Patent and

designed around it, as they have done now.  Based on the preceding discussion, the Court finds

---

[43]*Id.* at 230.

[44]*Id.*

that the parties, at the outset of this litigation, would have negotiated a reasonable royalty of 8% of Defendants' net profits, or $10,800.

In this case, like in *Lindemann*, Plaintiff did not adequately meet its burden.  Plaintiff "bore the burden and yet failed to adduce evidence dictating a particular amount, [and] left the [judge] with the widest range of choice."[45]  However, because the statute is quite clear that the Court "shall" award damages "in no event less than a reasonable royalty,"[46] the Court will alter its Judgment to award a reasonable royalty as stated above.

 4.    *Model Elegant*

Plaintiff also argues that $450,000 of revenue from the model Elegant should be added to the $2,700,000 of sales the Court already found to infringe.  In support, Plaintiff argues that the Utah Installation, which the Court found to infringe, was a model Elegant.  Although Brooks averred that the Elegant was the model installed in Syracuse, Utah, the Court never adopted such a finding.  While it is true that the Court found that the Utah Installation infringes the '160 Patent, the Court did not find that the Utah Installation was a model Elegant.  The Findings of Fact and Conclusions of Law adequately addresses the Model Elegant and will not be disturbed.

C.    COSTS

The Patent Act provides that the Court should award the prevailing party "interest and costs as fixed by the court."[47]  Plaintiff argues that the Findings of Fact and Conclusions of Law

---

[45]*Lindemann*, 895 F.2d at 1406.

[46]35 U.S.C. § 284.

[47]*Id.*

13

failed to award costs to Plaintiff. Aqua Shield has yet to file a motion for costs and the Court has

no information as to the extent of Plaintiff's costs. Plaintiff may seek an award of costs under 35

U.S.C. § 284, but the Court will not amend the Judgment to award a set sum at this time.

### III. CONCLUSION

It is therefore

ORDERED that Plaintiff's Motion to Alter Judgment (Docket No. 167) is GRANTED IN

PART AND DENIED IN PART. The Court grants the Motion to award Plaintiff a reasonable

royalty of $10,800. The Court further grants the Motion to allow Plaintiff to seek an award of

costs. The Motion is denied in all other respects.

The Clerk of the Court is directed to amend the Judgment (Docket No. 166) to award a

reasonable royalty to Plaintiff in the amount of $10,800.

DATED   December 9, 2013.

BY THE COURT:

TED STEWART
United States District Judge

14

**A112**

1          IN THE UNITED STATES DISTRICT COURT

2             DISTRICT OF UTAH, CENTRAL DIVISION

3

4    AQUA SHIELD, INC., a New York          )

5    Corporation,                           )

6              Plaintiff,                    )

7      vs.                                   )        Case No.

8    INTER POOL COVER TEAM, ALUKOV HZ SPOL. )    2:09-CV-13-TS

9    S.RO., ALUKOV, SPOL. S.R.O., POOL & SPA )

10   ENCLOSURES, LLC,                        )

11             Defendants.                   )

12   _____ )

13

14             BEFORE THE HONORABLE TED STEWART

15   ------------------------------------

16                  March 19, 2013

17                   Bench Trial

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP

25   350 South Main Street, #146, Salt Lake City, Utah  84101

1                      A P P E A R A N C E S

2

3

4    For Plaintiff:                    Todd Zenger
                                       KIRTON & McCONKIE
5                                      60 East South Temple, #1800
                                       Salt Lake City, Utah  84111
6

7
     For Defendant:                    Gregory Coffey
8                                      COFFEY & ASSOCIATES
                                       310 South Street
9                                      Morristown, NJ  07960

10
                                       Brandon Mecham
11                                     TRASKBRITT PC
                                       230 South 500 East, #300
12                                     Salt Lake City, Utah  84110

13

14

15

16

17

18

19

20

21

22

23

24

25

                          I N D E X

Witness                   Examination By              PAGE

Alexander Stonkus         Mr. Zenger   (Direct)         12

                          Mr. Coffey   (Cross)          58

                          Mr. Zenger   (Redirect)       82

                          Mr. Coffey   (Recross)        93

Bob Brooks                Mr. Zenger   (Direct)         98

                          Mr. Coffey   (Cross)         121




EXHIBITS RECEIVED INTO EVIDENCE:

Plaintiff's 16                                          36

Plaintiff's 19                                          36

Plaintiff's 1                                           98

Plaintiff's 8                                          107

Plaintiff's 10                                         108

Defendant's MM                                         129

```
 1    SALT LAKE CITY, UTAH; TUESDAY, MARCH 19, 2013; 8:30 A.M.
 2                        PROCEEDINGS
 3              THE COURT:  Good morning, counsel.  We are here in
 4    the case of Aqua Shield vs. Inter Pool Cover Team.  This is
 5    case 09-CV-13.  We have representing the plaintiff in this
 6    case Mr. Todd Zenger.
 7              MR. ZENGER:  Yes, Your Honor.
 8              THE COURT:  On behalf of the defendants
 9    Mr. Gregory Coffey and Brandon Mecham.
10              MR. COFFEY:  Good morning, Your Honor.
11              THE COURT:  Good morning.
12              Counsel, this is a bench trial and you have
13    submitted to me your trial briefs which summarize your
14    positions in this matter.  Therefore, I normally would not
15    have opening statements and we would go directly to the
16    first witness.  However, if either of you feel that it's
17    necessary and going to be particularly helpful to have some
18    kind of opening statement, I will give you that opportunity
19    to do so.
20              MR. ZENGER:  Your Honor, I don't believe there is
21    any opening statement needed.
22              MR. COFFEY:  With every level of respect to
23    Mr. Zenger, I think it would be helpful if I make a brief
24    opening statement, Your Honor.
25              THE COURT:  If you would like to go ahead, you
```

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AQUA SHIELD, INC.<br><br>Plaintiff,<br><br><br>vs.<br><br><br>INTER POOL COVER TEAM, ALUKOV<br>HZ SPOL. SRO, ALUKOV, SPOL. SRO,<br>POOL & SPA ENCLOSURES, LLC<br><br>Defendants. | MEMORANDUM DECISION AND<br>ORDER ON MOTIONS<br><br><br><br><br>Case No. 2:09-CV-13 TS |

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment of

Patent Infringement and Motion to Strike Declarations of Attorney Coffey and Attorney Sarney.

The Court will grant in part and deny in part Plaintiff's Motion for Summary Judgment and deny

Plaintiff's Motion to Strike for the reasons set forth below.

I. BACKGROUND

Plaintiff Aqua Shield alleges that, through their combined actions, Inter Pool Cover

Team, Alukov HZ spol Sro., Alukov, spol Sro., and Pool & Spa Enclosures, LLC (collectively

"IPC") infringed on Plaintiff's patent, U.S. Patent No. 6,637,160 (the "'160 Patent").

1

Defendants are a pan-European association of manufacturers and traders who develop, produce, and deal in swimming pool enclosures.

In its Amended Complaint, Aqua Shield alleges that its '160 Patent is valid and enforceable and that Aqua Shield has the exclusive right to make, use, offer to sell, and sell telescopic pool enclosures made in accordance with the invention disclosed in the '160 Patent. Aqua Shield also alleges that IPC sells and offers for sale, in the United States, embodiments of enclosures that come within the scope of the '160 Patent.

Aqua Shield has filed a Motion for Partial Summary Judgment on its infringement claim. Aqua Shield has also filed a motion asking the Court to strike the affidavits that IPC has attached it its opposition memorandum.

## II. SUMMARY JUDGMENT

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[1] The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[2] "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts

---

[1] *See* Fed.R.Civ.P. 56(a).

[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

2

**A118**

showing that there is a genuine issue for trial."[3]  "An issue is genuine 'if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party.'"[4]

"Literal infringement of a claim exists when every limitation recited in the claim is found

in the accused device, i.e., when the properly construed claim reads on the accused device

exactly."[5]  Thus, the role of the Court on summary judgment in a patent infringement suit is to

determine whether any reasonable juror could find that an accused product does not include all

the elements contained within a patent claim.

> A district court should approach a motion for summary judgment on the fact issue
> of infringement with great care.  Summary judgment may, however, properly be
> decided as a matter of law when no genuine issue of material fact exists and no
> expert testimony is required to explain the nature of the patented invention or the
> accused product or to assist in their comparison.[6]

Aqua Shield alleges that (1) IPC has installed a pool cover in Utah that infringes the '160

Patent ("the Utah Installation") and (2) IPC offers for sale other pool covers that infringe '160

Patent.

A.    THE UTAH INSTALLATION

Though IPC disputes all but five of Aqua Shields statements of fact "inasmuch as [they]

misstate[] facts in the record," only two disputes are actually addressed in IPC's argument: (1)

whether the Utah Installation contains an "anchor plate" as required by Claim 10; and (2)

---

[3]*Sally Beauty Co., Inc., v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

[4]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5]*Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed. Cir. 1996).

[6]*Id.* at 1557-58 (citations omitted).

whether the Utah Installation contains a hooks-and-straps system as required by Claim 15.

Though IPC's analysis of this issues is offered merely as "an example" of the dischord between

the Utah Installation and Patent '160, IPC cannot expect the Court to simply use its imagination

to divine other specific discrepancies.  Accordingly, the Court must proceed as though the only

factual disputes in this matter relate to Claims 10 and 15 of the '160 Patent.

IPC argues that the Utah Installation does not infringe Claim 10 because the photographs

offered by Plaintiff do not show that the accused product has an anchor plate as required by that

Claim.  Plaintiff has provided the sworn statement of Bob Brooks, inventor of the '160 Patent,

which affirms that the accused product has an anchor plate: "The U-shaped frame of the Utah

Installation also includes an anchor plate for contacting the rails which was verifiable by the

naked eye during inspection but were [sic] unable to take a picture of due to access restriction."[7]

IPC responds to Mr. Brooks's declaration by stressing that the photograph does not verify

Mr. Brooks's claim and thus there is a material issue of disputed fact as to whether an anchor

plate was a part of the accused product.  This argument confuses the respective burdens of parties

to a summary judgment motion.  As movant, Aqua Shield bears the burden of production.  The

extent of this burden is measured in light of whether the movant will ultimately bear the burden

of persuasion on an issue at trial.

> If the moving party will bear the burden of persuasion at trial, that party must
> support its motion with credible evidence—using any of the materials specified in
> Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial . .

---

[7]Docket No. 60 Ex. 1, at 10.

. . Such an affirmative showing shifts the burden of production to the party opposing the motion.[8]

> [T]he non-movant then must either establish the existence of a triable issue of fact under Fed.R.Civ.P. 56(e) or explain why he cannot . . . under Rule 56(f). Conclusory allegations made by a non-movant will not suffice. Instead, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein.[9]

Fed.R.Civ.P. 50 allows the Court to direct a verdict "if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."

Here, Aqua Shield has supported its Motion with the affidavit of Mr. Brooks.[10] If such testimony was offered at trial and no contradictory testimony was offered by IPC, Aqua Shield would be entitled to a directed verdict on Claim 10. Thus, the burden shifts from Aqua Shield to IPC to prove that there is a disputed issue of fact as to whether the elements of Claim 10 are present in the Utah Installation.

IPC cannot meet its burden by simply claiming, as they do, that Aqua Shield has not sufficiently proved the existence of the plate. Rather, it was incumbent on IPC to point the Court to some evidence showing that the plate was not a part of the Utah Installation. By failing to do so, IPC has failed to overcome summary judgment on this issue.

---

[8]*Anderson v. Dep't of Health & Human Servs.*, 907 F.2d 936, 947 (10th Cir. 1990) (quoting *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting)).

[9]*Id.* (internal citations and quotation marks omitted).

[10]Docket No 60 Ex. 1.

5

IPC also argues that the Utah Installation does not violate Claim 15 of the '160 Patent because that Claim requires a product to have hooks and straps for securing panels and the Utah Installation has none.  In his sworn affidavit, Mr. Brooks stated that "[h]ooks and straps securing the arcuate panels to ground were not detected at the Utah Installation at the time of the visit (they are used as needed during high wind conditions), but the hooks-and-straps system is depicted on models on the IPC's website."[11]  Defendants respond that there is no evidence in the '160 Patent that the hooks and straps are only necessary during high winds, or, in other words, that Claim 15 does not encompass a removable hooks-and-straps system.[12]

Because Aqua Shield has not offered any evidence that the Utah Installation had *or could have* a hooks-and-straps system, the question of whether Claim 15 allows the system to be removable is irrelevant.  Mr. Brooks has merely noted (1) that the hooks-and-straps system was not visible on the Utah Installation; (2) that the system was meant only for use during high winds; and (3) that the system is present on the other models IPC offers for sale.  The contention that the hooks and straps are only meant for periods of high winds is irrelevant without a further showing that the Utah Installation included such removable hooks and straps.  Nor does the contention that the system is present on other models have any bearing on the Utah Installation.  In short, Aqua Shield has not met its burden of production with respect to the inclusion of a hooks-and-straps system in the Utah Installation, whether removable or fixed.  Accordingly, the

---

[11]Docket No. 60 Ex. 1, at 11.

[12]Docket No 67, at 19.

Court will not grant summary judgment to Aqua Shield on infringement of Claim 15 by the Utah Installation.

B.   IPC'S OTHER PRODUCTS

In his affidavit, Mr. Brooks states that "IPC's other models including, but not limited to, the Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient models . . . based upon my review of IPC's product information . . . have the same structural and functional features as the Utah Installation."[13]  This statement, along with a chart affirming that every element of each claim is found in the accused products, is all Aqua Shield offers to support its claim.[14]  Though such evidence is by no means overpowering, it is nonetheless evidence.  As such, IPC has the burden of producing contrary evidence to show there is some dispute of material fact as to whether these other models each encompass all the elements of Claims 1-16.

IPC has failed to meet its burden.  IPC's sole contradictory statement is that "some of IPC's pool enclosures do not include 'a pair of end panels,' some do not include 'rectangular panels,' and some do not include 'horizontal frame members.'"[15]  No citation is provided.  Of IPC's exhibits, only A and B could speak to the issue, but neither is sufficient.  Exhibit A is apparently a screenshot from IPC's website, which contains blurry, miniature images of each of the models and a few distorted photos of a particular model.[16]  Exhibit B is a copy of the

---

[13]Docket No. 60 Ex. 1, at 11.

[14]*Id.* Ex. 1.

[15]Docket No. 67, at 20.

[16]*Id.* Ex. A.

7

schematics for some of IPC's models, which is annotated in a foreign language and is entirely unhelpful to the Court.[17] IPC's conclusory statement, coupled with unilluminating evidence, fails to establish a genuine issue of material fact, either by demonstration or inference. Accordingly, the Court must grant summary judgment in favor of Aqua Shield on IPC's Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient models.[18]

C.   OTHER LEGAL ARGUMENTS

In addition to its factual arguments, IPC argues that Aqua Shield is not entitled to judgment as a matter of law on infringement of the '160 Patent because (1) the patent is anticipated by two foreign patents and (2) "IPC's own engineering schematics anticipate[] the '160 Patent claims."[19]

> A patent is invalid if the claimed invention was "known or used by others in this country . . . before the invention thereof by the applicant for patent" . . . or was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States" . . . . Invalidity based on lack of novelty (often called "anticipation") requires that the same invention, including each element and limitation of the claims, was known or used by others before it was invented by the patentee.[20]

---

[17]*Id.* Ex. B.

[18]Mr. Brooks claims that IPC's infringing products include, but are not limited to, these models. The Court cannot speculate as to which other models Mr. Brooks attempts to encompass with the "not limited to" language. Accordingly, the Court's holding is limited to those models specifically identified.

[19]Docket No. 67, at 3.

[20]*Hoover Grp., Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed. Cir. 1995) (citations omitted) (quoting 35 U.S.C. § 102(a), (b)).

In support of its anticipation argument, IPC references a French and an Australian patent, both of which were in existence before the '160 Patent. The entirety of IPC's anticipation argument is that both patents show "arc shaped telescoping roofing elements of a pool enclosure installed on removable rails."[21]

A showing that a challenged patent shares an element with a prior patent is not enough—the presence of each element of a claim must be shown in the prior art. Rather than comparing the foreign patents with the '160 Patent element-by-element, IPC has merely provided blanket citations to the patents as a whole. The Court will not sift through the evidence to make arguments on IPC's behalf. Accordingly, the Court will reject IPC's anticipation argument based on the foreign patents.

IPC also argues that its own schematics anticipate the '160 Patent because the schematics reveal that IPC "offered and used the plurality of horizontal rails now accused of infringement in 2000—before Mr. Brooks filed for the '160 Patent."[22] The Court notes again that the schematics are in a foreign language, and thus are unhelpful. Regardless, as noted above, to invalidate a patent claim based on a prior invention, a party must show that the prior invention included every element of every claim of the challenged patent.[23] "Horizontal rails" are but one part of one element of the claims of the '160 Patent. Accordingly, IPC has not sufficiently supported its argument that all contested claims of the '160 Patent are anticipated by IPC's prior schematics.

---

[21]Docket No. 67, at 3.

[22]Docket No. 67, at 23.

[23]*Hoover*, 66 F.3d at 302.

9

**A125**

Nor is IPC's argument that it has sold five of its pool cover models in the United States prior to the '160 Patent availing. IPC reasons that, because Aqua Shield accuses these models of infringing the 160 Patent, and because these models were sold in the U.S. before the patent was granted, the models prove that the '160 Patent was anticipated and is thus invalid. As proof, IPC offers only the blurry screenshots referenced above. The screenshots do not indicate when the products contained thereon were available for sale in the United States. Because IPC offers no more, the Court must reject IPC's argument as unsupported without considering its merits.

Finally, IPC asks the Court not to consider the photographs of the Utah Installation provided by Aqua Shield because the photographs were not disclosed to IPC in a timely fashion. Though disclosed late, the Court notes that the photographs were still made available in plenty of time for IPC to respond to them for purposes of this Motion. Accordingly, the Court will deny the request.

### III. MOTION TO STRIKE

Aqua Shield asks the Court to strike the affidavits attached to IPC's opposition memorandum. The affidavits seek to authenticate other exhibits attached by IPC. As discussed above, the Court finds that even assuming the exhibits are authenticated, they are either unavailing or unnecessary. With or without the exhibits, IPC has not met its burden for successfully contesting any part of the summary judgment motion for which there was sufficient factual support offered by Aqua Shield. In the same vein, Aqua Shield has not met its burden for the Utah Installation as to Claim 15, and thus IPC's response, including exhibits, is irrelevant. Accordingly, the Court will deny the Motion to Strike as moot.

10

**A126**

IV.  CONCLUSION

In light of the foregoing, the Court will grant summary judgment on Aqua Shield's claim

that the Utah Installation infringes on Claims 1-14 and Claim 16 of the '160 Patent, but deny it as

to Claim 15.  The Court will also grant summary judgment on Aqua Shield's claim that IPC's

other models infringe the '160 Patent.  Finally, the Court will deny Aqua Shield's motion to

strike.  It is therefore

ORDERED that Aqua Shield's Motion for Partial Summary Judgment (Docket No. 59) is

GRANTED IN PART AND DENIED IN PART.  It is further

ORDERED that Aqua Shield's Motion to Strike Declarations of Attorney Coffey and

Attorney Sarney (Docket No. 70) is DENIED as moot.

DATED   November 28, 2011.

BY THE COURT:

_____

TED STEWART
United States District Judge

11

**A127**

H. Dickson Burton (4004)
TRASKBRITT, PC
230 South 500 East, Suite 300
Salt Lake City, UT 84110
Telephone: (801) 532-1922

Gregory J. Coffey, *pro hac vice*
Richard J. Dewland, *pro hac vice*
COFFEY & ASSOCIATES
310 South Street
Morristown, NJ 07960
Telephone: (973) 539-4500

**IN THE UNITED STATES DISTRCT COURT**
**DISTRICT OF UTAH, CENTAL DIVISION**

| AQUA SHIELD, INC. | |
|---|---|
| Plaintiff, | **NOTICE OF SUPPLEMENTAL AUTHORITY** |
| vs. | **2:09cv00013-TS** |
| INTERPOOL COVER TEAM, ALUKOV HZ SPOL. S.RO., ALUKOV, SPOL. S R.O., POOL & SPA ENCLOSURES, LLC | **Judge: Ted Stewart** |
| Defendants. | |

Defendants Inter Pool Cover Team, Alukov HZ spol. S.r.o., Alukov, spol, S.r.o. and Pool & Spa Enclosures, LLC (the "IPC Defendants") respectfully submit this Notice of Supplemental Authority pursuant to District of Utah Local Rule DUCivR 7-1(b)(4) in support of their contention that Plaintiff maintains no basis to assert a claim for willful infringement where it failed to seek a preliminary injunction upon the transfer of the case from the Eastern District of New York to the District of Utah. (*IPC Defendants Memorandum of Law filed April 23, 2015 [DN 196], at pgs. 6- 7*). In *West Coast Trends, Inc., v. Ogio International, Inc.*, 2:11-CV-01190, (D. Utah May 1, 2015, Order) (Campbell, T.) (copy attached), the District of Utah held that "[a]s to the question of

enhanced damages for alleged post-litigation willful infringement, the failure to seek preliminary injunctive relief ends the argument unless the patentee discloses and explains the circumstances that excuses its failure. Because West Coast Trends has not done so, it cannot now seek enhanced damages for Ogio's post-litigation sales." *Id*. at 2.

Respectfully submitted,

**COFFEY & ASSOCIATES**
Attorneys for IPC Defendants

By: _____
Gregory J. Coffey, Esq., *pro hac vice*
Richard J. Dowland, Esq., *pro hac vice*

Dated: May 5, 2015

2

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AQUA SHIELD, INC.,<br><br>Plaintiff,<br><br><br><br><br>vs.<br><br><br><br>INTER POOL COVER TEAM, ALUKOV<br>HZ SPOL. SRO, ALUKOV, SPOL. SRO,<br>POOL & SPA ENCLOSURES, LLC,<br><br>Defendants. | MEMORANDUM DECISION AND<br>ORDER ON CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT AND<br>MOTION TO PRECLUDE<br>RELIANCE UPON EVIDENCE FOR<br>FAILURE TO DISCLOSE OR<br>PRODUCE IT<br><br><br><br>Case No. 2:09-CV-13 TS |

This matter is before the Court on Defendants' Motion for Summary Judgment on

Invalidity of U.S. Patent No. 6,637,160 on Behalf of Defendants Interpool Cover Team, Alukov

Hz Spol. S.R.O., Alukov, Spol. S.R.O., and Pool & Spa Enclosures, LLC;[1] Plaintiff Aqua Shield,

Inc.'s Motion for Summary Judgment as to Defendants' Counterclaims I and II;[2] and Plaintiff's

---

[1]Docket No. 117.

[2]Docket No. 118.

1

Motion to Preclude Reliance upon Evidence for Failure to Disclose or Produce It.[3]  For the

reasons stated below, the Court will grant Plaintiff's Motion for Summary Judgment and deny

the remaining motions.

## I.  BACKGROUND

On November 28, 2011, the Court issued an order granting Plaintiff's motion for partial

summary judgment ("Summary Judgment Order") and held that Inter Pool Cover Team, Alukov

HZ spol Sro., Alukov, spol Sro., and Pool & Spa Enclosures, LLC (collectively "Defendants")

installed a pool cover in Utah that infringes on Claims 1–14 and Claim 16 of Plaintiff's patent,

U.S. Patent No. 6,637,160 (the "'160 Patent").  On October 18, 2012, the Court issued an order

clarifying that the Summary Judgment Order did not dispose of Defendants' invalidity

counterclaim.[4]  The parties subsequently filed the instant motions.

## II.  '160 PATENT AND PRIOR ART

The '160 patent contains one independent claim (Claim 1) and fifteen dependent claims

(Claims 2-16).  Plaintiff no longer alleges that Defendants' pool cover infringes Claim 15.

Claims 1-16 of the '160 patent are reproduced below.

> 1.  An apparatus for providing an enclosure for attachment to a building or
> for covering an area, comprising:
>> (a) a plurality of arcuate panels, said panels having a first and
>> second end, and a first and second side, wherein said panels are
>> generally rectangular, planar panels;

---

[3]Docket No. 121.

[4]Docket No. 105.

(b) a plurality of arcuate frame members, said frame members having a first and second end, and a first and second side for receiving said panels, and an inner and an outer surface;

(c) a pair of end panels for attachment to the ends of the enclosure to complete the enclosure;

(d) means-for [sic] a plurality of horizontal frame members whereby the ends of the arcuate frame members are secured;

(e) means for a plurality of rollers disposed on said horizontal frame members whereby said horizontal frame members are movable thereon;

(f) means for a plurality of horizontal rails whereby the rollers are rollable thereon and the rails are able to be attached to a foundation; and,

(g) wherein said plurality of arcuate panels and said plurality of arcuate frame members are sized so that arcuate panels and arcuate frame members of smaller diameter are disposed toward the interior of said panels and frame members of larger diameter so that said panels and frame members are able to telescope one within each other, wherein said arcuate panels approximate the shape of one of a circumference of half a circle or one-fourth an ellipse and said end panels are generally flat and removable.

2. The apparatus of claim 1, wherein said arcuate panels approximate the shape of the circumference of half an ellipse.

3. The apparatus of claim 1, wherein said plurality of arcuate frame members further comprise a generally rectangular shaped housing having a pair of horizontally disposed U-shaped receptacles on said outer surface thereof for receiving said first and second sides of said arcuate panels and an inwardly extending flap disposed on said inner surface.

4. The apparatus of claim 3, herein [sic] said rectangular shaped housing has a slot therein, said slot disposed on said inner surface thereof for receiving said flap.

5. The apparatus of claim 4, herein [sic] said means for a plurality of horizontal frame members further comprise a downwardly disposed U-shaped frame having a plurality of rollers disposed internal said U-shaped frame, said rollers being used for contacting said means for a plurality of horizontal rails.

6. The apparatus of claim 5, wherein said U-shaped frame further comprises a downwardly disposed anchor plate thereon for contacting the rails.

7. The apparatus of claim 6, wherein said anchor plate further comprises a hook disposed on the lower end of said anchor plate.

8. The apparatus of claim 7, wherein said U-shaped frame further comprising an upwardly disposed U-shaped receptacle thereon for receiving said first end of said arcuate panels.

3

**A132**

9. The apparatus of claim 8, said means for a plurality of horizontal rails further comprise a base plate upon which plate said rails are mounted and said rails are attached to a foundation.

10. The apparatus of claim 9, wherein said rail has an enlarged, exposed edge for receiving said hook of said anchor plate so that said anchor plate is secured to said rail.

11. The apparatus of claim 10, further comprising means for adding additional rails to said rail base plate whereby the number of rails varies.

12. The apparatus of claim 11, wherein said means for adding additional rails further comprises a slot disposed in the edge of said base plate for receiving the edge of another base plate.

13. Then [sic] apparatus of claim 12, further comprising a stop rod and an end plug disposed in the end of said rail.

14. The apparatus of claim 13, further comprising a cover for being placed over the tops of said rails and a spacer for being placed between said rails to enable one to walk over said rails.

15. The apparatus of claim 4 [sic], further comprising a plurality of hooks and straps for securing said arcuate panels to said arcuate frame members.

16. The apparatus of claim 15, wherein said arcuate panels are transparent.[5]

Defendant relies on five prior art references to support its invalidity argument: (1) U.S. Patent No. 3,979,782, issued to Joe Lamb in 1975 ("Lamb patent"); (2) U.S. Patent No. 4,175,361, issued to Masami Kumode in 1977 ("Kumode patent"); (3) U.S. Patent No. 4,683,686, issued to Veli Ozdemir in 1985 ("Ozdemir patent"); (4) U.S. Patent No. 5,845,343, issued to Harry Last in 1998 ("Last patent"); and (5) Australian Patent No. Au-A-69699/81, issued to M. Kumode ("Australian patent"). The four U.S. patents were all considered in the prosecution history of the '160 patent[6] and the Australian patent appears to be identical to the

---

[5]Docket No. 117, Ex. A at 31–32.

[6]Docket No. 117, Ex. A at 27–28.

4

**A133**

Kumode patent. Although neither party provided the Court the drawing figures of the U.S. patents, the Court will judicially notice them.[7]

### III. MOTION TO PRECLUDE RELIANCE

Plaintiff seeks to exclude the four United States patents relied upon by Defendants in their Motion for Summary Judgment because Defendants failed to timely disclose or produce them. A failure to disclose is governed by Rules 26 and 37(c) of the Federal Rules of Civil Procedure.

"'The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court.'"[8] The Court "need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose."[9] Nevertheless, the Court is guided by the following factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."[10]

Balancing these factors, the Court finds that Defendants' failure to disclose the U.S. patents was harmless. Because the patents Plaintiff seeks to exclude were included in the

---

[7]*See United States v. Estep*, 760 F.2d 1060, 1063 (Fed. Cir. 1985) (holding that courts may notice "matters that are verifiable with certainty").

[8]*Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (quoting *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996)).

[9]*Id.* (citing *United States v. $9,041,598.68*, 163 F.3d 238, 252 (5th Cir. 1998)).

[10]*Id.* (citing *Newman v. GHS Osteopathic Inc.*, 60 F.3d 153 (3d Cir. 1995)).

prosecution history of the '160 patent, Plaintiff has long been aware of them and will not be prejudiced by Defendants' failure to disclose them. There is also no evidence that Defendants acted willfully or in bad faith. The Court will therefore deny Plaintiff's Motion.

## IV.  SUMMARY JUDGMENT

### A.    STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.[11] The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.[12] To show that no genuine issue of material fact exists, the moving party has "the initial burden of production . . . and the burden of establishing that summary judgment is appropriate as a matter of law."[13] "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial."[14] "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[15]

---

[11]*See* Fed. R. Civ. P. 56(a).

[12]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[13]*Pelt v. Utah*, 539 F.3d 1271, 180 (10th Cir. 2008).

[14]*Sally Beauty Co., Inc., v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002).

[15]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

6

On summary judgment the Court employs the same evidentiary standard of proof that would apply at trial.[16] At a trial in this case, clear and convincing evidence is required to overcome the '160 patent's presumed validity.[17] Defendants therefore have the burden to put forth each element of their invalidity counterclaim by clear and convincing evidence such that no reasonable jury could find otherwise.[18] Because Defendants rely exclusively on prior art that was considered by the PTO,[19] they also have "the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job . . . ."[20] If Defendants are unable to meet this burden, summary judgment is properly granted against them and in favor of Plaintiff.[21] If Defendants meet this burden, it will then be Plaintiff's burden to show that the '160 patent is valid.[22] Plaintiff, as the moving party seeking a holding that the '160

---

[16]*Id.* at 252.

[17]*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1563 (Fed. Cir. 1997).

[18]*Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

[19]Although the Australian patent was not considered by the PTO during the prosecution of the '160 patent, Defendants' moving papers never mention its content. Moreover, the Australian patent appears to depict the exact same invention that is described in the Kumode patent, which was considered by the PTO.

[20]*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).

[21]*See K-Tec, Inc. v. Vita-Mix Corp.*, 729 F. Supp. 2d 1312, 1316 (D. Utah 2010) *aff'd*, 696 F.3d 1364 (Fed. Cir. 2012) ("'[W]hen a party has failed to introduce evidence sufficient to establish the existence of an essential element of that party's case in accordance with the applicable standard of proof, summary judgment is properly granted against that party.'") (alteration in original) (quoting *Optium Corp. v. Emcore Corp.*, 603 F.3d 1313, 1319–20 (Fed. Cir. 2010)).

[22]*Id.*

7

patent is not invalid, "must demonstrate that [Defendants have] failed to produce clear and convincing evidence of invalidity."[23]

B.   DISCUSSION

   1.   *Noninfringement*

In its Motion for Summary Judgment, Plaintiff first asks this Court to enter summary judgment in its favor on Count I, Defendants' counterclaim of noninfringement.  The Court will grant the Motion as it relates to noninfringement because Defendants do not oppose the Motion and because infringement was previously decided in Plaintiff's favor in the Court's November 28, 2011 order.[24]

   2.   *Anticipation*

Plaintiff next moves for summary judgment on Count II, Defendants' invalidity counterclaim arguing that the '160 patent was neither anticipated nor made obvious by prior art. Defendants argue that the opposite is true.

Defendants first argue that the '160 patent is invalid because it is anticipated by prior art. A patent is invalid as anticipated if "the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States . . . ."[25]

---

[23]*Id.* (citing *Eli Lilly and Co.*, 251 F.3d at 962).

[24]Docket No. 87.

[25]35 U.S.C. § 102(b).

"The first step of an anticipation analysis is claim construction."[26]  "The second step in an anticipation analysis involves a comparison of the construed claim to the prior art."[27]  To anticipate, a single prior art reference[28] must disclose "each and every limitation of the claimed invention[,] . . . must be enabling[,] and [must] describe . . . [the] claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention."[29]  In other words, "[t]o find that prior art anticipates, this Court must conclude that, as viewed by a person of ordinary skill in the field, there is no difference between the claimed invention" and a single prior art reference.[30]

Defendants' anticipation argument does not satisfy their burden on summary judgment. First, as Plaintiff points out, Defendants have not compared the construed claims of the '160 patent to the prior art—in this case, the Ozdemir patent.  Indeed, Defendants' motion papers contain no analysis of the Court's claim construction.  Second, Defendants have not introduced evidence showing that the Ozdemir patent discloses each limitation of the '160 patent. Defendant makes no effort to show, for example, that the Ozdemir patent teaches an invention

---

[26]*Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).

[27]*Id.*

[28]*In re Schreiber*, 128 F.3d 1473, 1780 (Fed. Cir. 1997) ("[A]nticipation requires that the identical invention is described in a single prior art reference.") (internal quotation marks omitted) (citing *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989)).

[29]*Id.* (alterations in original) (quoting *In re Paulsen*, 30 F.3d 1475, 1478–79 (Fed. Cir. 1994)).

[30]*EdgeCo. Inc. v. FastCap, LLC*, 2005 WL 1630836, at *14 (D.N.J. July 11, 2005) (citing *Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir. 1991)).

9

with a pair of removable end panels, telescoping frame members, or arcuate panels as required by claims 1–14 and 16 of the '160 patent. Defendants also have not discussed whether the Ozdemir patent teaches the hook-like terminations to prevent dislocation of the frame members from the track member required by claims 7 and 10 of the '160 patent. Defendants, therefore, have failed to prove by clear and convincing evidence that the Ozdemir patent anticipates any claim of the '160 patent.

### 3.   *Obviousness*

Defendants next argue that the '160 patent is made obvious by prior art. Obviousness is governed by 35 U.S.C. § 103(a), which forbids issuance of a patent when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."[31] "The grant of summary judgment of invalidity for obviousness must be done on a claim by claim basis."[32] "The accused infringer must prove by clear and convincing evidence that each claim that is challenged cannot reasonably be held to be non-obvious."[33] Because "[e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) *shall be presumed valid independently of*

---

[31]*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 3 (1966).

[32]*Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1384 (Fed. Cir. 2004) (quoting *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1371 (Fed. Cir. 2003)).

[33]*Id.* (quoting *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed. Cir. 1988)).

*the validity of other claims*" it cannot be assumed that claims dependent on an invalid claim are also invalid.[34]

The obviousness of a claimed invention may be based on a combination of different pieces of prior art if "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so."[35] "Although the incentive to combine may be inferred from the nature of the problem,"[36] "[t]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."[37] This requirement "can be useful to prevent hindsight when determining whether a combination of elements known in the art would have been obvious.[38]

Defendants have not met their burden to show that the '160 patent is made obvious by prior art. For starters, Plaintiff correctly notes that Defendants have not argued obviousness on a claim-by-claim basis. Defendants also do not try to show that all of the elements of even a single claim in the '160 patent were made obvious by prior art. Again, Plaintiff has pointed out that

---

[34]*Sys. Div., Inc. v. Teknek LLC*, 59 F. App'x 333, 344 (Fed. Cir. 2003) (alteration in original) (quoting 35 U.S.C. § 282).

[35]*Pfizer Inc. v. Apotex*, 480 F.3d 1348, 1361 (Fed. Cir. 2007).

[36]*K-Tec*, 729 F. Supp. 2d at 1325 (citing *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008)).

[37]*Innogenetics*, 512 F.3d at 1373.

[38]*Norgen Inc. v. Int'l Trade Comm'n*, 699 F.3d 1317, 1322 (Fed. Cir. 2012).

11

**A140**

Defendants make no mention of, for example, the removable end panels taught by claim 1 and Defendants' motion papers contain no analysis of claims 2-14 or 16 of the '160 patent.

Defendants also have not articulated why a person of ordinary skill in the art would have been motivated to combine the prior art to produce the claimed invention. While Defendants correctly contend that the Ozdemir patent teaches the desirability of eliminating the longitudinal struts that were present in the Kumode patent, Defendants' remaining arguments regarding a motivation to combine the elements of the prior art are conclusory and general in nature. In light of the need to avoid the bias of hindsight when determining obviousness, Defendants' conclusory statements that a person of ordinary skill would have been motivated to combine the prior art to produce the invention taught by the '160 patent are insufficient to overcome the patent's presumed validity.

## V.  CONCLUSION

Based on the foregoing, the Court determines that Plaintiff has demonstrated that Defendants have failed to present clear and convincing evidence that any claim of the '160 patent is invalid in light of the prior art. Defendants therefore have failed to overcome the presumed validity of the '160 patent and summary judgment must be granted in favor of Plaintiff and against Defendants.

It is therefore

ORDERED that Defendant's Motion for Summary Judgment on Invalidity (Docket No. 117) is DENIED.  It is further

12

**A141**

ORDERED that Plaintiff's Motion for Summary Judgment as to Defendants' Counterclaims I and II (Docket No. 118) is GRANTED and said counterclaims are dismissed. It is further

ORDERED that Plaintiff's Motion to Preclude Reliance upon Evidence for Failure to Disclose or Produce It (Docket No. 121) is DENIED. It is further

ORDERED that the hearing set in this matter for February 7, 2013, is STRICKEN. A final pretrial conference in this matter is set for February 7, 2013, at 2:30 P.M. and trial is set to begin on February 19, 2013, at 8:30 A.M.

DATED   January 15, 2013.

BY THE COURT:

TED STEWART
United States District Judge

13

**A142**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AQUA SHIELD, INC., a New York corporation,<br><br>              Plaintiff,<br><br>v.<br><br>INTER POOL COVER TEAM, ALUKOV HZ SPOL. S.RO., ALUKOV, SPOL. S.R.O., POOL & SPA ENCLOSURES, LLC,<br><br>              Defendants. | MEMORANDUM DECISION AND ORDER ON REMAND<br><br><br>Case No. 2:09-CV-13 TS<br><br>District Judge Ted Stewart |

This matter is before the Court following remand from the United States Court of Appeals for the Federal Circuit. The Federal Circuit vacated the Court's decision concerning the amount of the reasonable royalty and the finding of no willfulness, which led to the denial of enhanced damages. The Federal Circuit remanded for further proceedings on these issues. For the reasons discussed below, the Court finds that Plaintiff is entitled to damages in the amount of $216,000 and that Defendants' conduct was willful, but the Court declines to award enhanced damages or attorney's fees.

## I. BACKGROUND

Plaintiff brought this action in the Eastern District of New York on October 18, 2005, alleging that Defendants infringed U.S. Patent No. 6,637,160 (the "'160 Patent"). Plaintiff sought, but was ultimately denied, a preliminary injunction. "The district court in New York denied the requested preliminary injunction because Aqua Shield lacked information needed to

1

show a likelihood of success on the merits and because of questions about personal jurisdiction

over the defendants."[1]  The case was eventually transferred to this Court.

> Aqua Shield moved for summary judgment of infringement based on
> IPC's sales of various enclosure models. . . . IPC responded with noninfringement
> arguments only as to claims 10 and 15, not the other fourteen asserted claims.
> The district court held that there was no genuine issue of fact about IPC's
> infringement of all claims except claim 15, and therefore entered summary
> judgment of infringement of claims 1–14 and 16.  Aqua Shield later dropped its
> allegation of infringement of claim 15, and it presented no infringement issues at
> the later trial.
> With respect to invalidity, the parties filed cross-motions for summary
> judgment.  As to anticipation, the district court ruled that IPC failed to compare[ ]
> the construed claims of the '160 patent to the prior art and did not introduce[ ]
> evidence showing that the [prior art] discloses each limitation of the '160 patent.
> As to obviousness, the court ruled that IPC did not argue[ ] obviousness on a
> claim-by-claim basis, try to show that all of the elements of even a single claim in
> the '160 patent were made obvious by prior art, or articulate[ ] why a person of
> ordinary skill in the art would have been motivated to combine the prior art to
> produce the claimed invention.  For those reasons the district court granted
> summary judgment in favor of Aqua Shield regarding validity.[2]

The Court held a two-day bench trial in March 2013 concerning issues of relief.  In the

Court's Findings of Facts and Conclusions of Law, the Court found that Plaintiff had failed to

prove damages, that Defendants' conduct was not willful, and that Plaintiff was not entitled to

attorney's fees.  The Court did, however, enter a permanent injunction.

Plaintiff moved the Court to alter its judgment to include a finding of willfulness,

reasonable compensation, and costs.  The Court agreed to amend the judgment in part, awarding

Plaintiff $10,800 in damages as a reasonable royalty.  The Court declined to otherwise amend the

judgment.

---

[1] *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 768 (Fed. Cir. 2014).

[2] *Id.* at 768–69 (alterations in original) (citations and quotation marks omitted).

Plaintiff appealed the judgment of the Court and the Federal Circuit vacated the Court's royalty award, non-willfulness finding, and denial of enhanced damages and attorney's fees.

On appeal, Plaintiff challenged the Court's application of the hypothetical-negotiation approach. The Federal Circuit agreed, in part, finding that the Court erred in the use it made of Defendants' profit figures. The Federal Circuit found that the Court erred "in treating the profits IPC actually earned during the period of infringement as a royalty cap. That treatment incorrectly replaces the hypothetical inquiry into what the parties would have anticipated, looking forward when negotiating, with a backward-looking inquiry into what turned out to have happened."[3] This Court's analysis "incorrectly replace[d] the inquiry into the parties' anticipation of what profits would be earned *if a royalty (of amounts being negotiated) were to be paid* with an inquiry into what profits were earned *when IPC was charging prices without accounting for any royalty.*"[4]

The Federal Circuit noted that it had "not been shown proof that this case is different from the typical one in which pricing might be adjusted to account for a royalty based on sales price. Indeed, IPC has not pointed to any evidence supporting the district court's conclusion that a royalty should be a percentage of profits rather than sales revenues."[5] The court vacated the royalty calculation and remanded for redetermination. The Federal Circuit directed this Court to "consider all relevant record evidence, including the advantages of the patented product, the ease

---

[3] *Id.* at 772.

[4] *Id.*

[5] *Id.*

and cost of designing around the claimed invention, and the relevance of IPC's actual profits to

what IPC's expectations would have been in a hypothetical negotiation."[6]

On the issue of willfulness, this Court reasoned that prior to its infringement decision,

Defendants did not act willfully based on the decision of the New York court to deny Plaintiff's

motion for a preliminary injunction.  On appeal, the Federal Circuit found that "the Eastern

District of New York's decision to deny Aqua Shield's motion for a preliminary injunction

cannot reasonably be read to support a conclusion that any substantial basis existed for doubting

infringement or validity."[7]  The court went on to state:

> The New York court denied Aqua Shield's motion because of personal-
> jurisdiction questions and because Aqua Shield lacked sufficient knowledge of
> IPC's product to make the required showing of a likelihood of success on the
> merits.  Personal jurisdiction does not speak to infringement or validity at all.
> And Aqua Shield's ignorance of IPC's products appears irrelevant to a validity
> analysis and does not indicate what an infringement analysis of those products
> would show once the details of those products were fully known—as they were
> all along to IPC.  The denial of Aqua Shield's motion for a preliminary injunction
> is thus a legally insufficient reason for determining that IPC did not willfully
> infringe.[8]

On the issue of willfulness after the Court had issued its decision finding infringement,

this Court had relied on testimony that Defendants had attempted to design around the '160

patent by permanently fixing the end panels in place.  The Federal Circuit found that this

evidence "stops short of demonstrating that IPC did in fact design around the '160 patent and, if

so, when."[9]  "Questions remain about whether that change was actually implemented or whether

---

[6] *Id.* at 773.

[7] *Id.* at 774.

[8] *Id.*

[9] *Id.*

4

the resulting products avoided infringement.  Both inquiries are relevant to the issue of willfulness."[10]

The Federal Circuit thus vacated the Court's determination concerning willfulness.  The court stated that "[o]n remand, the district court should focus on IPC's defenses as articulated during the infringement and invalidity proceedings—during which IPC presented no infringement defenses for claims 2–9, 11–14, or 16, and presented no element-by-element argument for invalidity."[11]

> If the court finds that the defenses were objectively unreasonable, in the sense that no "reasonable litigant could realistically expect" them to succeed, it should proceed to consider *Seagate*'s second requirement.  On that issue, we note that the objective baselessness of an infringer's defenses, assessed on the litigation record, may have a strong bearing on whether the "objectively-defined risk" of infringement "was either known or so obvious that it should have been known to the accused infringer."[12]

The Federal Circuit further directed that "[i]f the court determines on remand that IPC willfully infringed Aqua Shield's patent, it should reconsider its decision to deny enhanced damages and attorney's fees."[13]  With this background in mind, the Court considers the issues currently before it.

---

[10] *Id.*

[11] *Id.* (citations omitted).

[12] *Id.* (quoting *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1008 (Fed. Cir. 2012); *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007)).

[13] *Id.* at 775.

## II. DISCUSSION

A.   REASONABLE ROYALTY

Upon a finding of infringement, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[14]

"The [reasonable] royalty may be based upon an established royalty, if there is one, or if not, upon the supposed result of hypothetical negotiations between the plaintiff and defendant."[15] "The hypothetical negotiation seeks to determine the terms of the license agreement the parties would have reached had they negotiated at arms length when infringement began."[16]

The following factors are considered in determining a reasonable royalty:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.
3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
7. The duration of the patent and the term of the license.

---

[14] 35 U.S.C. § 284.

[15] *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).

[16] *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1357 (Fed. Cir. 2012).

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.[17]

The Court previously considered these factors and found that an 8% royalty rate would be appropriate. The parties do not appear to have appealed this determination and both parties apply the 8% royalty rate in their supplemental briefing. Therefore, the Court will continue to apply the 8% royalty rate.[18] The question then becomes what is the appropriate royalty base to which the royalty rate should be applied.[19]

---

[17] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[18] The Federal Circuit directed that the Court, in redetermining its royalty calculation, "should consider all relevant record evidence, including the advantages of the patented product, the ease and cost of designing around the claimed invention, and the relevance of IPC's actual profits to what IPC's expectations would have been in a hypothetical negotiation." *Aqua Shield,*

7

**A149**

Plaintiff argues that the royalty rate should be applied to the selling price of the infringing devices. The evidence presented at trial supports this position. The parties' licensing negotiations focused on Defendants' selling price.[20] The testimony of Alex Stonkus and Jan Zitko, while admittedly less than clear, also supports the notions that royalty payments would be based on sales.[21]

Defendants argue that any reasonable royalty should be based on profits rather than sales. However, there is no evidence to support this argument. While the Court heard testimony about the parties' profits, there is no evidence suggesting that the hypothetical negotiation would have resulted in a royalty based upon profits. As on appeal, Defendants have "not pointed to any evidence . . . that a royalty should be a percentage of profits rather than sales."[22]

The evidence at trial showed that Defendants had sold $2.7 million worth of infringing products. Applying the 8% royalty rate to this amount, the Court finds that Plaintiff is entitled to a reasonable royalty of $216,000.

B.    WILLFULNESS

The Federal Circuit has held that "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood

---

774 F.3d at 773. Having considered these factors, the Court continues to find that an 8% royalty rate is reasonable.

[19] *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("A reasonable royalty may be a lump-sum payment not calculated on a per unit basis, but it may also be, and often is, a running payment that varies with the number of infringing units. In that event, it generally has two prongs: a royalty base and a royalty rate.").

[20] Trial Ex. CC.

[21] Trial Tr. 237–44, 302–04.

[22] *Aqua Shield*, 774 F.3d at 772.

that its actions constituted infringement of a valid patent."[23] "If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."[24]

As to the first requirement, the Federal Circuit held on appeal that this Court "should focus on IPC's defenses as articulated during the infringement and invalidity proceedings."[25] The court directed that "[i]f the court finds that the defenses were objectively unreasonable, in the sense that no 'reasonable litigant could reasonably expect' them to succeed, it should proceed to consider Seagate's second requirement."[26] On that issue, the Federal Circuit noted "that the objective baselessness of an infringer's defenses, assessed on the litigation record, may have a strong bearing on whether the 'objectively-defined risk' of infringement 'was either known or so obvious that it should have been known to the accused infringer.'"[27]

"Objective recklessness will not be found where the accused infringer has raised a 'substantial question' as to the validity or noninfringement of the patent."[28] Thus, the Court must consider whether Defendants' non-infringement and invalidity defenses were objectively

---

[23] In re Seagate, 497 F.3d at 1371.

[24] Id.

[25] Aqua Shield, 774 F.3d at 774.

[26] Id. (quoting Bard, 682 F.3d at 1008).

[27] Id. (quoting In re Seagate, 497 F.3d at 1371).

[28] Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 776 F.3d 837, 844 (Fed. Cir. 2015).

reasonable. Based on the record before it, the Court finds they were not as no "reasonable litigant could realistically expect"[29] those defenses to succeed "as articulated."[30]

During the proceedings related to infringement, Defendants only presented claims of non-infringement as to two of the sixteen claims asserted against them. And on only one claim—claim 15, which was later withdrawn by Plaintiff—did the Court find that issues of fact precluded summary judgment. Defendants' response to Plaintiff's motion regarding infringement showed a complete disregard of the respective burdens on summary judgment and Defendants took virtually no efforts to rebut the claims of infringement made by Plaintiff. No reasonable litigant could realistically expect such a strategy to succeed.

The same is true for Defendants' invalidity arguments. Defendants made only general arguments concerning anticipation and obviousness, but did not engage in any sort of rigorous analysis that would enable them to meet their burden on summary judgment. No reasonable litigant could realistically expect that strategy to succeed.

The Court must then proceed to *Seagate*'s second requirement: whether this objectively-defined risk was either known or so obvious that it should have been known to Defendants. The Federal Circuit noted that the objective baselessness of an infringer's defenses may have a strong bearing on this issue. As set forth above, Defendants' defenses, assessed on the litigation record, were objectively baseless. Thus, this supports the conclusion that Defendants either knew or should have known of this objectively-defined risk.

---

[29] *Bard*, 682 F.3d at 1008.

[30] *Aqua Shield*, 774 F.3d at 774.

10

Defendants continue to rely on the denial of Plaintiff's motion for preliminary injunction by the New York court in support of their argument that they did not willfully infringe. However, the Federal Circuit held that "[t]he denial of Aqua Shield's motion for a preliminary injunction is . . . a legally insufficient reason for determining that IPC did not willfully infringe."[31]

Defendants further contend that they had no expectation that their enclosures infringed until the Court issued its ruling on infringement. However, Plaintiff correctly points out that it sent Defendants a cease-and-desist letter in 2005, putting Defendants on notice of their possible infringement. Defendants also argue that once the Court issued its ruling on infringement, they instructed their factory to modify its products by fixing the end panels. In response to this argument, the Federal Circuit noted that "[q]uestions remain about whether that change was actually implemented or whether the resulting products avoided infringement."[32] Defendants provided no further evidence on these points. There is no evidence that this change was ever made, nor is there evidence suggesting that this change resulted in a non-infringing product. Rather, the evidence suggests that Defendants continued to engage in infringing activities after the Court issued its rulings on infringement and validity. The evidence shows that Defendants offered to sell, sold, and imported products that had detachable end panels.[33] Based upon this, the Court finds that Defendants willfully infringed Plaintiff's patent at the very least after the Court issued its rulings on infringement and invalidity.

---

[31] *Id.*

[32] *Id.*

[33] Tr. Ex. HH; Trial Tr. 266–73.

11

C.     ENHANCED DAMAGES

35 U.S.C. § 284 states in pertinent part that "the court may increase the damages up to three times the amount found or assessed."[34]  The Federal Circuit has held that "an award of enhanced damages requires a showing of willful infringement."[35]  "But, a finding of willfulness does not require an award of enhanced damages; it merely permits it."[36]  "[T]he decision to grant or deny enhanced damages remains firmly within the scope of the district court's reasoned discretion, informed by the totality of the circumstances."[37]

In exercising this discretion, the Court considers a number of factors, including:

> (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) defendant's size and financial condition; (5) closeness of the case; (6) duration of defendant's misconduct; (7) remedial action by the defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct.[38]

Considering these factors, the Court finds that an award of enhanced damages is not appropriate here.  First, there is no evidence that Defendants deliberately copied Plaintiff's patented technology.  Defendants presented testimony that they and others were making similar products prior to the issuance of the patent.  Second, there is evidence that Defendants sought the

---

[34] 35 U.S.C. § 284.

[35] *In re Seagate*, 497 F.3d at 1368.

[36] *Id.*

[37] *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999).

[38] *Liquid Dynamics Corp. v. Vaughn Co., Inc.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006) (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826–27 (Fed. Cir. 1992)).

A154

advice of counsel and were informed that they could continue to sell their products.[39]   Third,

while Defendants' behavior during litigation was certainly less than ideal, it was not so egregious

as to warrant enhanced damages.  Fourth, there is little evidence concerning the size and

financial condition of Defendants, other than the fact that they sold $2.7 million worth of

infringing products.  Fifth, for substantially the same reasons set forth above, this was not a close

case.  Sixth, Defendants' misconduct occurred over a significant duration, even after Plaintiff

sent a cease-and-desist letter and the Court ruled on infringement and invalidity.  Seventh,

Defendants allege that they attempted remedial action.  However, there is no evidence that

Defendants actually took that action and, even if they did, it is questionable whether this resulted

in a non-infringing product.  Eighth, there is no evidence that Defendants' actions were taken out

of a desire to harm Plaintiff.  Finally, there is no evidence that Defendants attempted to conceal

its misconduct.

Considering these factors and the totality of the circumstances, the Court declines to

award enhanced damages.

D.     ATTORNEY'S FEES

35 U.S.C. § 285 provides that "[t]he court in exceptional cases may award reasonable

attorney fees to the prevailing party."[40]   The Supreme Court has recently held "that an

'exceptional' case is simply one that stands out from others with respect to the substantive

strength of a party's litigating position (considering both the governing law and the facts of the

---

[39] Trial Tr. 53–54, 87–88, 248–52.

[40] 35 U.S.C. § 285.

13

A155

case) or the unreasonable manner in which the case was litigated."[41]  This Court is to "determine whether a case is 'exceptional' in the case-by-case exercise of [its] discretion, considering the totality of the circumstances."[42]

For substantially the same reasons set forth above, the Court finds that this is not an exceptional case and, therefore, declines to award attorney's fees.

### III.  CONCLUSION

Based upon the above, the Court awards Plaintiff a reasonable royalty in the amount of $216,000.  Plaintiff's request for enhanced damages and attorney's fees is DENIED.  The remaining portions of the Court's Judgment (Docket No. 179), including the permanent injunction, remain in effect.

The Clerk of the Court is directed to close this case forthwith.

DATED this 10th day of August, 2015.

BY THE COURT:

Ted Stewart
United States District Judge

---

[41] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S.Ct. 1749, 1756 (2014).
[42] *Id.*

14

**A156**

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

Central Division for the District of Utah

FILED
U.S. DISTRICT COURT
2015 AUG 11   P 3: 07
DISTRICT OF UTAH
BY:_____
DEPUTY CLERK

AQUA SHIELD,

        Plaintiff

        v.

INTERPOOL POOL COVER TEAM,
ALUKOV HZ SPOL SRO, ALUKOV SPOL
SRO, and  POOL &AMP; SPA
ENCLOSURES,

        Defendants

**JUDGMENT IN A CIVIL CASE**

Case Number:2:09-CV-13-TS

IT IS ORDERED AND ADJUDGED

That judgment be entered in favor of the plaintiff and against the defendant on plaintiff's claim that the defendants' models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient infringe claims 1-14 and 16 of the '160 Patent.  Defendants, their officers, agents, servants, employees and attorneys and those in active concert or participation with such person(s) who receive actual notice of this order, by personal service or otherwise, shall be permanently enjoined from infringing, either directly, by inducement, or by contribution the '160 Patent making, using, selling or offering to sell the products adjudged to infringe in the United States or importing into the United States the products adjudged to infringe or are not more than colorably different from the adjudicated devises.  The products adjudged to infringe the '160 Patent include the following pool cover models manufactured or offered for sale by defendants: Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient with generally flat and removable end-panels.  Plaintiff is further awarded costs in the amount of $1,971.17 and reasonable royalties in the amount of $216,000.00.

August 17, 2015

_____
Date

D. Mark Jones

_____
Clerk of Court

_____
(By) Deputy Clerk

A157

1   call Mr. Stonkus. Then I think I could get finished with

2   Mr. Stonkus so that when Mr. Zitko arrives, they could take

3   him one witness out of order.

4         MR. ZENGER: Do I understand that will be --

5   Mr. Stonkus is their only witness? Is that what I

6   understand.

7         MR. COFFEY: I am not going to make that

8   determination now because I think I am entitled to decide

9   that, but my only other witness would be Mr. Zitko. Okay.

10        THE COURT: All right.

11        MR. ZENGER: Let's go.

12        THE COURT: Mr. Stonkus, if I could get you to

13   retake the witness stand, please.

14        You are still under oath.

15           ALEXANDER STONKUS,

16        Having been duly sworn, was examined

17          and testified as follows:

18          DIRECT EXAMINATION

19   BY MR. COFFEY:

20   Q   Good morning, Mr. Stonkus.

21   A   Good morning.

22   Q   You have previously testified yesterday before the

23   Court so I don't intend to cover areas that were already

24   testified to, but I do have areas of inquiry on our case.

25      When did you first come to learn that the Pool & Spa

1  models were -- or certain of them were infringing?

2  A    When the summary judgment was done and then the

3  validity ruling this year.

4  Q    If I suggested to you that the summary judgment was

5  decided around 2011, would that be consistent with your

6  memory?

7  A    Yes.

8  Q    Can you tell the Court whether you had an expectation

9  at any time prior to that -- I'm initially talking about

10  Alex Stonkus -- that the Pool & Spa enclosures, which became

11  the determination on summary judgment, were infringing the

12  160 patent that's at issue in this case?

13  A    No, I never believed that they would infringe.  Alukov

14  had been making these enclosures years before -- identical,

15  continuous, moon shape, ellipse type look years before Aqua

16  Shield had received the patent.  So no, I never thought it

17  would be an issue.

18  Q    Are you aware that Aqua Shield's counsel sent a cease

19  and desist letter to Alukov at some point?

20  A    Yes.

21  Q    And what did that cease and desist letter seek to do?

22  A    To stop us from selling what were perceived as

23  infringing enclosures in the United States.

24  Q    Are you testifying today as the company representative

25  of all of the defendants?

1   A    Yes.

2   Q    As that representative, can you explain to the Court

3   why Alukov and the other defendants did not stop selling

4   pool enclosures at that time upon receiving the cease and

5   desist letter?

6   A    Several reasons.  The enclosures were being sold, as I

7   mentioned, not only by Alukov all over the world, but also

8   several other companies, manufacturers were all over the

9   world that were selling the exact same -- I'll call it

10   model, shape, sizes, everything.  And so from that

11   standpoint, we decided that, again, we had been doing it

12   before the patent came into play, there was no summary

13   judgment, no ruling, so we continued to sell them.

14   Q    And when you said that they were being sold all over

15   the world, were competitors selling pool enclosures like the

16   ones that ultimately were decided to be infringing in the

17   United States at that time?

18   A    Not to my knowledge, no.  Largely in Europe and other

19   parts of the world, if you get a pool, you get an enclosure.

20   That's a very dominant market over there and everybody is

21   selling these enclosures.  Same look as what we sell here.

22   Same look and design as what Aqua Shield -- the 160 patent

23   has, identical.

24   Q    Can you describe for me who the other competitors were

25   to Aqua Shield and to Alukov at about the time when the

1   cease -- by the way, when was the cease and desist letter
2   sent, to your knowledge?
3   A    In 2005.
4   Q    At that time there are other competitors to Alukov and
5   to Aqua Shield?
6   A    Absolutely.
7   Q    Can you name some of those competitors for us?
8   A    Sure.  I deal with these competitors even today,
9   whether it's Roll-A-Cover, Libart, DynaDome.  In my business
10  I lose business to them.  Even though, you know, they might
11  be a box enclosure as has been referred to, I lose business
12  and they buy their enclosures over my enclosures every week.
13  I get calls from customers who say, hey, I'm looking at a
14  DynaDome, I'm looking at a Roll-A-Cover, I'm looking at a
15  Libart enclosure, you know, what's the difference between
16  yours.  We talk about the design and the layout and so on,
17  but at the end of the day all these guys have been in
18  business, they retain business, and they sell pool
19  enclosures, patio enclosures, and I compete with them every
20  single day.
21  Q    Do you know the difference between a pool enclosure and
22  a pool cover, or do you not draw that distinction?
23  A    No, I don't draw a distinction.  It covers the pool.
24  It's raised above the pool.  As I have seen them on the Aqua
25  Shield site, people are swimming under them, which is the

1    same as a low shield enclosure that they sell that you

2    cannot walk under but people can swim under them.  We sell a

3    low height, we sell a medium, and we sell a high enclosure.

4    So at the end of the day the only difference is it doesn't

5    slide on tracks.  All you do is you lift it up and you prop

6    it up with a -- for lack of a better word, a pole, and it

7    keeps it up in the air when you want to have complete open

8    air -- or open-air swimming for the most part.

9    Q    At the time Pool & Spa entered the U.S. market was Aqua

10   Shield the only other pool enclosure manufacturer in that

11   market?

12   A    No, absolutely not.

13   Q    Why so?

14   A    DynaDome, Roll-A-Cover, Libart, Pool Enclosures, Inc.,

15   and so on and so on, all these companies have been selling

16   pool enclosures all over the United States.  A lot of them

17   all over the world.

18   Q    Did some of those companies make retractable pool

19   enclosures?

20   A    They all do.  Yes, some of them.  I think Pool

21   Enclosures, Inc. makes a retractable roof.  But DynaDome,

22   Libart, Roll-A-Cover, they are all retractable enclosures.

23   Q    When we talk about retractable, what do you mean by

24   that?

25   A    Telescopically, they will open and close by pushing it.

1    Q    Meaning that -- what would you do in good weather?  I'm

2    sorry, I'm not trying to be patronizing, but I have to make

3    a record.  So in good weather, what would you do?

4    A    Sure.  In nice weather, you open it up, enjoy the

5    open-air environment.  Inclement weather, off-season, keep

6    it closed and able to swim all year if you heat the water

7    and enjoy the pool.

8    Q    Are the Pool & Spa and Alukov enclosures on some sort

9    of track?

10   A    Yes.  We have one enclosure that is trackless on one

11   side and all our other enclosures have tracks on both sides,

12   the full enclosure.

13   Q    And back to the time of the -- and the Aqua Shield

14   enclosures have tracks, right?

15   A    That's correct.

16   Q    But do other pool enclosure companies sell enclosures

17   with retractability?

18   A    Yes.

19   Q    Would this retractability feature have existed on pool

20   enclosures, to your knowledge, before the 160 patent went

21   into effect in 2001?

22   A    Absolutely.  By demonstration, Alukov produced them

23   years before the patent had come into play.

24   Q    Back to when?

25   A    They started in 19 -- it was 1985 I believe.

1  Q    To your knowledge --

2  A    Then years they were not -- then there were lots of

3  other companies in the market prior to when Alukov started

4  business that were doing retractable pool enclosures with

5  tracks.

6  Q    To your knowledge has Alukov or Pool & Spa ever

7  received any other claim for patent infringement for

8  anything it's made?

9  A    No, not to my knowledge.

10  Q    Not at any time?

11  A    Not to my knowledge.

12  Q    And back to the time after the cease and desist letter

13  was sent by Aqua Shield's counsel -- do you recall that

14  testimony?

15  A    Yes.

16  Q    What happened after that?  Was there litigation filed?

17  A    Yes.  Basically the judge had made a ruling and they

18  had seeked preliminary injunction so that we not sell.  The

19  judge ruled, sorry, he didn't accept it, so we continued to

20  sell and market our enclosures.

21  Q    Where was that case?

22  A    That was in New York, Eastern District of New York.

23  Q    If that ruling had been for entry of a preliminary

24  injunction, would you have stopped selling pool enclosures?

25  A    Absolutely.  We're not in business to defy any patent

1  or any wrongdoing or anything else.  We have lots of other

2  enclosures that, as we've seen, don't defy the 160 patent.

3  So we would absolutely stop manufacturing -- or shipping

4  here to the U.S.

5  Q    Now after the time infringement was decided for certain

6  Pool & Spa and Alukov models, what did you do?

7  A    Once we got that ruling, I contacted the factory and --

8  Q    Where is the factory located?

9  A    Czech Republic.  I contacted them, spoke to their

10  design people as well as people in the office.  I had a lead

11  person there and specifically directed them that we cannot

12  ship into the United States any enclosures that have

13  detachable faces.  So that was very clear to them.  We

14  talked about how we would change that.  They felt certainly

15  we're going to make them fixed, permanent faces.  That was

16  the outcome of that conversation.

17  Q    Did you personally make those phone calls, those

18  communications?

19  A    It was done by e-mail and Skype, yes.

20  Q    By you?

21  A    By myself, yes.

22  Q    Are you the principal representative of Alukov and

23  Pool & Spa in the United States?

24  A    Yes.

25  Q    So if any pool enclosures were sold in the United

1    States since the time you have been working for Pool & Spa,

2    would there be any that you wouldn't know about?

3    A    No, no.  I have the exclusive right.  Any enclosures

4    that are sold in the United States come through Pool & Spa

5    Enclosures, LLC.

6    Q    Do you have any other representatives of Alukov that

7    sell Alukov's products, other than Pool & Spa, in the United

8    States?

9    A    No.

10   Q    Have you since Pool & Spa has been in business?

11   A    No.

12   Q    We'll get back to the Utah installation in a little

13   while.

14       Now why didn't you also instruct the factory at the

15   time the summary judgment was entered determining

16   infringement to completely not make any more pool

17   enclosures?

18   A    It was very clear by the summary judgment the models

19   that were identified.  We sell 18 models of pool/sunroom

20   enclosures.  We sell spa enclosures, but pool and sunroom,

21   and, again, seven of them were determined to be, but the

22   other -- balance of the 18 were -- 11 enclosures.  The

23   majority of them were not found to be infringing.

24   Q    Now did you instruct the factory to modify the

25   retractability of the pool enclosures at that time?

1    A    No.

2    Q    Why?

3    A    It was not -- it was not a subject of what we believe

4    would be any infringement to the patent, the 160 patent.

5    Q    You testified that other manufacturers, competitors

6    make retractable panels now -- retractable enclosures now,

7    right?

8    A    That is correct.

9    Q    Did Pool & Spa -- I'm sorry. Did Alukov make pool

10   enclosures with telescopic openings before the 160 patent?

11   A    Yes.

12   Q    Did others?

13   A    Yes. Both domestically and internationally, companies

14   were doing that.

15   Q    Now can you describe how these end panels attach and

16   what the difference is between a detachable end panel and a

17   stationary end panel?

18   A    Sure. The detachable one basically -- so it's a face

19   that comes on the end. We call it a face or an end panel.

20   If it's detachable, there's basically plugs that you would

21   just put into that. It's very simple. You put it up. You

22   stick the plugs in it -- which are pins in effect. They are

23   just pins. Very quick, very easy release. So that's the

24   detachable.

25       If it's affixed, it is a specific and direct part of

1   the enclosure.  You can't get -- can you get it apart?  Of

2   course.  You can take apart a building or take apart a car.

3   But you have to go through a completely taking out, you

4   know, between rivets, between screws, between plugs.  So

5   it's something you don't -- it's not a quick two-minute

6   detach, take off, put in the garage or put on the side.

7   It's a very cumbersome process and it is not -- you know,

8   customers don't do that.

9   Q    After you found out about the infringement

10  determination by the Utah court, why did you choose to

11  modify the product by fixing the end panels as opposed to

12  some other change?

13  A    Well, the end panels were to me, and what I have seen

14  in the prior patent that was already out there and

15  Mr. Brooks -- you know, I don't want to say copied, that's

16  the wrong word, but the prior patent that was out there did

17  not have detachable panels.  And so when I looked at the new

18  patent, to me, and I'm not a patent attorney, but the main

19  difference is one had a detachable panel and the other one

20  didn't.  So we decided to make it a permanent panel.

21  Q    You did have occasion -- understanding you are not an

22  expert and also understanding -- I'm going to be very

23  limited with these questions -- also understanding that

24  we're not trying the issue of infringement here, you did

25  have the opportunity at some point to inspect the prior

1  patent before the 160 patent?

2  A    Yes.

3  Q    And you had the opportunity to inspect the 160 patent

4  that Mr. Brooks is the inventor of, right?

5  A    Yes.

6  Q    To your knowledge did the prior patent have telescoping

7  capability to open and close the enclosure in good weather

8  and bad weather?

9  A    That is correct.

10 Q    Let's talk about some of the characteristics of the

11 Pool & Spa enclosures.  And, Mr. Stonkus, can you first

12 describe and tell the Court how you would compare the price

13 points.  Let me lay a foundation.

14      Are you the principal employee who attends trade shows

15 for Pool & Spa and Alukov in the United States?

16 A    Yes.

17 Q    And how long have you been doing that for?

18 A    Since 2008.

19 Q    And how frequently do you attend trade shows?

20 A    More and more over the last several years.  2008 might

21 have been a couple of shows, but last year probably around

22 20 shows we attended.

23 Q    At these shows do you see other pool enclosure

24 exhibitors?

25 A    I see them, yes.

1  Q    Are there occasions when Aqua Shield has exhibits?

2  A    I have seen Aqua Shield at shows, yes.

3  Q    And so do you feel that you have familiarity with what

4  the competition has been offering since 2008?

5  A    Yes.

6  Q    And so can you tell me -- first of all, do you have

7  knowledge -- actually, let me go back to one point.  I just

8  want to clean up one point, and that is with respect to the

9  modification that you testified was made to the pool

10 enclosures after the summary judgment ruling, did you change

11 the model names?

12 A    No.

13 Q    Can you explain to the Court why you didn't change the

14 model names?

15 A    The model names are names that we have had through

16 Alukov from day one.  Certainly since 2008 and years -- ten

17 years or years prior to when Alukov designed or came up with

18 the model names.  And so we felt between changing the Web

19 site, changing just all of our marketing material and

20 everything, it didn't make sense.  So for that reason we

21 didn't change the model names.  We just made the enclosure

22 so it didn't infringe with the 160 patent by making the

23 faces permanent and not detachable.

24 Q    Does Aqua Shield use the same model names as

25 Pool & Spa?

1  A    No.

2  Q    Is there any trademark protection or proprietary

3  ownership of those model names by Pool & Spa?

4  A    By Pool & Spa, no.

5  Q    So going back to these characteristics, can you

6  describe to the Court how you would compare, based on your

7  knowledge and experience, the difference between the price

8  point of a Pool & Spa, Alukov enclosure and an Aqua Shield

9  enclosure?

10 A    Well, as I look on their site, I've seen ranges going

11 for the pool enclosures from 19 to $39,000.

12 Q    For who?

13 A    For Aqua Shield.

14 Q    And based on your knowledge, what are the price

15 points -- and we're talking about the period from 2008 to

16 the present.

17 A    Okay.

18 Q    By the way, to your knowledge have the price points

19 changed during that period of time?

20 A    No, they've pretty much stayed in that range, as far as

21 I recollect.

22 Q    With respect to the Pool & Spa enclosure price points,

23 again, let's talk about just the infringing models.  What is

24 the price range of those models?

25 A    I mean we've sold them as least expensive as $10,000

1   and as much as $100,000.

2   Q     And could you put an average on the amount of a

3   Pool & Spa enclosure?

4   A     Well, if we took the 75 odd -- I think 75 ones that

5   were listed as infringing, the average of those is $35,000.

6   So just taking the average of those enclosures.

7   Q     Are the Pool & Spa enclosures generally more expensive

8   than the Aqua Shield enclosures?

9   A     Yes.

10  Q     Why?

11  A     Because -- I don't want to belittle, as Mr. Brooks has

12  said, they build a cheap enclosure.  We don't build a cheap

13  enclosure from the standpoint of options, colors, choices,

14  doors, with screens, without screens, windows, colors.  I

15  mean we've got eight colors.

16  Q     Let's start with that.  Can you describe for the Court,

17  to your knowledge, the difference between what Aqua Shield

18  offers and what Pool & Spa offers in terms of color of

19  enclosure?

20  A     Sure.  As we heard -- or as I understood yesterday was

21  two colors -- I'll call it colors, but anodized.  We have

22  white, beige, silver, charcoal, antique brown, dark green,

23  wood like finish, anodized.  It's eight colors.

24        In addition, if a customer chooses, and we do have

25  customers that do this, that want a pink enclosure, although

1    that hasn't come about, but just to illustrate, if they want

2    a pink enclosure, all we need is what is the palette color

3    and then we'll get that color specific for them.

4    Q    Now does Pool & Spa Enclosures and Alukov make both

5    custom and non-custom enclosures?

6    A    Yeah.  We have what we call standard enclosures.  We

7    pick the Universe model because it's a medium height

8    enclosure.  So it does give somebody the comfort to get in,

9    not a lot of entertainment space, but to get in and have

10   some -- I'll call it entertainment space to walk around.  So

11   we do have a Universe model.  And we do have a swim spa

12   enclosure -- or spa enclosure that is a standard.  Other

13   than that, everything else and the overwhelming majority of

14   our business is custom.  It is not standard enclosures.

15   Q    What do you mean by custom?

16   A    Custom means the customer is going to pick.  For

17   instance, we have lateral doors, which the Aqua Shield, as I

18   understand it, the doors are only on the faces, the two

19   ends, removable panels, the doors are there.  Now, again,

20   that is what I've seen for the pool enclosures.

21       The patio enclosures, they do have, as I recollect,

22   they do have a face -- I'm sorry, a door that -- what I will

23   call on the side.  So we have -- and there are ways to do

24   that.  I have seen other ones where they might have a door

25   at the end, meaning the two extreme ends, but what I will

1  call a pocket door in the middle. Keep in mind, they

2  telescopically open and close. So if there is a door at the

3  two ends, you can put the mechanisms of the door. If it's

4  one that's on the outside panel, you can put it on the

5  outside so it doesn't conflict when you roll it and it

6  doesn't hit versus one on the inside panel on the smaller

7  segment so they don't conflict. We do what's called a

8  pocket door. So basically it slides in and it doesn't

9  interfere. If you have five segments, it could be on

10  segment two, three, four as a pocket door.

11  Q    How do you come up with these custom designs?

12  A    Well, we have a whole engineering team at Alukov.

13  Q    Do you use architects?

14  A    No -- well, we get a lot of -- you know, I might

15  suggest something, hey, in the U.S., we would like to do

16  this. For instance, I suggested a snapped out track. Now

17  our enclosure, to my knowledge --

18  Q    Let me, Mr. Stonkus, interrupt you because I want to

19  move this along and I want to try to focus questions. So my

20  question was do you use architects for designing features of

21  custom pool enclosures?

22  A    Here in the U.S, yes, architects will be involved at

23  times.

24  Q    And does Pool & Spa have the capability to install pool

25  enclosures?

1  A   Yes, we do.  We do factory install.

2  Q   What is factory install?

3  A   Meaning Pool & Spa Enclosures will fly Alukov employees

4  from Europe to the United States to do installs here.

5  Q   Do you have other installers in the United States so

6  you don't have to fly people from Europe?

7  A   I have nobody that's a licensed Pool & Spa, Alukov

8  installer, no.

9  Q   Do you use outside contractors for that?

10 A   Customers may choose outside contractors to do.  But if

11 they do, that's obviously their desire.

12 Q   What about the -- what is polycarbonate?

13 A   Polycarbonate is -- I'll call it what people call it,

14 glass, from when you look at it.  But polycarbonate is 200

15 times stronger than glass.  It's virtually unbreakable.

16 It's UV protected so you are blocking the harmful rays of

17 the sun.  So it's, for lack of a better word, it's in the

18 family of acrylic and Lexan, that type of material.

19 Q   What I as a layman might refer to as plexiglass?

20 A   Yeah.

21 Q   What is the difference between the polycarbonates and

22 the choice of polycarbonates used by Pool & Spa as opposed

23 to Aqua Shield, to your knowledge?

24 A   To my knowledge Aqua Shield has an eight millimeter and

25 ten millimeter.  They have a -- I believe it's either a

1  three or four millimeter.  Those can come in -- I've seen

2  them on their Web site.  It looks like they are tinted or

3  smoked.

4      We have an eight millimeter, a ten millimeter that

5  comes in four different colors.  It can come clear, it can

6  come smoked, it can come blue, light blue and light green.

7  We have a four millimeter in a smoked and a clear.  We have

8  a three millimeter in a smoked and a clear.  We have

9  embossed where you can't see in or out of it.  We have a

10  quad, which is instead of a twin wall, it's a four wall,

11  it's a quad, and that can come in four different colors as

12  well.  So it's 17 different polycarbonate choices versus --

13  I think Aqua Shield, as I understand it, six choices.

14  Q    And so is it your belief that Pool & Spa Enclosures

15  cater to different customers?

16  A    Yes.

17  Q    When I say different, different that Aqua Shield's

18  customers?

19  A    Sure.  A number of reasons.  One is customers want to

20  know that the enclosure is going to be installed by

21  somebody -- a factory install.  And I hear quite often,

22  well, if Aqua Shield won't install their own enclosure, it's

23  very difficult for me to buy a product from them.  So I do

24  hear that.

25      From the standpoint of design and layout, I mean our

1    customers are looking for -- what I will call a lot of the

2    bells and whistles.  We can get to a wider width because we

3    have not, as I understood it yesterday, two profile sizes,

4    but we have five profile -- I'm sorry, six profile sizes.

5    So that allows us to get to wider widths, which is important

6    when you are trying to substantiate wind load and snow load

7    in various parts of the country.

8    Q    Now just to finish up with this, Mr. Stonkus, comparing

9    the -- is there a way to look at a square footage price of a

10    pool enclosure?

11    A    Sure.  Sure.

12    Q    What would be the square footage price that you would

13    estimate a Pool & Spa enclosure to start at?

14    A    We start at $25 a square foot.  Roughly at $25 a square

15    foot.

16    Q    Do you have any knowledge that you could tell the Court

17    about what an Aqua Shield enclosure would start at?

18    A    Yes.  Specifically on their Web site under their

19    frequently asked questions, they indicate their pool

20    enclosures start at around $20 a square foot.

21    Q    And have you had the opportunity to examine Aqua

22    Shield's Web site in the course of your dealings?

23    A    Yes, I have.

24    Q    Among those FAQs, does that have a price range on the

25    Web site, if you know?

1   A    No, other than starting at the price range from their

2   models that they have listed online for sale.

3   Q    What would that be about?

4   A    From 19 to 39,000.  That's pool enclosures.  Their

5   sunroom enclosures are from 8,000 to $12,000.

6        Our sunroom enclosures don't start until probably -- I

7   think our average sunroom is probably about $25,000 up to --

8   Q    How high does it go?

9   A    We sell a sunroom enclosure for 80,000.

10  Q    Is that really an exception or are there instances

11  where you do sell something for 80,000?

12  A    No, they are 50, 60, 70, 80,000.  So it is becoming

13  more -- you know, it's not an exception.

14  Q    Now do you have knowledge of the number of enclosures

15  that Pool & Spa has sold of the models that were determined

16  by the summary judgment determination in this case to be

17  infringing?

18  A    Yes.

19  Q    How many sales does that encompass?

20  A    Seventy-four.

21  Q    And --

22  A    That is Pool & Spa, excluding the one from Alukov

23  before Pool & Spa existed.

24  Q    So 74.  And then one more would be the Utah enclosure,

25  right?

1    A    Yes.

2    Q    So it would be 75?

3    A    Yes.

4    Q    Now can you take us -- when did the sale of those 74

5    enclosures start and when did it end?

6    A    It started in 2008 and basically ran through -- I guess

7    we did our cutoff in -- I think it was February -- mid

8    February.  I don't recall the exact date.

9    Q    Do you have a recollection as we sit here today about

10   taking me through -- and we've got to move forward quickly

11   here because I want to get through some stuff, but do you

12   have the numbers that you recall were sold in each year from

13   2008 on?

14   A    Yes.

15   Q    Can you tell us that?  In 2008, how many enclosures

16   were sold?

17   A    You know, it's interesting, I have my competitor here,

18   but I think it's important for the Court to understand that

19   we haven't taken market share away.  The market is -- but

20   2008, we sold two enclosures.

21   Q    What about in -- we're talking about the enclosures

22   that were the models on the summary judgment, not every

23   enclosure, right?

24   A    Yes.

25   Q    In fact, during these years, Alukov and Pool & Spa sold

1   other noninfringing enclosures, right?

2   A    Yes.

3   Q    So just the ones that were the models on the summary

4   judgment.  There were two in 2008?

5   A    There was -- right.  Now --

6   Q    Approximately how many in 2009?

7   A    See, what I have a recollection, 2009, approximately --

8   I know just because I live and breathe this stuff how many I

9   sold in overall total.  I can kind of approximate what was

10  the infringing enclosures.  Now -- I mean I don't want to

11  be -- we lay them out here by date, so, again, if I am off

12  by some number --

13  Q    We understand.  What do you recall?

14  A    They are identical -- or they are listed here by date.

15  Off the top of my head, in 2008 were two.  2009, I might say

16  six.

17  Q    2010?

18  A    Maybe 15.

19  Q    And 2011?

20  A    Maybe ten.

21  Q    And 2012, did you sell more in that year?

22  A    In 2012, maybe 15.

23  Q    That doesn't add up to 74.  So you don't know the

24  specific numbers?

25  A    I don't know the specifics.  But as I said, they are

1  very specific here in the documentation by date.

2  Q    In front of you you have Exhibits FF, GG, HH and II.

3  If you pull that out -- and that's the Defendant's Exhibits.

4  A    FF?

5  Q    Yes, FF.

6  A    Okay.  And particular number or page?

7  Q    The first page of FF.  Actually -- yeah, start with FF.

8  As you take a look at FF, GG, HH and II, do you see those?

9  A    I only see where FF is marked, unless it's further

10  down.

11  Q    FF starts with --

12  A    Page 126 on the bottom?

13  Q    One of 126, yeah.  Of the exhibits that I'm showing

14  you, and I want to move this along, Mr. Stonkus, of FF

15  through II, are you familiar with those documents?

16  A    Yes, I am.

17  Q    Have you seen those documents before?

18  A    Yes.

19  Q    And starting with FF and taking us through so we can

20  move this along, can you describe what FF is?

21  A    Basically is our documentation by customer, by

22  enclosure.  It shows, in effect, whether it was a pool, a

23  home enclosure, which we call a sunroom -- which Aqua Shield

24  refers to as a sunroom.  And it shows the cost of goods

25  sold.  It shows some financial information on the

1    transaction.

2    Q    Let's go to GG.  What's that?

3    A    I don't believe mine has any -- is there a page number?

4    I'm sorry.  Okay.  I'm sorry.  I gotcha.  I'm sorry.

5    Q    What is GG?

6    A    GG is an Alukov invoice to the Universe model, the

7    enclosure that was sold to the individual in Utah here.

8    Q    And why don't we just clean that up while we're on it.

9    What was the date of the sale of the Utah installation?

10   A    July 29th, 2005.

11   Q    And was Pool & Spa Enclosures in business at that time?

12   A    No.

13   Q    Can you describe for the Court what your understanding

14   is of how -- was this sold directly by Alukov?

15   A    Yes.  There was no involvement.  Pool & Spa Enclosures

16   was nonexisting.

17   Q    Was there some representative in the United States at

18   that time who facilitated this sale for Alukov, to your

19   knowledge?

20   A    To my knowledge, no.

21   Q    Can you explain to the Court the circumstances by which

22   Alukov sold this pool enclosure to Sunshine Pool Products in

23   Clearfield, Utah?

24           MR. ZENGER:  Objection, foundation.

25           MR. COFFEY:  I will lay a foundation.

**A182**

1  BY MR. COFFEY:

2  Q    Is it your understanding that a pool enclosure was sold

3  to an entity or individual in Utah?

4  A    Yes.

5  Q    And can you describe for the Court who sold it and who

6  it was sold to?

7       MR. ZENGER:  Objection, foundation.

8       THE COURT:  Overruled.

9       THE WITNESS:  My understanding, speaking to folks

10  over in Europe, Sunshine -- we say Sunshine Pool, it was the

11  owner of the company found Alukov on the Internet, contacted

12  them, told them what they were looking for, and they

13  consummated a deal for sale.

14  BY MR. COFFEY:

15  Q    Was Alukov, to your knowledge, actively marketing its

16  pool enclosures in the United States at that time?

17  A    Not to my knowledge, no.  Let me say this.  I get

18  folks, whether they be in Israel, Switzerland, all over the

19  world they find my Web site and ask me if I can sell or

20  ship.  So it's not unusual to find another company in

21  another part of the country and solicit them or request them

22  to sell product.

23  Q    Did Alukov or IPC have a representative in the United

24  States in 2005?

25  A    To any knowledge, no.

**A183**

1    Q    When is the first time they had a representative in the

2    United States?

3    A    I came onboard in 2008.

4    Q    That would be Pool & Spa?

5    A    That is correct.

6    Q    And have you had the opportunity to confer with people

7    in the company as well as search the records of the company

8    to see if there were any other spa enclosures or products of

9    Alukov sold in the United States other than this one, prior

10   to Pool & Spa commencing business?

11   A    Right.  No, I have not searched the records, but I have

12   made inquiries to Alukov to see if there are any other

13   sales, and they have indicated no.

14   Q    Now Sunshine Pool Products, that's a pool company,

15   presumably, here?

16   A    That's correct.

17   Q    Do you know and do you have any knowledge, were they

18   using it as a display to try to market this product?

19   A    I spoke to -- I spoke to --

20   Q    You can't tell me -- that's hearsay, so you can't tell

21   me what the guy said.  But my question to you is was

22   Sunshine Pools going to use it for their own purposes or

23   were they trying to sell it for Alukov?

24            MR. ZENGER:  Objection, foundation.

25            MR. COFFEY:  I will rephrase the question.

**A184**

1  BY MR. COFFEY:

2  Q    What was Sunshine Pools going to use this pool

3  enclosure for, if you know?

4        MR. ZENGER:  Objection, foundation.

5        MR. COFFEY:  I think it's appropriate.

6        THE COURT:  Overruled.

7        THE WITNESS:  The pool enclosure is in the

8  backyard of Sunshine Pool's owner, so he uses it for his own

9  personal use.

10       THE COURT:  Mr. Coffey, would you look for a time

11  for us to take a break.

12       MR. COFFEY:  That would be fine, Your Honor.

13       THE COURT:  We don't have to now.  I'm just saying

14  when it works for your examination.

15       MR. COFFEY:  I would be fine, and then I come back

16  and organize it and finish it up after break.

17       THE COURT:  All right.  Thank you.

18       MR. COFFEY:  If that's okay with you.

19       THE COURT:  Yes.  We'll now take a 15-minute

20  break.

21       MR. COFFEY:  Thank you, Your Honor.

22       (Recess)

23       THE COURT:  Mr. Stonkus.

24       Go ahead, Mr. Coffey.

25       MR. COFFEY:  Thank you, Your Honor.

BY MR. COFFEY:

Q    Mr. Stonkus, I want to remind you you are still oath.

Did we have any conversations during the break?

A    No.

Q    Mr. Stonkus, before we broke I was having you look at Exhibit GG, which was the Utah invoice.  Do you recall seeing that?

A    Yes.

Q    And there is just one invoice that comprises GG, right?

A    Yes.

Q    Do you know, as a company representative of the defendants in this case, do you know of any other invoices that were rendered to American companies or individuals prior to the time Pool & Spa started its business?

A    No, I'm not aware of any.

Q    Did you inquire to see if there were?

A    I did.

Q    Now turning over to Exhibit HH, I would ask you to take a moment to take a look at that.  My question, to move this along, will be what are the documents that comprise Exhibit HH?

A    This is an Alukov invoice to Pool & Spa Enclosures.

Q    Not just the first page, but what are the documents, if you can describe that to the Court, that are compromised in Exhibit HH?

1  A    These are all the invoices that represent from Alukov

2  to Pool & Spa Enclosures for all the infringing enclosures.

3  Q    The models that were determined to be infringing in the

4  summary judgment?

5  A    That is correct.

6  Q    And why does Alukov render an invoice to Pool & Spa?

7  A    Pool & Spa is a separate identity.  We are the

8  purchaser and reseller of Alukov's pool and patio spa

9  enclosures in the United States.

10  Q    Now I would ask you to take a look at Exhibit II and

11  describe to the Court what the documents are that comprise

12  Exhibit II?

13  A    These are Pool & Spa Enclosures' invoices from us to

14  the respective customers for the enclosures that we

15  purchased from Alukov and resold to these customers.

16  Q    Is this for the 74 enclosures that were found to be

17  infringing by the Court?

18  A    That's correct.

19  Q    And since Pool & Spa has been in business, are there

20  other invoices that were rendered to customers for sales of

21  pool enclosures?

22  A    Yes.

23  Q    This is a subset of that, right?

24  A    That's correct.

25  Q    Have you had the occasion to examine these invoices to

1    customers?

2    A    Yes.

3    Q    And do you believe that it is a comprehensive set of

4    all of the invoices to the customers for the 74 enclosures

5    that were found to be infringing?

6    A    It is, yes.

7    Q    Are there any others?

8    A    No.

9    Q    Now going back to -- let's just take a look at Exhibit

10   EE, if you would.  If you could describe -- actually, let's

11   go back to --

12              THE COURT:  Are you going to offer, before you go

13   on, FF through II?

14              MR. COFFEY:  You know what, I could do it now.  I

15   was going to lay a foundation.

16   BY MR. COFFEY:

17   Q    Mr. Stonkus, are Exhibits FF through II financial

18   records of Alukov and Pool & Spa that are kept in the normal

19   course of business?

20   A    Yes.

21   Q    And do you have any reason to believe that they are

22   inaccurate in any way?

23   A    I do not.

24              MR. COFFEY:  I offer FF through II in evidence.

25              MR. ZENGER:  Your Honor, with the following

**A188**

1    stipulation we do not object, and that is that so long as

2    these documents are not used contrary to the Court's motion

3    in limine and they will not be used as to any type of

4    reopening infringement, we not object.

5            Do we have that stipulation that these documents

6    will not be used for infringement?

7            MR. COFFEY:  So stipulated, Your Honor.

8            THE COURT:  They will be admitted.

9            MR. ZENGER:  Thank you.

10           (Defendant's Exhibits FF through II were received

11   into evidence.)

12   BY MR. COFFEY:

13   Q    Let's clean this up, Mr. Stonkus.  If you will take a

14   look as well at DD and EE.  First let's look at DD, and ask

15   you to tell me what DD is, not just the first page, but the

16   entire body of those documents.

17   A    The first three pages are a summary of the 74

18   enclosures and then the balance is the financial information

19   backing up the sale of those enclosures.

20   Q    Can you describe for the Court what Exhibit EE is?

21        By the way, for DD, would that be limited to the

22   enclosures that were found to be infringing?

23   A    That is correct, yes.

24   Q    Seventy-four of them?

25   A    Yes.

1  Q    What is EE?

2  A    EE is the design drawing of the enclosure purchased by

3  the customer, that gives all the detail from model to size,

4  door location options, color, any special snap out tracks,

5  just a design drawing.

6  Q    For the 74 that we've been talking about, right?

7  A    That is correct.

8  Q    Are these Exhibits DD and EE kept in the normal course

9  of business of Pool & Spa Enclosures?

10 A    They are.

11 Q    Is there anything that you believe that's inaccurate in

12 any way about these exhibits?

13 A    No.

14       MR. COFFEY:  I move DD and EE in evidence, Your

15 Honor, with the same stipulation that we discussed before.

16       MR. ZENGER:  Subject to them not being used --

17       THE COURT:  Understood, Mr. Zenger.

18       MR. ZENGER:  Thank you.  With the same objection,

19 no objection -- with the same stipulation, no objection.

20       MR. COFFEY:  That's right.

21       THE COURT:  They will be admitted.

22       (Defendant's Exhibit DD and EE were received into

23 evidence.)

24 BY MR. COFFEY:

25 Q    If you would, Mr. Stonkus, would you tell the Court

1  briefly what the procedure is once a customer places an

2  order with Pool & Spa to the time that that order is then

3  executed on and delivered and installed.  What I am

4  interested in knowing is what the involvement of Pool & Spa

5  is, Alukov and the other defendants, if there is

6  involvement.

7  A    Sure, there's involvement.  Basically Alukov actually

8  does the design drawings.  So I communicate with them what

9  the model is, the size and design and options and so on.

10 They do the drawing.  That drawing then is given to the

11 customer.  The customer will then review the drawing.  If

12 there are any changes or differences, they would make

13 notification of that.  And if that be the case, there would

14 be a second or third modification if they make different

15 changes to the drawing.  Once the drawing is finalized, then

16 the drawing goes to Alukov.

17 Q    In Czechoslovakia?

18 A    In Czech Republic, that specifically indicates the

19 version of the drawing that is finalized.

20 Q    By the way --

21          THE COURT:  Mr. Coffey, it's one thing for you to

22 talk over Mr. Brooks.  It's another thing for you to talk

23 over your witness.  But the worst thing is when you talk

24 over the Judge.

25          MR. COFFEY:  Thank you, Your Honor.

**A191**

1            You can proceed, Mr. Stonkus.

2            THE COURT:  We both interrupted you, Mr. Stonkus.

3       I'm sorry.

4       BY MR. COFFEY:

5       Q    What then happens?  Is it manufactured in

6       Czechoslovakia?

7       A    I will get back.  So once the drawing is done and

8       approved by the customer, they acknowledge acceptance of the

9       design, options, color, so on and so forth, Czech Republic

10      then gets that acceptance that says this is the final

11      version, they go to production.  Once they go to production,

12      production is completed, it's put into -- it's transported

13      from Czech Republic to the United States and arranged for

14      delivery to the customer.

15      Q    Does Inter Pool Cover Team have anything to do with

16      that transaction?

17      A    No, they don't.

18      Q    Is Pool & Spa Enclosures, LLC a member of that Inter

19      Pool Cover Team?

20      A    Yes.

21      Q    Is Alukov?

22      A    Yes.

23      Q    Does Alukov have manufacturing facilities in other

24      countries in eastern Europe?

25      A    Yes.

1  Q    Where?

2  A    Poland.  I believe they are building a facility -- I

3  could be wrong, but I believe they are building a facility

4  in Turkey.

5  Q    My question is for all of the 74 enclosures that are

6  identified by the documents that we've shown you as DD

7  through II in evidence, where did they all come from?

8  A    They all come from Czech Republic.

9  Q    Now in connection with these records, have you had the

10  occasion to come up with and could you tell the Court what

11  the gross revenue is on the sale of the 74 enclosures?

12  A    About 2.7 million.

13  Q    Does that include the Utah installation or not?

14  A    Excludes.

15  Q    How much is the gross revenue on the Utah installation?

16  A    It was sold for about 60,500 euros.  Convert that, say

17  1.3.  I don't know what the conversion rate was back in

18  2005, but roughly $9,000.

19  Q    And that is Pool & Spa's gross revenue, right?

20  A    That is the gross sale.

21  Q    That's the gross sale?

22  A    Right.

23  Q    And you said it was about -- so it would be about 2.7

24  million, plus the Utah installation?

25  A    Right.

**A193**

1    Q    Did you have occasion from an inspection of these

2    documents to come up with a gross profit on these sales?

3    A    Yes.

4    Q    What is the gross profit?

5    A    Gross profit on the 74 sales, just over $600,000,

6    excluding operating costs of the company.

7    Q    So in order to convert gross profit to net profit, what

8    would you have to subtract?

9    A    From gross profit to the net --

10   Q    What expenses?

11   A    Right.  Well, there are expenses to the transaction

12   itself, which would be the Alukov enclosure, transportation

13   to get it from Europe to the United States, delivery from

14   the port here in the U.S. to the customer, custom clearance

15   charges, duty charges.

16   Q    Have you had occasion to examine -- that would be

17   Pool & Spa's gross profit, correct?

18   A    Yes.

19   Q    Would there also be another component of profit that

20   Alukov derived by the sale of these 74 units to Pool & Spa?

21   A    Yes.

22   Q    Are you familiar with those figures and could you

23   describe what the gross profit to Alukov would be for the

24   sale of these 74 units?

25   A    Yes.  I have spoken to Alukov on that and my

1  understanding is on a -- I will call it, for lack of better

2  words, a 50,000 foot level, their gross margin that they

3  operate on is five percent.

4  Q    Would there be any reason that you can tell the Court

5  that that five-percent gross margin should be different for

6  these 74 enclosures that were sold by Alukov to Pool & Spa?

7  A    No, no different, to my understanding.

8  Q    You testified earlier, and I don't intend to get into

9  it again, but that Pool & Spa has been operating at a loss

10 since it started?

11 A    Yes.

12 Q    And would that be demonstrated how?

13 A    Tax returns.  Very simple.

14 Q    Can you represent to the Court that the tax returns of

15 Pool & Spa show a loss for every year from its inception?

16 A    I can.

17 Q    Now of the Exhibits DD through II in evidence, are you

18 able to deduce which of the invoices are for Pool & Spa

19 Enclosures' sales involving pool enclosures with removable

20 end panels?

21 A    Yes, that's very clear.

22 Q    How would you go about that?

23     MR. COFFEY:   And understanding, Your Honor, this

24 testimony, so we can move things along, is that I do not

25 intend to offer this in any way, shape or form as related to

1  the infringement claim, but really stipulated to the issue

2  of damages only and lost profits.

3  BY MR. COFFEY:

4  Q   So Mr. Stonkus, can you identify --

5            MR. ZENGER:  Your Honor, excuse me.  I don't think

6  they can parse it that way.  Is it better if I sit so you

7  can hear me?

8            THE COURT:  Go ahead and stand.

9            MR. ZENGER:  Every time before this qualification

10 has been for willfulness only and now it's trying to be slid

11 in for damages.  That's inappropriate because they are de

12 facto trying to put on noninfringement evidence to influence

13 the amount of damages.  So we object to any of these

14 drawings or any of this evidence that is going to try to

15 refute infringement of these 74 devices.  Whether it's for

16 infringement or damages, they are interrelated and cannot be

17 separated.

18            MR. COFFEY:  My comment would be we don't intend

19 to offer this as related in any way to the infringement

20 claim.

21            MR. ZENGER:  Or damages.  Damages and infringement

22 are connected.

23            MR. COFFEY:  We do intend to offer it as related

24 to the damage claim.

25            THE COURT:  Explain to me, Mr. Coffey, how this is

1  related to damages without also getting into the issue of

2  infringement.

3        MR. COFFEY: Our position is that Mr. Brooks

4  testified that Aqua Shield does not make any pool enclosures

5  that have nonremovable panels. Our position is on lost

6  profits that you can't profit or receive damages for lost

7  profits for something that you don't and have never made.

8  So we intend to offer, and it goes to the weight of the

9  evidence, evidence within these 74 enclosures that only

10  seven of them contain panels that are removable. I think

11  that is highly relevant to the lost profit claim.

12        In addition, we think it relates to the

13  willfulness issue from the standpoint that to the extent

14  only seven of these sales represent those that have

15  removable end panels, not going to the infringing issue in

16  any way, shape or form, but as to the damages issue, I think

17  it's highly germane.

18        THE COURT: Mr. Coffey, this would have all been

19  simplified if you would have, in fact, complied with the

20  requirement and provided information before trial about what

21  changes were made that you thought would have ended the

22  infringing nature of these products. You didn't do that. I

23  am just curious, why didn't you?

24        MR. COFFEY: Well, our position, Your Honor, is

25  that we did provide it to Mr. Zenger when he requested it.

1   At the pretrial conference, Mr. Zenger had filed a motion

2   the day before to compel this information. We were not the

3   subject of a motion nor were we ever the subject -- and that

4   is all the defendants, the subject of a motion to compel

5   this information --

6           THE COURT: You were subject to an obligation to

7   supply the other side with that evidence that you intended

8   to use at trial. That is an ongoing obligation. You failed

9   to comply with it. That's why the motion in limine was

10  granted. I still don't understand why you did not.

11          MR. COFFEY: If you will remember the procedural

12  history, Your Honor, after the infringement, summary

13  judgment motion was decided, the plaintiffs moved for a

14  final judgment at that time. There was no issue there that

15  they were asking for financial backup or otherwise at that

16  time. So from our standpoint, Your Honor, the issue of

17  damages had not yet been reached.

18          I view my responsibility to this Court too greatly

19  to sit here and say that it shouldn't have been produced in

20  the New York action. It probably should have. Okay. But

21  the issue here is that it wasn't until the day before the

22  pretrial conference that the plaintiffs sought to compel it.

23  We didn't have an order entered. We came to the Court, I

24  came here and said we would voluntarily produce it in

25  advance of the trial. We did it by the date the Court

1  directed us to do it. And then when Mr. Zenger said that he
2  was not satisfied, we supplemented it. We did it before he
3  filed his motion in limine before the Court.

4       So our position, Your Honor, is that this is not
5  something we're bringing up on the day of trial. This is
6  something he had in advance. If he had an expert in this
7  case, I'm out of the box. He would need to have his expert
8  evaluate that stuff and do what he needed to do. But our
9  position is there is no prejudice by us having produced it
10 after the time it was sought.

11      But I don't have a good answer for you on why it
12 wasn't produced at the time of the New York action or at the
13 time earlier in the litigation.

14      THE COURT: Mr. Zenger.

15      MR. ZENGER: Your Honor, these documents were
16 requested in discovery years ago. And this Court has the
17 power to prevent the defendants from using information that
18 they withheld to try to defend themselves under Rule 37. We
19 have made a request, and the Court ordered them to provide
20 us that information by February 21st. They did not. Hence,
21 we filed our motion in limine. So we object to any of this
22 evidence that purportedly goes to damages because of the
23 following three reasons.

24      First, you cannot award -- or in order to award --
25 excuse me. First infringement is found, and then for that

1   infringement damages are found.  This Court has found that
2   the models presented in our motion paper infringed, and
3   therefore we are entitled to damages for those model
4   numbers.

5          Their attempt here now to come in and say it
6   shouldn't be for all 74 that you found infringing but only
7   for some of them is they are arguing the others don't
8   infringe.  That is presenting evidence of noninfringement
9   and it is opening it up again.  We believe you have already
10  decided that issue.  They waived the opportunity to present
11  this evidence when we had the motion for summary judgment.
12  All of this evidence was available to them.  They chose not
13  to put it in.  We believe the law of the case is all of
14  these items infringe pursuant to the Court's order and
15  therefore any attempt to show noninfringement should be
16  precluded at this stage, including any use of any document
17  to that effect.

18          MR. COFFEY:  Your Honor, these documents are
19  already in evidence.  I already moved them and they are
20  already in evidence in the case.

21          MR. ZENGER:  Subject to my objection.

22          MR. COFFEY:  Subject to the objection and the
23  stipulation.

24          If you prefer me not to ask the witness about the
25  seven enclosures, I can refrain from asking about that.

1    THE COURT:  What the Court is going to do is it's
2  going to grant the request that there not be questioning
3  that would again raise the issue of infringement nor be an
4  attempt to reduce the amount of damages in this case based
5  upon your assertion that only seven of the 74, in fact,
6  infringe.

7    MR. COFFEY:  Is it permissible, Your Honor, for me
8  to ask the witness the question of whether, of the documents
9  that he has in front of him, how many -- and I think he's
10  already testified -- how many of them had or did not have
11  removable end panels?

12    THE COURT:  It would not be permissible.

13    MR. COFFEY:  Not permissible?

14    THE COURT:  It is not permissible.

15    MR. COFFEY:  I will continue, Your Honor.

16  BY MR. COFFEY:

17  Q    Now, Mr. Stonkus, do you understand that in a patent
18  case the Court is required to --

19    THE COURT:  I'm sorry, Mr. Coffey.  I believe your
20  witness has just arrived.

21    MR. ZENGER:  I believe we would like the witness
22  exclusion rule to apply and he should not be in the
23  courtroom while others are testifying, Your Honor.

24    THE COURT:  Mr. Coffey, if you want to go explain
25  that to him, or if Mr. Mecham wants to do so, I think that

1   would be the polite thing to do.

2           MR. COFFEY:  That would be good.  Thanks, Your

3   Honor.

4   BY MR. COFFEY:

5   Q    Mr. Stonkus, in connection with your responsibilities

6   for Pool & Spa and as a representative of Alukov, do you

7   have knowledge of commissions paid for the sale of pool

8   enclosures?

9   A    Yes.

10  Q    You have testified that you have knowledge of -- you

11  have knowledge of the gross revenue and the margin

12  associated with the sale of the 74 enclosures, right?

13  A    Yes.

14  Q    Do you also have knowledge of the negotiations that

15  took place between Mr. Brooks and Mr. Zitko in 2005

16  regarding licensing the patent?

17  A    No.  The only knowledge I have is roughly 2008 when I

18  came onboard.

19  Q    You participated in at least one meeting?

20  A    Yes.  I did so with Mr. Brooks in Atlantic City and we

21  did sit and meet, yes.

22  Q    Based upon this experience, have you a position on a

23  reasonable royalty rate for the infringing models in this

24  case?

25  A    Yes, I do.

Q    What is that percentage?

         MR. ZENGER:  Objection, foundation.

BY MR. COFFEY:  I will establish that.

BY MR. COFFEY:

Q    Is that based upon a percentage or a dollar amount?

A    No, a percentage.

Q    Can you explain what it is and how you developed it?

A    Sure.  Basically I believe it should be fair, probably six percent.  From a standpoint of how, it's what is paid to the industry that I see by speaking to others, whether it be the pool companies, spa companies, what they pay their employees, my background and experience in dealing with salesforce and people.  You know, I only pay mine anywhere from two to five percent, but they get some stipend, salary as well.  But in this particular case, there is no salary associated with this commission.  So therefore I believe it should be a little bit higher than I would typically give somebody.

     It goes in line with when I have other dealers that offer our enclosures for sale, typically they are in that five-percent range is what Pool & Spa is giving to those as a royalty or commission for selling our enclosures.

Q    Would that six-percent figure that you have told the Court be for an exclusive or nonexclusive entitlement to a royalty?  Do you know what I mean by that?

1   A    No, I don't.

2   Q    Do you understand that a patentee can license a process

3   or a patented art form to more than one party?

4   A    Yes.

5   Q    If I use the word exclusive, would you understand that

6   that involved licensing to only one party?

7   A    Yes.

8   Q    And so would the six percent that you have proposed to

9   the Court and testified to in court today be for an

10  exclusive or nonexclusive license royalty?

11  A    Nonexclusive.  We would not give anybody an exclusive

12  right to resell our product.

13  Q    Well, you are getting it from Aqua Shield?

14  A    Right.

15  Q    So your expectation is that they would be able to

16  license it to other people as well?

17  A    No, we didn't really address that nor -- well, the

18  answer would be subject to approval.

19  Q    And that six percent, would that be constant through

20  the expiration of the patent?

21  A    Yes, it could be.

22  Q    Would that be based upon the use thus far of the

23  infringing art in order to sell it as you have in the case

24  of the 74 enclosures?  Do you understand my question?

25  A    No, I don't.

1    Q    What other factors can you tell the Court would go into

2    your determination of arriving at a six-percent royalty for

3    this particular right to use the Aqua Shield technology?

4    A    Well, you mean the Alukov technology?

5    Q    No.  I'm talking about the Aqua Shield technology.  I'm

6    saying that in this case if a royalty is determined, you

7    have said that a fair royalty would be what?

8    A    Six percent if Aqua Shield would, in effect, license

9    Alukov's enclosures as they had previously had discussion --

10   or we had discussion, and sitting at lunch Mr. Brooks

11   indicated, yes, I would be interested in reselling

12   Alukov/Pool & Spa enclosures.

13   Q    I don't want to confuse the record.  Aqua Shield isn't

14   paying a royalty to Alukov in this case, right?

15   A    That is correct.

16   Q    If this case is proven, Alukov and Pool & Spa are

17   paying a royalty to Aqua Shield, right?

18   A    Yes.

19   Q    And you said that royalty would be six percent, right?

20   A    Which I believe would be fair.

21   Q    And what other factors, other than those you have

22   testified to, would go into your arrival at six percent as

23   opposed to two or 15 percent?

24   A    Just what I see as other competitors are doing, what's

25   out in the market.  You know, it's higher than we

 1   traditionally would pay, but, you know, somebody like

 2   Alukov, who has a sales and marketing team and needs to be

 3   supported, would certainly benefit from a higher dollar

 4   amount and therefore be able to offer our enclosures.

 5   Q    Of the 74 enclosures that are sold -- or were sold by

 6   Pool & Spa, would you propose the six percent for all of

 7   those 74 as a royalty?

 8   A    Yes.  It would be -- and, again, six percent, I will

 9   give you my definition of that six percent, would be

10   certainly for I guess the infringing ones and, again, to me

11   it would be the six percent on the ones without detachable

12   faces.

13   Q    And from looking at the documents that are in evidence,

14   is there a way to make that determination?

15   A    Very clear.  Our design drawing under faces

16   specifically state whether it's detachable or it's fixed.

17            MR. ZENGER:  Objection.

18            MR. COFFEY:  I am not going to pursue that with

19   you because that's not --

20            MR. ZENGER:  I request that the response be

21   stricken.

22            MR. COFFEY:  I don't intend to pursue that, Your

23   Honor.

24            THE COURT:  The Court will just not consider it,

25   Mr. Zenger.  Remember, this is not a jury trial.

1          MR. ZENGER:  We will have a transcript, right?

2          THE COURT:  You'll have a transcript.

3          MR. ZENGER:  Thank you, sir.

4          MR. COFFEY:  I'm sorry.  I didn't hear.

5          MR. ZENGER:  I just inquired about a transcript.

6 BY MR. COFFEY:

7 Q   To your knowledge was the proposed royalty percentage

8 by Mr. Zitko and Mr. Brooks higher or lower than what you've

9 proposed to the Court today?

10 A   The proposed was lower.

11 Q   What was that number, if you remember it?

12 A   That number started at 5.5 percent on a declining

13 scale.

14          MR. ZENGER:  Objection, foundation.

15          THE COURT:  Sustained.

16 BY MR. COFFEY:

17 Q   I would like you to look at, Mr. Stonkus, Exhibit CC,

18 if you would.  Do you have that in front of you?

19 A   Yes.

20 Q   And what is Exhibit CC, to your knowledge?

21          MR. ZENGER:  Objection, foundation.

22          THE COURT:  Overruled.

23          THE WITNESS:  CC is an e-mail between Mr. Brooks

24 and Jan Zitko specifically addressing -- inside the box was

25 a proposal by Mr. Brooks starting in 2009 for a 5.5-percent

1    fee, or royalty, with a declining scale for the life of the

2    patent until 2021, where it was only a two-percent royalty

3    that would be given.

4    BY MR. COFFEY:

5    Q    Doesn't it say 2.75 percent?

6    A    To the right -- well, there are two things.  Inside the

7    box is, to my knowledge, what Mr. Brooks had -- let me see.

8         THE COURT:  How do you know any of this,

9    Mr. Stonkus?  Other than the fact that your attorney may

10   have brought this to your attention, how are you familiar

11   with this?

12        THE WITNESS:  When this came out, Mr. Zitko had

13   sent it to me and said this is his conversation.

14        MR. ZENGER:  Objection, hearsay.

15        THE COURT:  So this was -- you were copied in on

16   this specific email?

17        THE WITNESS:  I received the e-mail -- I was not

18   copied.  I received this e-mail as forwarded to me by

19   Mr. Zitko.

20        THE COURT:  All right.  Thank you.  You may go

21   ahead.

22   BY MR. COFFEY:

23   Q    You can continue with your description of what this

24   provides.

25        Is this a royalty percentage that was discussed between

1  Mr. Brooks and Mr. Zitko?

2  A    It is, yes.  This is a direct e-mail between the two

3  parties.

4  Q    And even at the 2009 rate of 5.5 percent, that's lower

5  than what you have proposed as a fair royalty of six

6  percent, correct?

7  A    That is correct.

8          MR. COFFEY:  I move CC in evidence.

9          MR. ZENGER:  Objection, I don't think a foundation

10  has been laid that this was written by Mr. Brooks or that it

11  is what it purports to be.

12          MR. COFFEY:  I can wait and put it in through

13  Mr. Zitko.

14          THE COURT:  I'm going to admit it.  CC will be

15  admitted.

16          (Defendant's Exhibit CC was received into

17  evidence.)

18  BY MR. COFFEY:

19  Q    Just a couple of other things, Mr. Stonkus.  Could you

20  take a look at Exhibit H, Defendant's H -- and we'll move

21  this along -- Exhibit I and Exhibit J.

22  A    Yes.

23  Q    Are you familiar with those documents?

24  A    Yes.

25  Q    Would you explain to me what each of those documents

1    is, very briefly?

2    A    Sure.  Exhibit H is the certificate of formation in the

3    State of Delaware of Pool & Spa Enclosures.

4    Q    What about I?

5    A    Exhibit I is State of New Jersey, our certificate of

6    authority.  And J is our internal IRS identification number

7    certification, I guess, if that's the right word.

8    Q    On Exhibit I it indicates a date of the 27th of

9    February, 2008.  Exhibit H indicates the formation of

10   Pool & Spa on March 29th, 2007.  What is your best

11   understanding about when Pool & Spa commenced operations in

12   the United States?

13   A    The formation was done in 2007, although there were no

14   sales or activity in selling, no recorded sales, no Web

15   site.  So there was no activity in 2007.  I came onboard in

16   2008, and that's when a Web site was developed, and a sales

17   and marketing plan, and so on, were put in.

18   Q    What month in 2008, if you remember?

19   A    I believe I came on in February.  I came on during

20   the -- actually it's January.  I came on during the Atlantic

21   City Pool & Spa show.  That's the first show I attended,

22   which was 2008.  So that's always held in January.

23           MR. COFFEY:  Your Honor, I move defendants H, I

24   and J.

25           MR. ZENGER:  No objection.

1      THE COURT:  H, I and J will be admitted.

2          (Defendant's Exhibits H, I and J were received

3  into evidence.)

4  BY MR. COFFEY:

5  Q    Taking a look at, Mr. Stonkus, if you would, starting

6  with -- and we're going to do this quickly -- Exhibits L, M,

7  N.  Do you see those?  My question is are they Pool & Spa

8  documents?

9  A    These are screen shots of our Web site.

10  Q    Do they provide specifications on the Pool & Spa

11  enclosures that are sold by Pool & Spa and Alukov in the

12  United States?

13  A    Yeah.  You will see some particular polycarbonate

14  that's offered to colors that are offered for the members of

15  profiles, aluminum profiles, yes.

16  Q    These are all duplications of screens on Pool & Spa's

17  Web site?

18  A    Yes.

19  Q    Is there anything inaccurate about those exhibits?

20  Have they been modified in any way?

21  A    No, I have not modified this in many years.

22          MR. COFFEY:  Your Honor, I move Defendant's K, L,

23  M and N in evidence.

24          MR. ZENGER:  Subject to the Court's motion in

25  limine, no objection.

**A211**

1          (Defendant's Exhibits K through N were received

2     into evidence.)

3     BY MR. COFFEY:

4     Q     Mr. Stonkus, you had indicated that you had a sense

5     about how many pool enclosures were sold by Pool & Spa

6     through the years since 2008.  You said there were two sold

7     in 2008.  Do you remember that?

8     A     Yes.

9     Q     And do you have any belief that your testimony about

10    the numbers sold each year might have been inaccurate?  Is

11    there anything that refreshes your memory about how many

12    were sold?

13    A     I know how many were sold.

14    Q     I haven't refreshed your memory or discussed this with

15    you at a break?

16    A     No, not at all.  I indicated before I know how many

17    model enclosures for pool -- and I will call them sunroom

18    enclosures were sold by year, total, not specific to what

19    has been determined as to the infringing.  Again, that was

20    just my guess based on -- you know, a guess based on kind of

21    a total.  Again, I know what the total is by year, not what

22    the infringing 74, you know, was.  But they are clear.  You

23    can see the dates in the documents here, what year they were

24    sold.  So they are easy to pull out how many per year are

25    sold.

1   Q   Mr. Stonkus, do you have a number for those years?

2   A   I know in total, yes.

3   Q   What was the total again?  Seventy-seven?

4   A   Seventy-seven?

5   Q   I'm sorry.  74.

6   A   Seventy-four of Pool & Spa determined to be infringing,

7   which don't include the other models that are out there.

8   Q   Finally, Mr. Stonkus, you testified that you didn't

9   believe that Pool & Spa or Alukov were infringing until the

10  Court ruling.  Is that your testimony?

11  A   That is correct.

12  Q   Were you ever informed or was anyone in the company

13  ever informed prior to the Court ruling that you were

14  infringing on the Aqua Shield patent?

15  A   No.

16  Q   I'm not going to repeat the testimony, but is it your

17  testimony that you sought the advice of counsel with respect

18  to that issue?

19  A   Yes.

20  Q   Prior to -- when was that?

21  A   I mean when I came onboard, you know, I was aware of --

22  I was made aware of this.  The first question I asked

23  counsel is can we continue to sell these and are we limited

24  in what we sell and how we sell, and the answer was no.

25  Q   Do you have knowledge, as a company representative,

1    that inquiries were made about whether Pool & Spa was

2    infringing before you came onboard in 2007?

3              MR. ZENGER:  Objection.

4              MR. COFFEY:  I will withdraw the question.

5    BY MR. COFFEY:

6    Q    At the time you came onboard with the company,

7    Mr. Stonkus, did you think that the Aqua Shield patent was

8    valid?

9              MR. ZENGER:  Objection, foundation.

10             MR. COFFEY:  I think he can testify to it, Your

11   Honor.

12             THE COURT:  Overruled.

13             THE WITNESS:  No.  I certainly did not think in

14   any shape or form it was valid.

15   BY MR. COFFEY:

16   Q    Why didn't you think that?

17   A    Very clearly every competitor that is out there is

18   selling a retractable enclosure.  These have been in Europe

19   for years and years and years, before even Alukov came in

20   business and years before Aqua Shield obtained the patent.

21   Q    And would it have mattered if you knew whether sales

22   were being made in the United States?

23   A    No.  No.

24   Q    Wouldn't it be necessary for sales to be made in the

25   United States in order for the patent to be violated?

1        MR. ZENGER:  Objection, foundation.  Calls for a

2   legal conclusion.

3        MR. COFFEY:  I will rephrase the question.

4   BY MR. COFFEY:

5   Q    Were there any other reasons why you did not feel, when

6   you came on the company, that the Aqua Shield patent was

7   valid?

8   A    There were many companies doing retractable enclosures,

9   many companies that were selling patio enclosures.

10  Q    In the U.S.?

11  A    In the U.S.  Again, they are retractable, they have

12  tracks, they have doors, plus the existing patent that was

13  already out there.

14       MR. COFFEY:  I have no further questions, Your

15  Honor.  I want to thank the Court for its patience.

16       THE COURT:  Thank you, Mr. Coffey.

17       Mr. Zenger.

18       MR. ZENGER:  Is this a good time for a break or do

19  you want me to start?

20       THE COURT:  We're going to go for about 45

21  minutes.

22                    CROSS-EXAMINATION

23  BY MR. ZENGER:

24  Q    Mr. Stonkus, you don't have any patent training, do

25  you?

1   over each other. I just want you to answer his question as

2   directly as you can relying on your attorney to come back

3   with additional information elicited. Okay.

4           THE WITNESS: Okay.

5           THE COURT: Thank you.

6           Mr. Coffey, if you would, please, do not begin

7   asking the next question until he is through with this

8   answer.

9           MR. COFFEY: Okay, Your Honor. Thank you.

10  BY MR. COFFEY:

11  Q   Mr. Brooks, do you recall that the proposal for the

12  royalty percentages discussed with Mr. Zitko involved a

13  descending scale until the time of the expiration of the

14  patent?

15  A   I don't remember exactly. That was four years ago.

16  That was one 30-minute conversation, maybe 40 minutes, with

17  a couple drinks.

18  Q   How many years ago was that?

19  A   I would say about three or four years ago. A good four

20  years ago. I would say about four years ago. I don't

21  remember if it was summer, winter. I don't remember.

22  Q   Your testimony is you didn't propose that to Mr. Zitko

23  but he proposed it to you?

24  A   Yes.

25  Q   And is it also your testimony that you never agreed to

1  accept that?

2  A    I don't accept nothing.

3  Q    Did you ever and can you point to any document or any

4  meeting where you outright rejected that percentage?

5  A    There was no meeting after that.  There were no

6  discussions with Mr. Zitko.  He tried to call me, but I

7  didn't answer his call.

8  Q    Have you negotiated any royalty agreements or licensing

9  agreements with anyone else at any time in your career?

10  A    No.

11  Q    Now on Aqua Shield's Web site there are listed

12  representatives in various states.  You're familiar with

13  that?

14  A    Yep.

15  Q    And in a number of those listed representatives, when

16  you dial the number, it actually goes right into Aqua

17  Shield's home office in Long Island, right?

18  A    Not some of them, all of them.

19  Q    All of them do?

20  A    Absolutely.

21  Q    When Aqua Shield sells a pool enclosure through one of

22  those individuals as listed on your Web site, do they pay

23  those individuals a percentage?

24  A    Yes.

25  Q    What percent is that?

```
 1   A    It ranges, and I cannot disclose this because of
 2   competitor.
 3   Q    So you refuse to disclose the range?
 4   A    Yes.
 5   Q    Does Aqua Shield have salesmen on staff separate and
 6   apart from the those representatives that are identified on
 7   your Web site?
 8   A    We have sales team on staff, yes.
 9   Q    And does Aqua Shield pay a commission?
10   A    Yes.
11   Q    To a salesman?
12   A    Salary plus commission.
13   Q    Will you disclose to the Court what the commission is
14   on the sale to an employee salesperson of Aqua Shield?
15   A    When you said disclose to Court, to the Judge or to
16   Mr. Stonkus?
17   Q    I'm asking the question.
18   A    Well, I will not disclose to you.  But the Judge, I
19   could disclose all information to Judge.
20   Q    So you won't testify in open court what that percentage
21   will be?
22   A    We in a battle with this company for eight years.
23   Q    Well, you testified what your profit margins are,
24   right?
25   A    That's correct, because I'm a manufacturer.
```

1   Q   So when a pool enclosure is sold by Aqua Shield by one

2   of its in-house salesmen, they get a commission?

3   A   Salary plus commission.

4   Q   Is it more or less than five percent?

5   A   I cannot disclose this.

6   Q   You heard Mr. Stonkus testify earlier today that his

7   experience in the industry and the commission that

8   Pool & Spa pays salespeople is approximately two percent.

9   Did you hear that testimony?

10   A   I heard it.

11   Q   Will you tell us today in open court whether that

12   percentage is consistent with what Aqua Shield would pay

13   either in-house or an outside salesperson?

14   A   You will never find a salesperson for two percent,

15   never. If you find it, for very short time.

16   Q   So your testimony is it would be more than two percent?

17   A   Absolutely.

18   Q   Would it be ten percent?

19   A   I cannot discuss this with you. I'm sorry.

20   Q   Now didn't Mr. Zitko tell you when you were discussing

21   the licensing agreement that they didn't believe the patent

22   was being violated at that time?

23   A   He told me that.

24   Q   Mr. Stonkus told you the same thing?

25   A   I never talked to Mr. Stonkus.

1    Q    But he did tell you that?

2    A    Yes.  You want to know what I answer him?

3    Q    No.  After those -- the last meeting you had with

4    Mr. Zitko would have been down in Florida?

5    A    Only once in Florida.

6    Q    Have you had any conversations with Mr. Zitko or

7    Mr. Stonkus since that time?

8    A    No.  Maybe once Mr. Zitko.  He call me several times.

9    I didn't answer the phone.  One time it's possible, I don't

10   remember exactly, I pick up the phone and I said that

11   whatever his offer was, it was a slap in the face.  That's

12   why I didn't.  That's about it.

13   Q    And you know we're here in connection with this case

14   because there's been a finding of infringement, right?

15   A    Yes.

16   Q    And you know that at some point, about four years ago,

17   a percentage was proposed on a declining scale, you say by

18   Mr. Zitko, of approximately five percent as a licensing

19   agreement, right?

20   A    Nothing was discussed with me, excuse me.  You said it.

21   I didn't say that.

22   Q    So it's your testimony --

23   A    If somebody send me e-mail, it doesn't mean I accept

24   it.

25   Q    I understand.  I'm not suggesting that you accepted it.

1   But I am suggesting that you have testified here that you

2   were in receipt of a number, and that number was five

3   percent on a declining basis?

4   A   Don't remember exactly the number. I don't remember

5   exactly the number. That was four years ago. But whatever

6   the number was there, I never responded to it. It was a

7   joke.

8   Q   As you sit here today, was it more than five percent?

9   A   It was in that range.

10   Q   And you do remember, I think you testified, I'm not

11   trying to trick you, that it was a declining basis, right?

12   A   You don't try to trick me.

13   Q   I am not. My job is to elicit testimony.

14      It was on a declining basis, right?

15   A   Can you repeat it one more time? I'm sorry.

16   Q   In other words, it was a percentage, but it declined as

17   the license got closer to the expiration of the patent,

18   right?

19   A   It was declining from 2006 because of competition.

20   That's what I said.

21   Q   But it did go until the time of the expiration of the

22   patent, right? The percentage -- you wouldn't enter into a

23   license or a royalty agreement --

24   A   Are we talking about the chart that he send me or from

25   2006 that I said my income is declining? We're talking

1   about two different things.

2   Q   I have been talking all along about the chart he sent

3   you.

4   A   Okay.

5   Q   We agreed that that was approximately five percent on a

6   declining basis, right?

7   A   I don't remember.  It was a chart.  It was a chart.

8   Q   It was in that range?

9   A   In that range, but declining or rising, I don't

10  remember.

11  Q   And you never had any royalty negotiations or licensing

12  negotiations with any of these other competitors that you've

13  testified about today, correct?

14  A   That's correct.

15  Q   And your testimony is because they agreed to take

16  things off their Web site?

17  A   That's correct.

18  Q   And was it your position that they were selling

19  infringing products at that time?

20  A   Yes.

21  Q   And --

22  A   Selling or advertising.

23  Q   Well, there is a difference.  You agree with me that

24  your position would be they were advertising infringing

25  products, right?

1   A    Well, Libart was selling, manufacturing and selling.

2   DynaDome just advertising, testing the waters.

3   Q    And Libart actually sold infringing products?

4   A    Yes.

5   Q    But you never pursued them in court?

6   A    That's correct.  They removed it right away.

7   Q    And, again, separate and apart from lost profits, which

8   is the issue you raised about this 35 to 45 percent

9   declining, and we'll get back to that in a minute, is that

10  you disagreed with the five-percent chart that Mr. Zitko

11  sent you as a reasonable royalty, right?

12  A    That's right.

13  Q    Did you ever from that point on propose to Mr. Zitko,

14  Mr. Stonkus, or any one of the defendants a royalty

15  percentage that you would accept?

16  A    I don't remember.

17  Q    Do you have a percentage that you can tell us would

18  have been acceptable at that time when this negotiation was

19  taking place?

20  A    I told Mr. Zitko that it would only be acceptable if

21  we're the exclusive distributor of their product.  That is

22  acceptable, plus percentage.

23  Q    So you weren't interested in a royalty only at that

24  time, you wanted to be the exclusive seller of Alukov

25  products?

1   A   That not infringe Aqua Shield.

2   Q   Let's understand that.  Again, I don't mean to belabor

3   the record, Your Honor, but I think I've got to make sure of

4   this.

5       You wanted to sell Alukov products which were not

6   infringing?

7   A   That's correct.

8   Q   So you were not interested at that time in negotiating

9   a royalty agreement or a licensing agreement for what you

10   thought were the Alukov infringing products, you wanted them

11   to just stop making those products?

12   A   Well, yes.

13   Q   So then a minute ago you said you wanted a percentage?

14   A   License to produce it under the license of Aqua Shield.

15   For that is percentage.

16   Q   Which is it, you wanted to sell Alukov noninfringing

17   products, but you also wanted to have Alukov manufacture and

18   pay you a royalty for what you thought were infringing

19   products?

20   A   That is correct.  Absolutely right, yes.

21   Q   But you never communicated a percentage of what that

22   royalty licensing percentage should be, right?

23   A   That's right.

24   Q   And you don't have a percentage today that you can tell

25   the Court would be a fair percentage if that negotiation

1   with Alukov were to continue through conclusion?

2   A    Not with Alukov. We never talk. I have no interest.

3   Q    And separate and apart from the negotiations with

4   Alukov, you similarly don't have a percentage that you would

5   license the 160 patent for to another competitor because you

6   are not interested in doing that, right?

7   A    Well, I build the market to manufacture and produce and

8   sell in this country.

9   Q    And let's get into that a little bit. In 2006, your

10  position is you had 100 percent of the market share?

11  A    Yes.

12  Q    For pool enclosures in the United States?

13  A    For arch enclosure with the shape that we have,

14  100 percent.

15  Q    But that 100 percent of the market share would not

16  include all pool enclosures in the United States, only those

17  that you were seeking to protect by your patent, right?

18  A    Here you come to a Kia and Mercedes.

19  Q    You agree with me that --

20  A    I would sell all the Kias in this country.

21  Q    You wanted to sell all the Kias?

22  A    That's correct.

23  Q    You didn't want to sell the Mercedes?

24  A    No.

25

1    Q    And you would agree with me, though, that Pool & Spa,

2    once they got into the market in '07 --

3    A    They didn't come into the market.

4    Q    Let me ask the question. Okay. Once Pool & Spa came

5    into the market, you would agree with me that they sell more

6    products than those seven that were alleged and found to be

7    infringing in this case, right?

8    A    Incorrect.

9    Q    What?

10   A    You just said they went into the market. When somebody

11   come into your house with the keys from your house and open

12   your apartment, freely walk into the house, is it legit?

13   Q    I understand and that's not responsive to my question.

14   My question is --

15   A    Well, then don't say they went to the market. They

16   came to the market.

17   Q    At some point in time Pool & Spa started selling pool

18   enclosures in the United States, right?

19   A    Illegally.

20   Q    But they did, right?

21   A    Yeah.

22   Q    And your position is that some of them they sold were

23   illegal because they were infringing your patent, right?

24   A    Most of them.

25   Q    But you would agree with me that there were a number of

1  models they sold which didn't infringe your patent, right?

2  A    In my view, only one model.

3  Q    Which model was that?

4  A    A round spa enclosure.

5  Q    So other than the round spa enclosure, your position is

6  that everything they sold infringed?

7  A    Yes.

8  Q    And if it turned out that Pool & Spa had many other

9  models that were not infringing, you would agree with me

10 that that would represent a separate part of the market

11 share that you wouldn't have, right?

12 A    It's a different market. I build the market for

13 inexpensive, round, arch shaped enclosures. That's

14 different. You are comparing apples and oranges. It's

15 completely two different things.

16 Q    The difference between the Aqua Shield and Pool & Spa

17 is apples to oranges, right?

18 A    No. It's identical copy, identical. If you look at

19 the Web site, it's identical.

20 Q    So when you're referring to apples and oranges, what

21 are you referring to?

22 A    I am referring to a different market, the boxy type and

23 arch shaped type.

24 Q    Now with respect to the lost profit issue, you said the

25 reduction was from 35 to 45 percent down to ten to

1   A    Right.

2   Q    You haven't told the Court the reduction in the number

3   of enclosures -- strike that.

4        You haven't told the Court the number of pool

5   enclosures that Aqua Shield made after Pool & Spa went into

6   the U.S. market, correct?

7   A    That's correct.

8   Q    Nor have you told us the reduction in the number of

9   pool enclosures made between the time before Pool & Spa went

10  into the industry in the United States and after, right?

11  A    One more time.  I'm sorry.

12  Q    Similarly you haven't told us the difference in the

13  number of enclosures or the reduction in the number of

14  enclosures from the time that before Pool & Spa went into

15  the U.S. market and after, correct?

16  A    That's correct.

17  Q    I do apologize to the Court if I asked this, but I just

18  want to make sure.  For any year that Aqua Shield has been

19  in business, you haven't told the Court what the gross

20  revenue of Aqua Shield has been for the period 2001 to the

21  present, right?

22  A    If the Court will ask me, I will produce it.

23  Q    But you haven't in your testimony?

24  A    That's correct.

25  Q    You can't point to any document that you have been

1  shown that identifies that, right?  Were you shown any

2  documents that identify that?

3  A    I didn't show nothing.  To you, no.

4  Q    So without telling me the number of units that were

5  sold in a given year, you can't quantify for the Court, can

6  you, what the dollar value is of the reduction that you

7  allege from 35 to 45 percent to ten to 15 percent, correct?

8  A    I could present to the Court at the request of the

9  Court.

10        THE COURT:  Mr. Brooks, if you would just answer

11  his question, please.

12        THE WITNESS:  One more time.  I'm sorry.

13        (Whereupon, Mr. Coffey's question on page 18, line

14  4 was read.)

15        THE WITNESS:  Can you rephrase it one more time?

16  BY MR. COFFEY:

17  Q    So without knowing the --

18        MR. COFFEY:  Could you read it back one more time

19  for me?  I want to write it down.

20        (Whereupon, Mr. Coffey's question on page 18, line

21  2 was read.)

22        THE WITNESS:  It is correct, yes.

23        If I have to say yes or no, he is correct, but I

24  don't think it's proper answer to say yes, in my opinion.

25  //

1   BY MR. COFFEY:

2   Q    Now, again, not covering ground we covered yesterday, I

3   want to confirm a couple of things with you, Mr. Brooks.  If

4   you don't understand my question, I'm happy to rephrase it.

5        Your basis for the 35- to 45-percent reduction down to

6   ten to 15 percent -- that was your testimony, right?

7   A    Yes.

8   Q    You haven't referred to any document that supports that

9   position, correct?

10  A    I have my documents I refer.  That number just didn't

11  came from the moon.

12  Q    But you didn't refer to any document when you were

13  testifying that that was the reduction in margin, yesterday,

14  correct?

15  A    I didn't refer to documents.

16  Q    You weren't asked to refer to any document that

17  verified that, right?

18  A    I wasn't asked, no.

19  Q    And you weren't shown any financial record that would

20  justify that reduction?

21  A    I did not show, no.

22  Q    And you didn't tie in, for instance -- well, you

23  indicated that the 35- to 45-percent margin reduction down

24  to ten to 15 percent was per unit, but you didn't refer to

25  any specific sale yesterday to support that, right?

```
 1   A     That is incorrect.  I did give example yesterday.

 2   Q     You gave an example of that?

 3   A     Yeah.

 4   Q     What was the example you gave?

 5   A     The example was, for example -- let me repeat it.  What

 6   I sold for $49,000 in 2006, in 2013 sell for 38,000.

 7   Q     What did it originally sell for?

 8   A     Forty-nine plus.

 9   Q     The sale price, though, doesn't represent the margin,

10   does it?

11   A     It represents the margin.

12   Q     So that if a pool enclosure sells for $49,000, your

13   position is that's the margin?

14   A     That is a gross revenue, 49 percent.  But the gross

15   represent margin.  If I limit my percentage 35 percent, so I

16   know my percentage out of 49,000.

17   Q     We agree, don't we, that Aqua Shield's enclosure sold

18   for different prices?

19   A     That is correct.

20   Q     We would further agree that the margin reduction would

21   be different for an Aqua Shield enclosure that sold for less

22   money than an Aqua Shield enclosure that sold for more?

23   A     That's incorrect also.

24   Q     So why don't you tell us, is it consistent across the

25   board in terms of the value reduction in the margin across
```

1  all product lines?

2  A    The margin, margin range between 30 to 45 percent, 30

3  to 40 percent based on the model.  Certain models we make

4  30 percent, certain models 35 percent.  Some models up to

5  45 percent.

6  Q    Today?

7  A    Used to.  Used to in 2006.

8  Q    So when you were testifying a minute ago, you were

9  indicating what you used to make?

10  A    That's correct.

11  Q    But you haven't specified the specific models to the

12  Court in your testimony.  You gave an example, and I

13  acknowledge that, but you haven't given the specific models

14  to the Court in terms of how that margin changed, correct?

15  A    That's right.  But I would explain to the Court if --

16  Q    That's not my question.

17          THE COURT:  Mr. Brooks, if your attorney has not

18  made this clear to you, I will.  I cannot accept evidence

19  and rely on evidence that is not produced here in open

20  court.  So your offer to give me something that they don't

21  hear is something that will not happen.  So to the extent

22  you want me to know something so that I can rely upon it in

23  making my decision in this case, it's going to have to be

24  done here in court.  They are going to have to hear it and

25  they are going to have to be able to cross-examine you on

1   that information.

2          Again, I had hoped that your attorney had

3   explained that to you, but if he has not, you have now heard

4   it from me.

5          Do you understand that, Mr. Brooks?

6          THE WITNESS:  Can I ask you a question?

7          THE COURT:  Yes.

8          THE WITNESS:  After it's over and the lawyers

9   submit their briefs, can they include?

10         THE COURT:  No, no.  It has to be produced here in

11   court.

12         THE WITNESS:  Okay.

13   BY MR. COFFEY:

14   Q   Mr. Brooks, just a couple more questions.  This $4,000

15   extra expense that you testified you were incurring as a

16   result of --

17   A   I'm sorry.  Can you repeat?  My mind was --

18   Q   No problem at all.  I'm happy to repeat it.

19      You testified to some questions from Mr. Zenger

20   yesterday that you are incurring another $4,000 a month, I

21   think it was, in expenses associated with some acts that

22   Pool & Spa and Alukov have engaged in.  Do you remember that

23   testimony?

24   A   If you referring to Google advertising?

25   Q   You said you are incurring about $4,000 more a month as

1   a result of what they did.

2   A     If I recall, it was 4,000 because of the -- between two

3   to $4,000.

4   Q     You said two to four?

5   A     Yeah.

6   Q     I'm glad I asked you because I wasn't sure.

7         Is that advertising expense that you are incurring?

8   A     Well, it's advertising, selling expense, yes.

9   Q     Is that Google advertising?

10   A     Yes.

11   Q     What do you pay a month now in Google advertising?

12   A     At least three and a half to four and a half thousand

13   dollars a month, at least. At least.

14         MR. COFFEY: I have no further questions, Your

15   Honor. I want to thank you for your patience, Mr. Brooks.

16         THE COURT: Thank you, Mr. Coffey.

17         Mr. Zenger, do you have you any redirect?

18               REDIRECT EXAMINATION

19   BY MR. ZENGER:

20   Q     Mr. Brooks, the end panels on your pool enclosures are

21   attached in ways that make them removable, correct?

22   A     Yes.

23   Q     In what ways are they attached?

24   A     You could bolt them. You could snap them. Very

25   simple.

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AQUA SHIELD, INC.,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>INTER POOL COVER TEAM, ALUKOV<br>HZ SPOL. SRO, ALUKOV, SPOL. SRO,<br>POOL & SPA ENCLOSURES, LLC,<br><br>Defendants. | ORDER GRANTING IN PART AND<br>DENYING IN PART PLAINTIFF'S<br>MOTION IN LIMINE<br><br><br><br>Case No. 2:09-CV-13 TS |

This matter is before the Court on Plaintiff's Motion in Limine and in the Alternative

Motion for Sanctions.[1]  Through its Motion, Plaintiff seeks to prevent Defendants from

introducing (1) any evidence of noninfringement and (2) any substantive evidence not previously

disclosed.  In the alternative, Plaintiff seeks an order sanctioning Defendants for their alleged

failure to disclose by (1) directing that matters related to damages be established according to

Plaintiff's claims and (2) precluding Defendants from relying on undisclosed evidence.  For the

reasons stated below, the Court will grant the Motion in part.

---

[1]Docket No. 145.

1

A244

Plaintiff first seeks an order from the Court preventing Defendants from offering evidence that Defendants' pool enclosure models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient do not infringe the '160 Patent, as these models have already been determined to infringe the '160 Patent. Defendants state that they have no intention of re-litigating issues (including infringement) already decided by the Court.

As the Court has already determined that these models do infringe the '160 Patent and Defendants agree that they will not re-raise the issue of infringement at trial, the Court will grant the Motion and preclude any evidence that the infringing models do not infringe the '160 Patent.

Plaintiff next seeks preclusion of any evidence not previously disclosed by Defendants, particularly as such evidence relates to the issue of damages. Defendants respond that they do not intend to introduce any evidence which they have not already provided to Plaintiff. The Court will therefore grant the Motion and prevent Defendants from introducing at trial any damages evidence not previously disclosed to Plaintiff.

Having granted the primary relief sought in Plaintiff's Motion, the Court declines to address Plaintiff's alternative request for sanctions at this time. However, Plaintiff is free to raise this issue at trial.

It is therefore

ORDERED that Plaintiff's Motion in Limine and in the Alternative, Motion for Sanctions (Docket No. 145) is GRANTED IN PART AND DENIED IN PART.

2

**A245**

DATED   March 18, 2013.

BY THE COURT:

_____
TED STEWART
United States District Judge

# KROL & O'CONNOR

320 WEST 81ˢᵗ STREET
NEW YORK, NY 10024

PH. (212) 595-8009
FAX (212) 595-8149
KROLlaw@aol.com

August 2, 2005

Dear Sir or Madam:

We represent Bob Brooks, the Chief Executive Officer and co-owner of Aqua Shield, Inc. This letter concerns the infringement of United States Patent Number 6,637,160, owned by Mr. Brooks, an apparatus for providing an enclosure for attachment to a building or for covering an area, and employed in Aqua Shield, Inc.'s telescopic swimming pool enclosures. Said patent was duly filed with the United States Patent and Trademark Office on July 10, 2001 and awarded to Mr. Brooks on October 28, 2003. Thus, Mr. Brooks has been granted, by the United States Government, the exclusive right to make, use, offer to sell, or sell his patented invention, within the United States, or to import said invention into the United States, as per 35 U.S.C. § 271(a). Any unauthorized manufacture, use, offer to sell, sale or importation of the invention covered by U.S. Patent 6,637,160 constitutes an infringement, resulting in severe civil penalties including an injunction, damages, and attorney's fees.

It has recently been brought to our attention that your company, Inter Pool Cover Team, is planning to manufacture and sell infringing pool enclosures within the United States, in violation of 35 U.S.C. § 271, and in abrogation of the rights awarded to Mr. Brooks by the grant of his patent. Without prejudicing or waiving Mr. Brook's right to seek further remedies or relief, this letter constitutes a formal demand upon you to cease and desist – immediately – and thereafter refrain from any further infringement of U.S. Patent 6,637,160.

In order to comply with this demand, you must immediately (i) remove and ensure the removal of any and all advertisements or other offers, in any media, to sell your infringing products, (ii) rescind and terminate any sales or outstanding offers to sell your infringing products, (iii) destroy or, in the alternative, dismantle and remove from the United States, all infringing products you may have already manufactured and imported into the United States, and (iv) abstain from any further manufacturing of your infringing products in the United States or any importation of your infringing products into the United States.

Under the provisions of 35 U.S.C. 271(a), et seq., the owner of a United States Patent may seek various remedies in the U.S. District Court for patent infringement, e.g., injunctive relief, retroactive and constructive royalties, disgorgement of profits, recovery of any damages, costs of the action and reasonable attorneys' fees, and even an award of treble damages for willful infringement. Unless we obtain immediate satisfaction in this matter, our client will resort to legal remedies in order to vindicate his rights to the full extent provided by law.



PLAINTIFF'S
EXHIBIT
8

**A247**

We expect to receive a communication from you or your counsel within ten (10) business days from the receipt of this letter, containing satisfactory assurances to the effect that the your company will comply with our demands and cease and desist from any further infringement of U.S. Patent 6,637,160.

Very truly yours,

Krol & O'Connor
320 West 81st Street
New York, New York 10024
(212) 595-8009

By: _____

Igor Krol

| | Item Description (Nature de l'envoi) | Registered Article (Envoi recommandé) | Letter (Lettre) | Printed Matter (Imprimé) | Other (Autre) | Recorded Delivery (Envoi à livraison attestée) | Express Mail Inter-national |
|---|---|---|---|---|---|---|---|
| | Insured Parcel (Colis avec valeur déclarée) | | Insured Value (Valeur déclarée) | | Article Number | | |
| | Office of Mailing (Bureau de dépôt) | | | | Date of Posting (Date de dépôt) | | |

Addressee Name or Firm (Nom ou raison sociale du destinataire)

Inter Pool Cover Team

Street and No. (Rue et No.)

Aluknv Hz, Orel 18

Place and Country (Localité et pays)

518 21 Slatinany     Czech Republic

This receipt must be signed by: (1) the addressee; or, (2) a person authorized to sign under the regulations of the country of destination; or, (3) if those regulations so provide, by the employee of the office of destination. This signed form will be returned to the sender by the first mail.

(Cet avis doit être signé par le destinataire soit par une personne y autorisée en vertu des réglements du pays de destination, ou, si ces réglements le comportent, par l'agent du bureau de destination, et renvoyé par la première courrier directement à expéditeur.)

☐ The article mentioned above was duly delivered.
(L'envoi mentionné ci-dessus a été dûment livré.)

Date     16·8·2005

Signature of Addressee (Signature du destinataire) r.o.
du destinataire Orel 18, 538 21 Slatihany
v.p. 724 469 631 434 · tel 502 141 902, 724

Office of Destination Employee Signature
(Signature de l'agent du bureau du destination)

Postmark of the office of destination (Timbre du bureau de destination)

15.8.05~16

PS Form 2865, February 1997 (Reverse)

**A249**

**UNITED STATES POSTAL SERVICE**

**Return Receipt for International Mail**
(Registered, Insured, Recorded Delivery, Express Mail)

Postmark of the office returning the receipt.
Timbre du bureau renvoyant l'avis

Administration des Postes des États-Unis d'Amérique

*Par Avion*

Return by the quickest route (air or surface mail), a découvert and postage free,

The sender completes and indicates the address for the return of this receipt.
(A remplir par l'expéditeur, qui indiquera son adresse pour le renvoi du présent avis.)

Name or Firm *(Nom ou raison sociale)*

 Krol & OiSannay

A renvoyer par la voie la plus rapide (aérienne ou de surface), à découvert et en franchise de port.

320 W. 81st St
Street and Number *(Rue et no.)*

New York NY 10024
City, State, and ZIP + 4 *(Localité et code postal)*

USA

UNITED STATES OF AMERICA ‖‖‖ États-Unis d'Amérique

PS Form 2865, February 1997   *Avis de réception*   CN07 *(Old C5)*

**A250**

**KROL & O'CONNOR**

320 WEST 81ˢᵗ STREET
NEW YORK , NY 10024

PH. (212) 595-8009
FAX (212) 595-8149
KROL.law@aol.com

August 16, 2005

Dear Sir or Madam:

We represent Bob Brooks, the Chief Executive Officer and co-owner of Aqua Shield, Inc. This letter concerns the <u>infringement</u> of United States Patent Number 6,637,160, owned by Mr. Brooks, an apparatus for providing an enclosure for attachment to a building or for covering an area, and employed in Aqua Shield, Inc.'s telescopic swimming pool enclosures. Said patent was duly filed with the United States Patent and Trademark Office on July 10, 2001 and awarded to Mr. Brooks on October 28, 2003. Thus, Mr. Brooks has been granted, by the United States Government, the exclusive right to make, use, offer to sell, or sell his patented invention, within the United States, or to import said invention into the United States, as per 35 U.S.C. § 271(a). Any unauthorized manufacture, use, offer to sell, sale or importation of the invention covered by U.S. Patent 6,637,160 constitutes an infringement, resulting in severe civil penalties including an injunction, damages, and attorney's fees.

It has recently been brought to our attention that your company, Awesome Pool Products, is selling and distributing infringing pool enclosures within the United States, in violation of 35 U.S.C. § 271, and in abrogation of the rights awarded to Mr. Brooks by the grant of his patent. Without prejudicing or waiving Mr. Brook's right to seek further remedies or relief, this letter constitutes a formal demand upon you to cease and desist – immediately – and thereafter refrain from any further infringement of U.S. Patent 6,637,160.

In order to comply with this demand, you must immediately (i) remove and ensure the removal of any and all advertisements or other offers, in any media, to sell your infringing products, (ii) rescind and terminate any sales or outstanding offers to sell your infringing products, (iii) destroy or, in the alternative, dismantle and remove from the United States, all infringing products you may have already manufactured and imported into the United States, and (iv) abstain from any further manufacturing of your infringing products in the United States or any importation of your infringing products into the United States.

Under the provisions of 35 U.S.C. 271(a), et seq., the owner of a United States Patent may seek various remedies in the U.S. District Court for patent infringement, <u>e.g.</u>, injunctive relief, retroactive and constructive royalties, disgorgement of profits, recovery of any damages, costs of the action and reasonable attorneys' fees, and even an award of treble damages for willful infringement. Unless we obtain immediate satisfaction in this matter, our client will resort to legal remedies in order to vindicate his rights to the full extent provided by law.



PLAINTIFF'S
EXHIBIT
10

We expect to receive a communication from you or your counsel within ten (10) business days from the receipt of this letter, containing satisfactory assurances to the effect that the your company will comply with our demands and cease and desist from any further infringement of U.S. Patent 6,637,160.

Very truly yours,

Krol & O'Connor
320 West 81st Street
New York, New York 10024
(212) 595-8009

By: _____
Igor Krol

Subj: **general info**
Date: 8/30/2005 9:57:39 P.M. Eastern Standard Time
From: sales@awesomepoolproducts.com
To: aquashieldusa@aol.com

To: Bob Brooks

I received your notice of your patent and have stopped selling pool enclosures in the USA. I was not aware of your patent and I did not sell any pool enclosures in the USA.

Thanks,

Richard Barnes
Owner
Awesome Pool Products
801-825-8222
sales@awesomepoolproducts.com
http://www.awesomepoolproducts.com

**A253**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| AQUA SHIELD, INC., | ) |
| Plaintiff, | ) |
| v. | ) 05-CV-4880 (CBA) |
| INTER POOL COVER TEAM, | ) |
| Defendant. | ) |

### DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR INJUNCTION RELIEF

Defendant Inter Pool Cover Team ("IPC") hereby submits this Memorandum in opposition to the application for injunctive relief brought by plaintiff Aqua Shield, Inc. ("Aqua Shield").

## I. PRELIMINARY STATEMENT

For a variety of reasons, this Court should deny plaintiff's application for a temporary restraining order (TRO). Aside from plaintiff having utterly failed to identify a specific allegedly infringing product, or to make any showing whatsoever that any single product which IPC might display and offer for sale at the trade show in Orlando, Florida, infringes its patent, and aside from having entirely failed to demonstrate that it has met the formidable requirements for entry of a preliminary injunction, let alone a TRO, plaintiff has not even attempted to demonstrate that this Court has jurisdiction over IPC. In fact, plaintiff's Complaint does not even allege personal jurisdiction over IPC. Finally, defendant raises substantial issues of non-infringement and patent invalidity, which would be sufficient to defeat any showing of a likelihood of success on the merits, had plaintiff bothered to make such a showing.

## II. STATEMENT OF FACTS

Plaintiff charges IPC with infringement of U.S. Patent No. 6,637,160 ("the '160 patent"). IPC is a pan-European association of qualified manufacturers and traders who develop, produce and deal in swimming pool enclosures (see Exhibit A to the Declaration of Michael F. Sarney ("Sarney Decl."), submitted herewith.). IPC's primary place of business is located in the Czech Republic (Id.) (Complaint, ¶5). Significantly, customers cannot purchase IPC's products through the Internet website (Id.). As shown from the print out of its Internet website, IPC offers many models of pool enclosures (Id.).

## III. ARGUMENT

### A. Legal Standards

#### 1. Preliminary Injunction

A preliminary injunction is an extraordinary remedy and is an exception rather than the rule. GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984). Injunctive relief in patent cases is authorized by 35 U.S.C. §283. Preliminary injunctions in patent cases are controlled by the law of the Federal Circuit, rather than by the regional circuit, since they involve substantive issues unique to patent law. Hybritech Inc. v. Abbot Laboratories, 849 F.2d 1446, 1451 n. 12 (Fed. Cir. 1988); Easter Unlimited Inc. v. Rubie's Costume Company, Inc., 2000 WL 1341400, *3 (S.D.N.Y.). The decision whether to grant or deny a preliminary injunction is within the discretion of the district court. Genentech Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

In order to obtain a preliminary injunction in a patent infringement action, the moving party must establish: (1) a reasonable likelihood of success on the merits at trial; (2) irreparable harm if injunctive relief is not granted; (3) the balance of hardships tipping in its favor; and (4) the impact of the injunction on the public interest. Id.; Polymer Technologies Inc. v. Bridwell,

103 F.3d 970, 973 (Fed. Cir. 1996); Hybritech, 849 F.2d at 1451. To demonstrate a likelihood of success, the moving party must show that, in light of the presumptions and burdens that will attach at trial, it will likely prove infringement of the patent, and that it will likely withstand any alleged challenge to the validity and enforceability of the patent. Genentech, 108 F.3d at 1364; New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882-83 (Fed. Cir. 1992).

Thus, in order to demonstrate a likelihood of success on the merits of its infringement claim, plaintiff must show that it will likely prove that a particular pool cover offered for sale by IPC infringes a specific claim of the patent in suit, and that its infringement claims will withstand IPC's defense that the asserted patent claims are invalid. Genentech, 108 F.3d at 1364 (emphasis added). In other words, if IPC raises a "substantial question" concerning validity, enforceability, or infringement (i.e., asserts a defense that plaintiff cannot show "lacks substantial merit") the preliminary injunction should not issue. Id., citing New England Braiding, 970 F.2d at 882-83.

### 2.    Personal Jurisdiction

A plaintiff bears the burden of proving a Court's personal jurisdiction over a defendant. American Para Professional Systems, Inc. v. Labone, Inc., 175 F.Supp.2d 450, 454 (E.D.N.Y. 2001); Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). A district court has no power to grant an injunction against a party over whom it has not acquired valid jurisdiction. Weitzman v. Stein, 897 F.2d 653, 658 (2d Cir. 1990); Visual Sciences, Inc. v. Integrated Communications Inc., 660 F.2d 56, 59 (2d Cir. 1981) (where a plaintiff seeks preliminary injunctive relief, a district court must have personal jurisdiction over the defendant before it can validly enter even an interlocutory injunction).

A prima facie showing of jurisdiction is insufficient where a party seeks injunctive relief. Weitzman, 897 F.2d at 658; American Para Professionals, 175 F.Supp.2d at 454. Rather, where

a challenge to jurisdiction is interposed on an application for a preliminary injunction, the plaintiff is required to adequately establish that there is at least a reasonable probability of ultimate success upon the question of jurisdiction when the action is tried on the merits. Visual Sciences, 660 F.2d at 59; American Para Professionals, 175 F.Supp.2d at 454.

### 3. Patent Infringement

A determination of patent infringement requires a two-step analysis. First, the applicable claim of the patent must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device. Terlep v. The Brinkmann Corp, 418 F.3d 1379, 1381 (Fed Cir. 2005). Claim construction is an issue of law. Id. Infringement, whether literal or under the doctrine of equivalents, is a question of fact. Id.at 1383.

It is the claims of the patent which provide the concise formal definition of the invention, and the words of the claim must be "read on" the accused structure to determine whether each of the limitations recited in the claim is present in the accused structure. Corning Glass Works v. Sumitomo Electric USA Inc., 868 F.2d 1251, 1259 (Fed. Cir. 1989). For a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device. Terlep, 418 F.3d at 1384-85; Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1196 (Fed. Cir. 1994). If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law. Bayer AG v. Elan Pharmaceutical Research Corp., 212 F.3d 1241, 1247 (Fed. Cir. 2000).

If an asserted claim does not literally read on an accused product, infringement may still be found under the doctrine of equivalents, if there is not a substantial difference between the limitations of the claim and the accused product. Bayer, 212 F.3d at 1250. Relevant to this inquiry is whether the element not literally present in the accused device performs substantially

the same function in substantially the same way to achieve substantially the same result. Eagle

Comtronics, Inc. v. Arrow Communication laboratories, Inc., 305 F.3d 1303, 1315 (Fed. Cir.

2002); Wolverine, 38 F.3d at 1196. However, to determine whether there is infringement under

the doctrine of equivalents, the patentee must still demonstrate that each element or its

substantial equivalent is present in the accused device. Eagle, 305 F.3d at 1315; Wolverine, 38

F.3d at 1196. Moreover, the doctrine of equivalents analysis must be applied to individual claim

limitations, not to the invention as a whole. Terlep, 418 F.3d at 1384-1385; Eagle, 305 F.3d at

1315; Warner Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 40, 117 S.Ct. 1040, 137

L.Ed.2d 146 (1997). Infringement under the doctrine of equivalents is a question of fact. Bayer,

212 F.3d at 1251.

**B.    Plaintiff Fails to Demonstrate a Likelihood of Success on the Merits**

      Plaintiff utterly fails to demonstrate a likelihood of success on the merits of its claim for

patent infringement.

      **1.    Plaintiff Cannot Demonstrate a Likelihood of Success if the Court Lacks
Personal Jurisdiction Over IPC**

      Incredibly, plaintiff's Complaint fails to even allege personal jurisdiction over IPC. On

the other hand, the Complaint does allege that IPC is headquartered in the Czech Republic.

Finally, the Complaint fails to allege any connection at all between IPC and this judicial district,

or the State of New York. Thus, plaintiff has failed to make even a prima facie showing of

jurisdiction, let alone a showing sufficient to meet the higher standard required for entry of an

injunction. See Weitzman, 897 F.2d at 658 (injunction improperly entered because it was not

clearly established that the court had jurisdiction over the party).

      Furthermore, it is submitted that, since plaintiff is seeking to enjoin IPC from appearing

at the trade show in Orlando, Florida, it is in that judicial district which plaintiff should properly

have sought injunctive relief. As such, even if this Court somehow possesses jurisdiction over IPC, venue would be improper.

Accordingly, this Court may not enter an injunction against IPC, at least not at this time, since plaintiff has not clearly established that the Court has personal jurisdiction over IPC, nor has it even established a reasonable probability of success on the question of jurisdiction. Id.; Visual Sciences, 660 F.2d at 59; American Para Professionals, 175 F.Supp.2d at 456. Plaintiff's application for injunctive relief must therefore be denied.

### 2.    Plaintiff Fails Even to Demonstrate That It Has Standing to Bring Its Claim

A party has standing to bring an action for patent infringement only if it is the patentee, a successor in title to the patentee, or an exclusive licensee of the patent at issue. Giantceutical, Inc. v. Ken Mable, Inc., 356 F.Supp.2d 374, 377 (S.D.N.Y. 2005). A party is an exclusive licensee if it "possess all substantial rights in the patent." Id., quoting Fieldturf, Inc. v. Southwest Recreational Industries, 357 F.3d 1266, 1268 (Fed. Cir. 2004).

Here, Mr. Brooks is identified as the patentee on the face of the patent. Mr. Brooks also admits that he is the holder of the patent (Brooks Affidavit, ¶2). Yet, Mr. Brooks has not been named as a plaintiff.

With respect to Aqua Shield itself, Mr. Brooks states only that Aqua Shield manufactures the patented invention with his permission, and that Aqua Shield is the only entity with such permission (Brooks Affidavit, ¶3). No evidence is offered to support these assertions. Moreover, plaintiff fails to make any showing that it is an exclusive licensee, and in particular, that it possesses all substantial rights in the patent." Giantceutical, 356 F.Supp.2d at 377. Indeed, the only evidence of record, the patent itself, shows that Mr. Brooks possesses substantial rights

in the patent. In short, there is no showing that Mr. Brooks transferred all substantial rights to Aqua Shield.

Thus, it appears that Aqua Shield may not have standing, and that Mr. Brooks must be named as a plaintiff. Accordingly, the application for injunctive relief should be denied for this reason as well, since plaintiff has failed to demonstrate a likelihood of success, in that it has failed to demonstrate that it has standing.

### 3. Non-Infringement

#### a. Plaintiff Fails to Show That Any IPC Product Infringes the Patent

Incredibly, plaintiff seeks to have IPC enjoined from displaying all of its telescopic pool enclosures at the Florida trade show, without any demonstration whatsoever that any of such products are infringing. A broad sweeping injunction against all of IPC's pool cover products is not permissible absent a showing that each product itself is likely to infringe, since every order granting an injunction or restraining order, pursuant to Rule 65(d) Fed.R.Civ.P., must be specific in terms and must describe in reasonable detail the act or acts sought to be restrained.

Yet, plaintiff itself states only that "most" of IPC's telescopic pool enclosures fall within the scope of the claims of the '160 patent (Plaintiff's Memorandum of Law, p. 5). Thus, plaintiff is actually asking this Court to enjoin IPC from showing **non-infringing** products at the Florida trade show. Plaintiffs' application for injunctive relief should therefore be denied outright for failing to even identify a single allegedly infringing product.[1]

---

[1] IPC submits that the request for such relief is not only frivolous, by is in fact offensive to the judicial process, and therefore warrants the imposition of sanctions against plaintiff.

Furthermore, plaintiff addresses the issue of infringement only in the most conclusory manner possible. Plaintiff even fails to apply the correct legal standard for proving infringement.

Plaintiff relies on Mr. Brooks' affidavit, but Mr. Brooks makes only the conclusory statement that IPC's telescopic pool enclosures "embody the subject matter covered by the '160 patent" (Brooks Affidavit, ¶5). This is not evidence, and it is wholly inadequate. Mr. Brooks fails to identify specifically which products allegedly infringe. Likewise, he fails to identify which claims of the patent are allegedly infringed. Moreover, and most importantly, he fails to make any showing at all that any particular IPC product includes every element recited in any particular claim, either literally or under the doctrine of equivalents. Yet, plaintiff unbelievable asserts that it has presented clear evidence of infringement (Plaintiff's Memorandum, p. 5). Accordingly, because plaintiff fails to demonstrate, in a specific product, the presence of each limitation of a particular claim, or its substantial equivalent, injunctive relief must be denied.

Turning to the '160 patent itself, claim 1 recites the following:

An apparatus for providing an enclosure for attachment to a building or for covering an area, comprising:

    a) a plurality of arcuate panels, said panels having a first and second end, and a first and second side, wherein said panels are generally rectangular, planar panels;

    b) a plurality of arcuate frame members, said frame members having a first and second end and a first and second side for receiving said panels, and an inner an outer surface;

    c) a pair of end panels for attachment to the ends of the enclosure to complete the enclosure;

    d) means for a plurality of horizontal frame members whereby the ends of the arcuate frame members are secured;

    e) means for a plurality of rollers disposed on said horizontal frame members whereby said horizontal frame members are movable thereon;

**A261**

f) means for a plurality of horizontal rails whereby the rollers are rollable thereon and the rails are able to be attached to a foundation; and

g) wherein said plurality of arcuate panels and said plurality of arcuate frame members are sized so that arcuate panels and arcuate frame members of smaller diameter are disposed toward the interior of said panels and frame members of larger diameter so that said panels and frame members are able to telescope one within each other, wherein said arcuate panels approximate the shape of one of a circumference of half a circle or one-fourth an ellipse and said end panels are generally flat and removable.

Accordingly, in order to demonstrate a likelihood of success on the issue of infringement, plaintiffs must demonstrate that each and every limitation of claim 1 is present in at least one specific IPC pool cover, either literally or under the doctrine of equivalents. Genentech, 108 F.3d at 1364.[2]

This plaintiff entirely fails to do. As stated above, plaintiff fails to identify which products are infringing, and fails to compare each element of claim 1 with any particular product. Thus, plaintiff has not met its burden of showing a likelihood of success on the issue of infringement, and the application for injunctive relief must be denied.

**b.    IPC's Products Do Not Infringe**

The requested injunctive relief must also be denied because IPC raises substantial questions regarding the alleged infringement. As mentioned, plaintiff only refers to IPC's products by reference to IPC's website, which shows many different pool enclosures (Sarney Decl., Exh. A). Of those, however, at least five were offered for sale by IPC in 2000 and spring/summer of 2001, prior to Mr. Brooks having even filed for his patent in July 2001 (See

---

[2] Claims and 2 through 16 of the '160 patent are dependent on claim 1, and therefore cannot be infringed absent infringement of independent claim 1. See Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989); London v. Carson Pirie Scott & Co., 946 F.2d 1534, 1539 (Fed. Cir. 1991). Analysis of claims 2-16 are therefore unnecessary for the purposes of this motion.

A262

IPC price lists, Sarney Decl., Exh. B). Accordingly, if those five products are alleged to be infringing, then the '160 patent would be invalid. Of course, as discussed, plaintiff has entirely failed to identify, let alone demonstrate, which models are allegedly infringing.

Furthermore, some of IPC's pool enclosures do not include "a pair of end panels," some do not include "horizontal rails," some do not include "rectangular panels," and some do not include "horizontal frame members." Each of these elements are required by claim 1, and the absence of any one of them in a particular pool enclosure product renders such product non-infringing. Terlep, 418 F.3d at 1384-85; Wolverine, 38 F.3d at 1196.

Thus, even if the Court determines that IPC has not proved that its products do not read on claim 1 of the '160 patent, which it would be hard pressed to do, in the context of this expedited motion, IPC has at least demonstrated that there are substantial questions as to whether infringement exists. Plaintiff has therefore failed to demonstrate a likelihood of success on its claim of infringement for this reason as well. Accordingly, plaintiff's application for injunctive relief should be denied on this basis, at least, since "a denial of a preliminary injunction does not require that non-infringement be clear beyond all question." Illinois Tool Works v. Grip-Pak, Inc., 906 F.2d 679, 682 (Fed. Cir. 1990).

4.    **Invalidity of the '160 Patent**

Pursuant to 35 U.S.C. §282, a patent is presumed valid. This presumption, however, like all presumptions, is a procedural device which merely places the burden on the defendant to raise substantial issues of invalidity or unenforceability. New England Braiding, 970 F.2d at 882. Moreover, the presumption does not relieve a patentee who moves for a preliminary injunction from carrying the normal burden of demonstrating that it will likely succeed on all disputed liability issues at trial, even when the issue concerns the patent's validity. Genentech, 108 F.3d at

1364, n. 2, quoting New England Braiding, 970 F.2d at 882; Nutrition 21 v. Thorne Research, Inc., 930 F.2d 867, 869 (Fed. Cir. 1991) ("at the preliminary injunction stage, because of the extraordinary nature of the relief, the *patentee* carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement") (emphasis in original).

As discussed above, at least five of the pool enclosures shown on IPC's website were offered for sale by IPC before Mr. Brooks even filed for his patent. Thus, any one of these could render the '160 patent invalid, particularly if plaintiff alleges infringement by such product(s).

Further, one of the elements of claim 1 of the '160 patent is "a means for a plurality of horizontal rails." IPC has used a plurality of horizontal rails for its pool enclosures since at least February 4, 2000, as depicted in the engineering schematic drawing of the rails used by IPC in connection with at least some of its pool enclosures (Sarney Decl., Exhibit C). As such, this raises a substantial question of validity.

Furthermore, several other publications and foreign patents, dated prior to Mr. Brooks' having filed his patent application, show some, if not all of the elements of the claimed invention. First, a 1986 French patent shows arc shaped telescoping roofing elements of a pool enclosure installed on removable rails (See Sarney Decl. Exh. D). Second, a brochure for Arqualand pool enclosures states that the company has been constructing pool enclosures for 35 years (Sarney Decl., Exh. E). A comparison of the pictures of the depicted Arqualand enclosures, when compared to a picture of plaintiff's pool enclosure (Sarney Decl., Exh. F), shows a remarkable similarity, including arc roofing elements on rails.

Next, a 1981 Australian patent shows these same elements (Sarney Decl., Exh. G). Finally, the advertisement for Eureka states that it has been manufacturing telescopic pool

enclosures for the last 20 years. The pictures of this product again show most, if not all of the elements of claim 1 of the '160 patent (Sarney Decl., Exh. H).

While IPC does not contend that this showing is sufficient to prove invalidity, it does submit that, at this stage, and given the very short time to respond plaintiff's expedited application, IPC has, at least, demonstrated that their are substantial issues relating to the validity of the '160 patent. Accordingly, for this reason as well, plaintiff's application for injunctive relief should be denied.

## C.    Plaintiff's Failure to Show Irreparable Harm

The focus of the irreparable injury inquiry is harm that is impossible to measure in monetary terms. Drexelbrook Controls v. Magnetrol International Inc., 720 F.Supp. 397, 407 (D. Del. 1989), citing Atlas Powder Co. v. Ireco Chemicals, 773 F.2d 1230, 1233 (Fed. Cir. 1985). "Without a clear showing of validity and infringement, a *presumption* of irreparable harm does not arise in a preliminary injunction proceeding." Nutrition 21, 930 F.2d at 871 (emphasis in original).

Since it has not made such a clear showing, plaintiff is not entitled to the presumption. Moreover, plaintiff has failed to demonstrate any reason why it would not be fully compensated by an award of monetary damages, should it be successful in its effort to prove infringement in this case. Mr. Brooks' unsupported speculation as to the loss of market and the inability to charge a premium for his products is not entitled to any probative value as part of the Court's consideration of this issue. Nutrition 21, 930 F.2d at 871 ("neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to

A265

trial"). See also <u>Giantceutical</u>, 356 F.Supp.2d at 381 (unsupported claim of alleged loss of market share inadequate to demonstrate irreparable harm).

**D.    The Balance of Hardships Do Not Weigh in Plaintiff's Favor**

The third factor to be considered on a motion for a preliminary injunction is the balance of hardships. <u>Easter Unlimited</u>, 2000 WL 1341400, *9. Under this factor, the district court must balance the harm that will occur to the moving party from the denial of the injunction with the harm that the non-moving party will incur if the injunction is granted. <u>Id.</u>, quoting <u>Hybritech</u>, 849 F.2d at 1457. A preliminary injunction is a "drastic remedy," and the "hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating." <u>Easter Unlimited</u>, 2000 WL 1341400, *9, quoting <u>Illinois Tool Works, Inc.</u> <u>v. Grip-Pak, Inc.</u>, 906 F.2d 679, 683 (Fed. Cir. 1990).

Here, given the complete failure of plaintiff to demonstrate a likelihood of success, or irreparable harm, the balancing of harm is decidedly in IPC's favor, and the equities cannot support imposition on IPC of the drastic remedy of a TRO or a preliminary injunction.

**E.    The Public Interest Would Not be Served by Entry of an Injunction**

The fourth factor to be considered is the impact of the injunction on the public interest. <u>Id.</u> at *10. While there is a public interest in the protection of patent rights, this interest is counterbalanced by the accused infringer's right to compete before a trial on the merits can be concluded. <u>Id.</u>; <u>Giantceutical</u>, 356 F.Supp.2d at 382. Here, there is no basis for finding that the public interest would be served by preventing IPC from competing at the Orlando trade show.

**IV. CONCLUSION**

For the foregoing reasons, plaintiff has entirely failed to demonstrate that it is entitled to the injunctive relief which it seeks. Plaintiff has failed to show that this Court has jurisdiction

over IPC, that it has standing to bring this action, that any particular IPC product includes every element recited in claim 1 of the '160 patent, or its substantial equivalent, and that its patent is not invalid. Plaintiff's application should therefore be denied.

Dated: October 24, 2005                    KATTEN MUCHIN ROSENMAN L.L.P.


By: _____
Michael F. Sarney (MS3755)
Samson Helfgott (SH3614)
Jan
575 Madison Avenue
New York, New York 10022
Tel: (212) 940-8800
Fax: (212) 940-8776

Attorneys for Defendant

**PROOF OF SERVICE**

I hereby certify that on the 14th day of June, 2016, I electronically filed the Corrected Joint Appendix (Volume I) in PDF-OCR format via the Electronic Case Filing System.

I hereby certify that on the 14th day of June, 2016, I caused one (1) copy of the Corrected Joint Appendix (Volume I) in PDF-OCR format to be served upon the attorneys listed below via the Electronic Case Filing System.

Todd E. Zenger, Esq.
Kirton McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah 84111
tzenger@kmclaw.com

By: */s/ Gregory J. Coffey*
     Gregory J. Coffey
     **COFFEY & ASSOCIATES**
     310 South Street
     Morristown, New Jersey 07960
     (973) 539-4500 – Phone
     (973) 539-4501 – Fax
     gjc@coffeylaw.com - Email
     Counsel for Appellants

Dated: June 14, 2016